**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

Haymarket DuPage LLC.,

    Plaintiff,

v.

Village of Itasca, Itasca Plan Commission, Itasca Fire Protection District No. 1, Itasca Mayor Jeffrey Pruyn in his official capacity, Itasca Public School District 10, and Itasca Public School District 10 Superintendent Craig Benes in his official capacity,

    Defendants.

Case No. 22-CV-160

**JURY TRIAL DEMANDED**

**<u>COMPLAINT</u>**

# **Table of Contents**

INTRODUCTION AND SUMMARY OF CLAIMS ................................................................. 1

JURISDICTION AND VENUE ......................................................................................... 9

PARTIES ..................................................................................................................... 9

STATUTORY AND REGULATORY FRAMEWORK ........................................................ 12

    Fair Housing Act ..................................................................................................... 12

    Americans with Disabilities Act .............................................................................. 14

    Section 504 ............................................................................................................ 18

    Illinois Municipal Code .......................................................................................... 19

STATEMENT OF FACTS .............................................................................................. 21

    The Need for Substance Use Treatment in DuPage County ...................................... 21

    Haymarket Center ................................................................................................... 22

    Haymarket DuPage ................................................................................................. 23

    Itasca Deliberately Misclassifies the Project ........................................................... 25

    Public Opposition by Itasca's Mayor ....................................................................... 32

    Fire District Opposition .......................................................................................... 36

    Opposition by Itasca Residents ............................................................................... 37

    Zoning Applications Meet Their Burden under the Zoning Ordinance ....................... 41

    Impact on EMS ...................................................................................................... 46

    The Bridge Development ......................................................................................... 50

    Itasca School District Opposition ........................................................................... 52

    Public Questioning and Comment ............................................................................ 55

        *2019 Public Questioning* ................................................................................. 55

        *Public Questioning and Comment in 2020/2021* ............................................... 58

    Procedural Anomalies ............................................................................................. 61

    Haymarket Reaffirms Conditions ............................................................................ 65

    Village Board Denies Haymarket Proposal .............................................................. 66

    Defendants' Actions Injured Haymarket .................................................................. 68

CLAIMS ..................................................................................................................... 70

    COUNT I: FAIR HOUSING ACT ......................................................................... 70

        *Itasca and Itasca Plan Commission ("Itasca Defendants")* ................................. 70

    COUNT II: FAIR HOUSING ACT ........................................................................ 71

        *Itasca Fire Protection District No. 1* ................................................................ 71

i

COUNT III – FAIR HOUSING ACT ................................................................. 73

    *Itasca Public School District 10* .............................................................. 73

COUNT IV – FAIR HOUSING ACT ................................................................. 74

    *Jeffrey Pruyn (Official Capacity)* ........................................................... 74

COUNT V – FAIR HOUSING ACT ................................................................... 76

    *Craig Benes (Official Capacity)* ............................................................. 76

COUNT VI: TITLE II OF THE ADA ................................................................. 77

    *All Defendants* ......................................................................................... 77

COUNT VII: SECTION 504 OF THE REHABILITATION ACT ....................... 79

    *Itasca Defendants* .................................................................................... 79

COUNT VIII: ILLINOIS STATE LAW ............................................................. 80

    *Itasca Defendants* .................................................................................... 80

**PRAYER FOR RELIEF** ................................................................................... **82**

**JURY DEMAND** ............................................................................................... **84**

Haymarket DuPage LLC, for its Complaint against Defendants Village of Itasca, Itasca Plan Commission, Itasca Fire Protection District No. 1, Itasca Mayor Jeffrey Pruyn in his official capacity, Itasca Public School District 10, and its Superintendent Craig Benes in his official capacity (collectively, "Defendants"), states as follows:

**INTRODUCTION AND SUMMARY OF CLAIMS**

1. Plaintiff Haymarket DuPage LLC ("Haymarket" or "Haymarket DuPage") brings an action for declaratory judgment, permanent injunctive relief, and damages under the Fair Housing Amendments Act, 42 U.S.C. §3602 *et seq*. ("FHA"); Title II of the Americans with Disabilities Act, 42 U.S.C. §12101 *et seq.* ("ADA"); and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 *et seq*. ("Section 504"). This Complaint arises out of Defendant Village of Itasca and Defendant Itasca Plan Commission's (collectively, the "Itasca Defendants"): (a) refusal to allow Haymarket DuPage to operate a healthcare facility in Itasca, which is permitted as a special use under existing zoning law in Itasca; (b) requirement that Haymarket DuPage submit a zoning application as a planned development (rather than as a healthcare facility) and an application for Class 1 Site Plan Review; (c) denial of both applications; and (d) failure to comply with applicable zoning procedures while hearing and denying Haymarket DuPage's zoning applications. It also arises out of all Defendants' intentional and orchestrated discriminatory conduct across Itasca's key governmental entities designed to interfere with the rights of Haymarket, the people with disabilities it serves, and their families. Defendants' concerted actions to delay and refuse operation of Haymarket DuPage's healthcare facility have had, and will continue to have, devastating consequences to Haymarket, and to citizens in Itasca,

DuPage County, and the collar county region who increasingly need treatment for substance use disorders and related mental health disabilities, but who are unable to find sufficient treatment.[1]

2.      This Complaint is also filed pursuant to this Court's supplemental jurisdiction under 28 U.S.C. §1367 and the Illinois Municipal Code, 65 ILCS §5/11-13-25, authorizing *de novo* review of municipal zoning decisions.

3.      Haymarket Center, whose main location is in Chicago's West Loop, is the metropolitan area's largest and most comprehensive non-profit provider of treatment for substance use disorders and mental health disabilities. Haymarket Center is unique among substance use and mental health treatment facilities in the area because it accepts individuals for treatment regardless of their ability to pay, and provides wrap-around services including primary health care, GED preparation, and career counseling and placement. About 70-75% of Haymarket's patients rely on Medicaid, and 25-30% have no insurance and rely on state-funded programs.

4.      From 2017 to 2018, nearly 2,000 men and women from DuPage County and other collar counties received treatment at the West Loop location. In April 2019, to respond to the need for its services in DuPage County and the collar counties, Haymarket Center contracted to buy a 168 room, multi-story Holiday Inn hotel at 860 W. Irving Park Road in Itasca ("Property"), a suburb in DuPage County. The seven-acre Property is adjacent to Interstate 290 West on one side and a business park on the other, and is far from residential neighborhoods. It is in a zoning area designated by Itasca as a B-2 district, which allows healthcare facilities as a special use.

---

[1] On November 17, 2021, the Centers for Disease Control and Prevention reported the U.S. recorded its highest number of drug-overdose deaths in a 12-month period. Kamp, Jon, *Drug Overdose Deaths, Fueled by Fentanyl, Hit Record High in U.S.,* Wall Street Journal (November 17, 2021) *available at* https://www.wsj.com/articles/drug-overdose-deaths-fueled-by-fentanyl-hit-record-high-in-u-s-11637161200.

Haymarket Center seeks to operate the Haymarket DuPage facility in addition to its existing Chicago facility.

5.      After considerable planning for contingencies and multi-disciplinary medical, psychiatric, social service, support, and security staffing levels, Haymarket DuPage sought approval to operate a healthcare facility that would offer a full continuum of health care services including diagnosis, treatment, and recovery support for persons over 18 with substance use and mental health disabilities. Haymarket DuPage's patients are considered people with disabilities under the FHA, ADA, and Section 504.

6.      Haymarket DuPage's proposal to operate its healthcare facility in Itasca garnered support from local, regional, state, and national experts on substance use treatment. The supporters included health care organizations, state agencies, advocacy groups, and other providers such as: Edward-Elmhurst Hospital; Advocate Medical Group; Cook County Health; National Alliance on Mental Illness – DuPage; Thresholds; Northwestern Medicine at Central DuPage Hospital; Loyola Medicine; Kenneth Young Center; Rush University Health System; DuPage County Medical Society; Illinois Primary Health Care Association; Illinois Association for Behavioral Health; Heartland Alliance Health; League of Women Voters of Roselle-Bloomingdale, Elmhurst, Arlington Heights-Mt. Prospect, Buffalo Grove-Wheeling-Prospect Heights-Elk Grove Village, Naperville; Hope for Healing; LTM Foundation; Live4Lali; DuPage County Sherriff; DuPage County Health Department; NAMI DuPage; DuPage County HOPE

Task Force; DuPage County NAACP; National Safety Council (based in Itasca); National Council for Behavioral Health; The Kennedy Forum; and many others.[2]

7.      Haymarket DuPage's proposal also drew considerable opposition from the Itasca Defendants, Mayor Jeffrey Pruyn, Itasca Public School District 10 and its Superintendent Craig Benes, Itasca Fire Protection District No. 1, and Itasca residents. Itasca's governmental entities and residents pulled their forces together in a strategy to drive out Haymarket and the people with disabilities it treats. Opposition in this regard included: an organized march on September 18, 2019, during which more than a thousand individuals walked the streets of Itasca wearing "small town proud" t-shirts and carrying "No Haymarket" signs, led by an individual using a bullhorn and chanting the words "no Haymarket" and "small-town proud"; a dedicated opposition website managed by Itasca residents; a "No Haymarket Itasca" Facebook page focused on opposition; campaign-style yard signs that read "No Haymarket" posted throughout Itasca; and public testimony and questioning against Haymarket DuPage during the zoning hearings in Itasca. Defendants strategically fostered, intentionally contributed to, and were unduly negatively influenced by this "not in my backyard" opposition.

8.      The zoning hearing process began in 2019 and lasted over two years, during which time Haymarket was required to undergo more than 35 hearings and incur considerable expense. The unprecedented number of hearings, fraught with discriminatory procedural irregularities, was due in large part to Itasca Defendants' deliberate misclassification of Haymarket DuPage's proposal as a "planned development" instead of a special use permitted as a "healthcare facility" under its Zoning Ordinance. As a result, Haymarket DuPage was held to a

---

[2] List of Individuals, Community Groups, Health Care Providers, Organizations, Elected Officials, and Governmental Agencies supporting Haymarket DuPage's proposed facility in Itasca *attached as* Exhibit A; *see also* https://www.haymarketdupage.org.

higher and more onerous standard than would have been required had it been allowed to apply for a special use as a healthcare facility. Further, when Haymarket DuPage requested that Itasca Defendants modify this zoning classification as a reasonable accommodation under civil rights laws, they refused.[3]

9.      Itasca Defendants strategically granted Defendant Fire Protection District No. 1 ("Fire District"), Defendant Itasca Public School District 10 ("School District"), and a group of Itasca residents and businesses ("Neighborhood Opposition") (collectively the "Objectors") unprecedented standing as parties to oppose Haymarket DuPage in the zoning proceedings, which they took full advantage of by providing false and/or erroneous evidence. In addition to the traditional right to provide testimony and cross-examine witnesses, the Itasca Defendants allowed the Objectors to, among other things, submit proposed findings of fact[4] and provide closing statements before the Plan Commission vote on the Haymarket DuPage proposal.

10.      The Neighborhood Opposition included a group of individual residents self-identified as the Concerned Citizens of Itasca ("Concerned Citizens"), several individual single-family home owners, and two businesses located within 250 feet of the Property. They were all represented by a common attorney. Throughout the course of the hearings, this attorney presented conflicting information on who his actual clients were and, in fact, he himself owned several of the named "objecting" properties. Itasca permitted the Neighborhood Opposition a formal means to insert discriminatory and misleading information into the required zoning

---

[3] On November 24, 2021, the United States Department of Justice issued a letter to Itasca Mayor Jeff Pruyn to notify Itasca that the U.S. Attorney's Office for the Northern District of Illinois had initiated an investigation of Itasca's compliance with Title II of the Americans with Disabilities Act in regard to its handling of the zoning applications of Haymarket DuPage. The letter notes that Title II of the Americans with Disabilities Act prohibits discrimination against individuals with disabilities, including individuals with substance use disorder. On December 2, 2021, Pruyn published the letter, *attached as* Exhibit B, on Itasca's web site.
[4] While granted the right to submit proposed findings of fact, the Objectors decided not to submit recommended findings.

process and record, and directly and offensively to interrogate witnesses, such as witnesses whose family members or friends had died because of the lack of services that Haymarket would provide in DuPage County, and witnesses who were themselves people with substance use disorder.

11.    Defendants worked in concert with each other and the Neighborhood Opposition to orchestrate the opposition to Haymarket DuPage, and to craft and present pretextual bases to ultimately deny Haymarket the right to operate its desperately-needed facility.

12.    Defendants School District and its Superintendent Craig Benes ("Benes") opposed Haymarket DuPage. Through Benes' public statements about how Haymarket DuPage might affect the School District, they intentionally disseminated inaccurate and misleading information to create fear of Haymarket DuPage, its patients, and their families. In particular, Benes and through him, the School District, raised the fear that: children whose mothers were patients in Haymarket DuPage's proposed Mother and Child Program would necessarily have disabilities, need special education services, and/or be homeless; the children of other patients at Haymarket DuPage would necessarily be homeless and be allowed to seek educational services in Itasca based on that status; and Haymarket DuPage patients themselves who are over the age of 18 would have disabilities and require special education services, and demand educational opportunities at the local high school district. The School District and Benes alleged all of this would cost the School District significant additional funding per pupil.

13.    Due to the School District's and Benes' conduct, Haymarket DuPage voluntarily withdrew its Mother and Child Program when it submitted its amended zoning application. Even so, because of the School District's and Benes' public and formal opposition to the children who could accompany their mothers into treatment at Haymarket DuPage, the Itasca Defendants

insisted on a condition that should Haymarket DuPage be approved, it would have to undergo a new zoning process to seek approval to operate the program if Haymarket later determined the Mother and Child Program was needed in Itasca. Moreover, even after Haymarket DuPage voluntarily withdrew its Mother and Child Program, the School District and Benes continued to oppose Haymarket DuPage.

14.     Against the backdrop of their discriminatory stereotyping of Haymarket's mission and the patients it would serve, Defendants focused their pretextual basis for denial of Haymarket's healthcare facility on a false claim that the presence of Haymarket DuPage in Itasca would unduly and adversely affect the provision of emergency medical services ("EMS") to Itasca residents. This claim was based on biased speculation about how many EMS calls would be made to the Fire District by Haymarket DuPage.

15.     Haymarket DuPage took several steps to assuage the pretextual claim that its presence would adversely affect the provision of EMS to the residents of Itasca:

   a.   First, Haymarket DuPage presented evidence that its potential EMS needs would fall well below the Fire District's current and future capacity to address EMS calls.

   b.   Second, Haymarket DuPage contracted with Elite Ambulance, the second-largest private ambulance company in Illinois, to respond to its basic life support calls, thus reducing the EMS response burden on the Fire District.

   c.   Third, Haymarket DuPage emphasized it would have trained medical staff on-site 24 hours a day, seven days a week, and 365 days a year. Because of this support, Haymarket DuPage would be able to address certain medical needs in-house, which would eliminate the need to call for EMS. In addition, because of in-house medical staff, Haymarket would implement a triage plan to direct when to call Elite Ambulance or 911 for EMS services, which would avoid unnecessary calls for 911 assistance by the Fire District.

   d.   Fourth, Haymarket DuPage agreed to maintain a contract with a private ambulance service at all times.

   e.   Fifth, Haymarket DuPage offered to contract with a second ambulance company, if necessary, to obviate any EMS burden on the Fire District.

    f.   Sixth, Haymarket offered to meet regularly with Itasca police and fire representatives to develop a mutually-agreed upon EMS plan.

    g.   Finally, Haymarket DuPage formally offered to abide by the above terms as conditions for zoning approval.

16.    Defendant Plan Commission presided over the multi-year hearing process. During those hearings, Haymarket submitted all required evidence to meet the Itasca zoning ordinance standards for (a) a special use as a planned development and (b) site plan review in Itasca's B-2 District. It also squarely addressed pretextual concerns about EMS, and even further offered to be bound by a set of conditions to alleviate all pretextual concerns raised. As such, there was no legitimate basis under the plain operation of Itasca's zoning ordinance for Itasca to reject the applications.

17.    Nevertheless, on September 22, 2021, while a group led by the Neighborhood Opposition held "No Haymarket" signs, spoke with the media, and honked their horns outside Village Hall, the Plan Commission held a 45-minute hearing during which they failed to discuss and ignored the extensive record of evidence, and recommended unanimously to deny Haymarket DuPage's applications for zoning relief. Thereafter, on November 2, 2021, in a meeting that lasted only 17 minutes, the Village Board accepted the Plan Commission's recommendation and voted to reject Haymarket DuPage's request for zoning approval. The meeting began with a charged statement by Mayor Pruyn in opposition to Haymarket DuPage.

18.    Because of the Defendants' unlawful and discriminatory actions, Haymarket DuPage is unable to offer its life-saving treatment to scores of patients in and around Itasca, DuPage County, and the collar counties, and has suffered significant damages. To remedy the discrimination and continuing harm, Haymarket DuPage seeks declaratory and injunctive relief, compensatory damages, punitive damages, and attorneys' fees and costs.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C.

§1331, 42 U.S.C. §3613(a), 42 U.S.C. §12133, and 29 U.S.C §794a. This Court has

supplemental jurisdiction over *de novo* review of the zoning procedures under 28 U.S.C. §1367.

20.      Haymarket DuPage's claims for declaratory and injunctive relief are authorized

under 28 U.S.C. §§2201-02 and 42 U.S.C. §3613(c)(1).

21.     Venue is proper in the Northern District of Illinois under 28 U.S.C. §1391(b)

because Defendants reside there and all of the events or omissions giving rise to Haymarket

DuPage's claims arose there.

## PARTIES

22.     Haymarket DuPage LLC is an Illinois limited liability company, managed by

McDermott Center d/b/a Haymarket Center, an Illinois not-for-profit corporation that is a state-

licensed substance use and mental health treatment and intervention service provider under 77

ILCS §2060. Since 1975, Haymarket has been a leader in the field of substance use and

behavioral health treatment through (a) evidence-based interventions based on significant

research on effectiveness, and (b) state of the art programming geared towards strong outcomes.

Haymarket's treatment programs are accredited by the Commission on Accreditation for

Rehabilitation Facilities ("CARF").

23.     The Village of Itasca ("Itasca") is a unit of local government in DuPage County,

located within the Northern District of Illinois. Itasca is responsible for the acts of its agents and

employees. Through its Zoning Administrator, Plan Commission, Village Board, and Attorneys,

Itasca is responsible for enforcement of its Zoning Ordinances. Itasca is a housing provider under

the Fair Housing Act, a public entity under the Americans with Disabilities Act, and a recipient

of federal funding under Section 504 of the Rehabilitation Act. Itasca is situated amidst three

Interstates - 290, 355, and 390 (Elgin-O'Hare Expressway) - and neighbors the communities of

Roselle, Wood Dale, Bensenville, Addison, Bloomingdale, Elk Grove Village, and Schaumburg.

24.     The Itasca Plan Commission ("Plan Commission") is an administrative body in

Itasca made up of seven Itasca residents appointed by Defendant Mayor Pruyn with the advice

and consent of the Village Board, and is charged with, among other things, the authority to hear

applications for zoning relief in Itasca, and to make recommendations regarding those

applications to the Board. By virtue of its organization under the Village of Itasca, the Plan

Commission is a recipient of federal funding under Section 504. The Plan Commission, as a

body authorized to recommend approval or denial of special use, planned development, and site

plan review applications, acted with discriminatory intent, and acted arbitrarily and capriciously

to violate Itasca zoning procedures and standards. The Plan Commission is also joined under

F.R.C.P. 19 as necessary for the complete injunctive relief sought by Haymarket.

25.     The Itasca Fire Protection District No. 1 ("Fire District") is a special district under

Illinois law that provides fire suppression and prevention, rescue, and emergency ambulance

services to the residents of the District, which includes Itasca. The Fire District was a formally

recognized "Objector" to Haymarket DuPage's request to operate. The Fire District acted in

concert with other Defendants to interfere with Haymarket's rights under applicable civil rights

statutes, and through its agents and employees acted with discriminatory intent to cause denial of

Haymarket's zoning application. The Fire District is also joined under F.R.C.P. 19 as necessary

for the complete injunctive relief sought by Haymarket.

26. Jeffrey Pruyn ("Pruyn") is the elected Mayor of Itasca. Pruyn is sued in his official capacity. Pruyn serves as a non-voting member of the Village Board. Pruyn utilized his position and platform as Itasca Mayor to disseminate and further stereotypical, discriminatory, and unwarranted opposition to the operation of Haymarket DuPage and the patients and clients it seeks to serve. Pruyn is also joined under F.R.C.P. 19 as necessary for the complete injunctive relief sought by Haymarket.

27. Itasca Public School District 10 ("School District") is organized under the Illinois School Code, and is operated by the School District's Board of Education. The School District operates three schools for students in primary grades who live in Itasca and neighboring Wood Dale.[5] The School District is a recipient of federal funding under Section 504. The School District as an Objector, and through its Superintendent and Board, discriminatorily interfered with the rights of Haymarket DuPage, the patients and clients it seeks to serve, and their children. The School District is also joined under F.R.C.P. 19 as necessary for the complete injunctive relief sought by Haymarket.

28. Craig Benes ("Benes") is employed by the Board of the School District as the School District's Superintendent and is empowered to function as chief executive officer managing all aspects of School District operations. Benes is sued in his official capacity. Benes utilized his position and platform as School Superintendent to disseminate and further stereotypical, discriminatory, and unwarranted opposition to Haymarket DuPage, based on the protected status of the patients Haymarket DuPage seeks to serve. Benes is also joined under F.R.C.P. 19 as necessary for the complete injunctive relief sought by Haymarket.

---

[5] Itasca students attend Lake Park High School District 108, East Campus, in the neighboring DuPage County suburb of Roselle.

11

## STATUTORY AND REGULATORY FRAMEWORK

### Fair Housing Act

29.     The federal Fair Housing Act ("FHA") prohibits discrimination in housing. In

1988, the FHA was amended to prohibit discrimination against people with disabilities. 42

U.S.C. §3604(f).

30.     Under the FHA, "disability"[6] means (1) "a physical or mental impairment which

substantially limits one or more of such person's major life activities, (2) a record of having such

an impairment, or (3) being regarded as having such an impairment." 42 U.S.C. §3602. People

with substance use disorder are considered people with disabilities under the FHA. *Id.*

31.     Discrimination under the FHA includes "a refusal to make reasonable

accommodations in rules, policies, practices, or services, when such accommodations may be

necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C.

§3604(f)(3)(B).

32.     The FHA also makes it unlawful "to discriminate in the sale or rental, or to

otherwise make unavailable or deny, a dwelling to any buyer or renter because of a [disability]

of—(A) that buyer or renter, (B) a person residing in or intending to reside in that dwelling after

it is so sold, rented, or made available; or (C) any person associated with that buyer or renter." 42

U.S.C. §3604 (f)(1).

33.     The FHA also makes it unlawful to "[t]o discriminate against any person in the

terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or

---

[6] The FHA and Section 504 use the term "handicap," which is disfavored by people with disabilities. "Disabled" or "disability" has the same legal meaning. *Compare* 42 U.S.C. §3602(h) *with* 42 U.S.C. §12102(1). *See also Bragdon v. Abbott*, 524 U.S. 624, 631 (1998) (noting that the definition of "disability" in the ADA is "drawn almost verbatim from the definition of . . . 'handicap' contained in the Fair Housing Amendments Act of 1988").

facilities in connection with such dwelling, because of a [disability] of—(A) that person; or (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or (C) any person associated with that person." 42 U.S.C. §3604(f)(2).

34.     It is a violation of the FHA to "make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based upon…[disability]… or an intention to make any such preference, limitation or discrimination." 42 U.S.C. §3604(c).

35.     Under the FHA, it is further unlawful to "coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed … any right granted or protected by" the Act. 42 U.S.C. §3617.

36.     It is a violation of the FHA to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin. 42 U.S.C. §3604(b).

37.     The federal regulations implementing the FHA specifically prohibit "[e]nacting or implementing land-use rules, ordinances, procedures, building codes, permitting rules, policies, or requirements that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings to persons because of . . . [disability]." 24 C.F.R. §100.70(d)(5).

38.     The regulations also make it unlawful "to restrict or attempt to restrict the choices of a person by word or conduct in connection with seeking, negotiating for, buying or renting a dwelling so as to perpetuate, or tend to perpetuate, segregated housing patterns, or to discourage or obstruct choices in a community, neighborhood or development" because of disability. 24 C.F.R. §100.70(a).

13

39.     The *Joint Statement of the Department of Housing and Urban Development and the Department of Justice*, *State and Local Land Use Laws and Practices and the Application of the Fair Housing Act* (hereinafter "*Joint Statement on Land Use*")*,* issued on November 10, 2016, emphasizes, among other things, that the Fair Housing Act prohibits discrimination against individuals because of their disabilities or the disability of anyone associated with them, and that the FHA may be applied to local governments in the context of exclusionary zoning or other land-use decisions.[7]

40.     Haymarket DuPage is an "aggrieved person" as defined by 42 U.S.C. §3602(i). Haymarket DuPage also has standing as a party associated with individuals with disabilities. 42 U.S.C. §3604(f)(1).

41.     Haymarket DuPage intends to provide temporary housing and services to people with disabilities, as defined by the FHA, 42 U.S.C. §3602(h).

**Americans with Disabilities Act**

42.     Title II of the Americans with Disabilities Act ("ADA") provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §12132.

43.     Under the ADA, a disability is defined as "a physical or mental impairment that substantially limits one or more major life activities . . .; a record of such an impairment; or being regarded as having such an impairment." 42 U.S.C. §12102(1). The term "[p]hysical or

---

[7] *Available at* https://www.justice.gov/crt/page/file/909956/download.

mental impairment" includes "[a]ny physiological disorder or condition . . . affecting one or more body systems, such as: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), [and] cardiovascular." 28 C.F.R. §35.108(b)(1)(i). "Major life activities" include functions such as "[c]aring for oneself, performing manual tasks, . . .eating, sleeping, . . . reaching, lifting, bending, speaking, [and] working." *Id.* §35.108(c)(1)(i). People with substance use disorder are considered people with disabilities under the ADA. 28 C.F.R. §35.131.

44.    Under the ADA, a "public entity" includes "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. §12131(1) (A)-(B).

45.    Under Title II of the ADA,

A public entity shall not discriminate on the basis of illegal use of drugs against an individual who is not engaging in current illegal use of drugs and who - (i) [h]as successfully completed a supervised drug rehabilitation program or has otherwise been rehabilitated successfully; (ii) [i]s participating in a supervised rehabilitation program; or (iii) [i]s erroneously regarded as engaging in such use.

28 C.F.R. §35.131(a)(2).

46.    The regulations implementing Title II of the ADA provide, *inter alia*, that

A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—

(i)    Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;

(ii)    Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(iii)    Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others; . . .

15

(vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

28 C.F.R. §35.130(b)(1).

47.     Under the ADA regulations,

[a] public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:

(i)     That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;

(ii)    That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or

(iii)   That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State.

28 C.F.R. §35.130(b)(3)(i)-(ii).

48.     The ADA regulations further require public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. §35.130(b)(7)(i).

49.     The federal regulations implementing Title II of the ADA also provide that:

A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.

28 C.F.R. §35.130(b)(8).

16

50. Moreover, under the ADA regulations, "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. §35.130(d).

51. The federal regulations implementing Title II of the ADA provide that "[a] public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." 28 C.F.R. §35.130(g).

52. The federal regulations implementing the ADA also prohibit a public entity from "administer[ing] a licensing . . . program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability," and from "establish[ing] requirements for the programs or activities of licensees that subject qualified individuals with disabilities to discrimination on the basis of disability." 28 C.F.R. §35.130(b)(6).

53. Title V of the ADA prohibits "discriminating against any individual because such individual has opposed any act or practice made unlawful by" the ADA, and "interfere[ing] with any individual in the exercise … of any right granted or protected" by the ADA. 42 U.S.C. §12203(a)-(b). The federal regulations implementing the ADA contain similar prohibitions. *See* 28 C.F.R. §35.134(a)-(b).

54. While "a public entity may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities" it "must ensure that its safety requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities." 28 C.F.R §35.150(h).

## Section 504

55.     Section 504 of the Rehabilitation Act of 1973 ("Section 504") prohibits discrimination against people with disabilities by recipients of federal funding. Section 504 provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. §794(a).

56.     Itasca is a recipient of federal assistance, and thus must comply with Section 504 and its implementing regulations.

57.     Under Section 504, an "individual with [a disability]" is defined as "any person who has a physical or mental impairment that substantially limits one or more major life activities; has a record of such an impairment; or is regarded as having such an impairment." 24 C.F.R. §8.3. The term "physical or mental impairment" includes "[a]ny physiological disorder or condition . . . affecting one or more of the following body systems: Neurological; musculoskeletal; special sense organs; respiratory, including speech organs; [and] cardiovascular." *Id.* "Major life activities" include "functions such as caring for one's self." *Id.* People with substance use disorder are considered people with disabilities under Section 504. 24 C.F.R §8.3(a)(2).

58.     Under Section 504, recipients of federal financial assistance may not deny individuals with disabilities the benefit of housing, aid, benefits, or services, or afford the opportunity to benefit from housing, aid, benefits, or services in a manner unequal to the opportunity provided to others. 24 C.F.R. §8.4(b)(1)(i)–(ii). Similarly, a recipient of federal financial assistance may not: "[p]rovide different or separate housing, aid, benefits, or services to

18

individuals with [disabilities] or to any class of individuals with [disabilities] from that provided

to others;" "deny a dwelling to an otherwise qualified buyer or renter because of the [disability]

of that buyer or renter or a person residing in or intending and eligible to reside in that dwelling

after it is sold, rented, or made available;" or "otherwise limit a qualified individual with

[disabilities] in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by

others receiving the housing, aid, benefit, or service." *Id.* at §8.4(b)(1)(iv), (vii)–(viii).

59.     The federal regulations implementing Section 504 also provide that:

[A] recipient may not . . . utilize criteria or other methods of administration the purpose or effect of which would:

(i)     Subject qualified individuals with [disabilities] to discrimination . . .; [or]

(ii)    Defeat or substantially impair the accomplishment of the objectives of the recipient's federally assisted program or activity for qualified individuals with a particular [disability] involved in the program or activity, unless the recipient can demonstrate that the criteria or methods of administration are manifestly related to the accomplishment of an objective of a program or activity.

24 C.F.R. §8.4(b)(4)(i)–(ii).

60.     Section 504 also requires that recipients of federal financial assistance "administer

programs and activities receiving Federal financial assistance in the most integrated setting

appropriate to the needs of qualified individuals with [disabilities]." 24 C.F.R. §8.4(d).

61.     Under Section 504, recipients of federal funding must grant reasonable

accommodations to qualified individuals with [disabilities] in order for them to have meaningful

access to the benefits of a covered program. *Alexander v. Choate*, 469 U.S. 287, 301 (U.S. 1985).

## Illinois Municipal Code

62.     Under Illinois law, Itasca is granted the power to enact a zoning ordinance to

classify, regulate, and control the location of trades and industries, and to divide the municipality

19

into districts "of such number, shape, area, and of such different classes . . . as may be deemed best suited to carry out the purposes of the grant of" its zoning power. 65 ILCS 5/11-13-1(5). Once the zoning ordinance is adopted, the municipality is vested with the authority to enforce it. 65 ILCS §5/11-3-3.

63.     A zoning ordinance, such as the zoning ordinance for Itasca, classifies the uses allowed on property as either permitted or special uses. Special uses, such as the one at issue here, require the owner to petition the municipality for permission to establish a use (here, for a healthcare facility or planned development). As required by law, Itasca's Zoning Ordinance establishes standards for when a special use, and site plan review, will be granted, and the applicant must meet those standards. Itasca Zoning Ordinance, §§14.11(4)(a); 14.12 (7)(a)-(e); 14.13(7)(a)-(i). The Itasca Plan Commission, which holds the public hearing required for consideration of an application for a planned development and site plan review, must make findings of fact and conclusions of law, and vote to recommend that the Village Board approve or deny the applications. Itasca Zoning Ordinance §§14.12 (4)(e); 14.13(5)(c). The Board is vested with the ultimate power to grant or deny a planned development and site plan review. Itasca Zoning Ordinance §§14.12; 14.13.

64.     The Illinois Municipal Code provides that a municipality's decision regarding an application for a special use shall be subject to *de novo* judicial review as a legislative decision. 65 ILCS §5/11-13-25.

65.     Denial of the zoning applications are reviewed under *LaSalle Nat'l. Bank v. County of Cook,* 12 Ill. 2d 40 (Ill. 1957), and cases thereafter. Factors to be considered include: (1) existing uses and zoning of nearby properties; (2) the extent to which the property's value is diminished by the Board's action; (3) the extent to which such diminution of property values

20

promotes the public health, safety and welfare; (4) the relative gain to the public as compared to the hardship imposed upon the individual property owner; (5) the suitability of the property for the proposed use; and (6) the length of time the property has been vacant as zoned.

66.    When a municipality engages in conduct contrary to applicable zoning ordinances, its actions may violate the FHA, the ADA, and Section 504. *See, e.g.*, *Joint Statement on Land Use*, pp. 1-5.[8]

## STATEMENT OF FACTS

### The Need for Substance Use Treatment in DuPage County

67.    The opioid epidemic in the United States is well documented. In 2019, roughly 70,630 people died of an overdose, which represented a 4% increase over 2018.[9] Since 1999, nearly 841,000 people have died from a drug overdose.[10]

68.    The COVID-19 pandemic has exacerbated this grave situation. The Centers for Disease Control and Prevention report that increased stress caused by the pandemic can lead to increases in alcohol and substance use.[11] As a result, 100,306 people died of a drug overdose in the United States during the 12-month period that ended in April 2021, an increase of 28.5% from the previous year.[12] This marks the "first time the number of overdose deaths in the United States has exceeded 100,000 a year, more than the toll of car crashes and gun fatalities combined. Overdose deaths have more than doubled since 2015."[13]

---

[8] *See* footnote 7, *supra.*
[9] Centers for Disease Control, "Drug Overdose Deaths Remain High"
https://www.cdc.gov/drugoverdose/deaths/index.html.
[10] *Id.*
[11] Rabin, Roni Caryn, "Overdose Deaths Reached Record High as the Pandemic Spread" N.Y. Times (November 17, 2021) *available at:* https://www.nytimes.com/2021/11/17/health/drug-overdoses-fentanyl-deaths.html.
[12] Centers for Disease Control and Prevention, "Drug Overdose Deaths in the U.S. Top 100,000 Annually," (November 17, 2021) *available at* https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2021/20211117.html.
[13] Rabin, Roni Caryn, "Overdose Deaths Reached Record High as the Pandemic Spread" N.Y. Times (November 17, 2021) *available at:* https://www.nytimes.com/2021/11/17/health/drug-overdoses-fentanyl-deaths.html.

69.     In 2019, the DuPage County Health Coalition reported that 57,000 individuals in the County needed treatment for alcohol and substance use disorders but went without due to a lack of available treatment facilities.[14] In DuPage County, there were 96 overdose deaths in 2019, and 435 between 2015 and 2019.[15] Between January and June 2020 alone, there was a 52% increase in overdose deaths in DuPage County.[16]

70.     Within a ten-mile radius of the proposed Haymarket facility, there are only 179 residential treatment beds and 8 recovery home beds for those with a substance use disorder.[17] That translates to a shortage of 433 treatment beds and 1,828 recovery home beds in that area.[18]

71.     Eight to ten overdoses occurred in the last year in Itasca. There are 25 Alcoholics Anonymous ("AA") and 1 Narcotics Anonymous ("NA") locations within five miles of Itasca, and another three AA and three NA sites located just outside the five-mile boundary.[19] There are three sites in Itasca itself. *Id.*

**Haymarket Center**

72.     Haymarket Center is an Illinois not-for-profit organization that currently operates a facility in Chicago's West Loop at 932 W. Washington Boulevard, Chicago, Illinois 60607 ("Haymarket Center" or "Haymarket Chicago"). It serves approximately 12,000 patients annually.[20]

---

[14] Letter from Kara R. Murphy to Dr. Lustig (October 27, 2020) *available at* http://www.itasca.com/DocumentCenter/View/9628/HCD-45---Letter-of-Support-DuPage-Health-Coalition---Presented-11420
[15] Impact DuPage, "Monthly Lives Saved by DuPage Narcan Program," *available at:* https://www.impactdupage.org/indicators/index/view?indicatorId=4867&localeId=668.
[16] Public Safety Announcement: DuPage Overdose Statistics 2020 (February 4, 2021), DuPage County Coroner *available at* https://www.dupageco.org/Coroner/Coroner_News/2021/64269/.
[17] Kisiel Evaluation Report, pg 24 (hereinafter "Kisiel Report") *available at* http://www.itasca.com/DocumentCenter/View/9249/J--August-7-2020-Supplement---Evaluation-Report.
[18] Kisiel Report, pg 25. Itasca attempted to downplay the need for the healthcare facility by alleging there are 40 treatment facilities located within 10 miles of Itasca. However, those facilities are primarily DUI counseling and outpatient clinics, and do not have the residential treatment and recovery home beds so desperately needed. *Id.*
[19] *Id.* at 22.
[20] Haymarket Center, "Impact," *available at* https://www.haymarketcenter.org/impact.

73.     Haymarket Chicago is one of the region's largest and most comprehensive providers of substance use and mental health treatment. It is a fully accredited nonprofit organization, licensed by the Illinois Department of Human Services and the Commission on Accreditation for Rehabilitation Facilities (CARF).

74.     Haymarket Center is unique among recovery homes in the area because it accepts individuals for treatment regardless of their ability to pay. Treatment is open to all 24 hours a day, 7 days a week, 365 days a year. About 70-75% of Haymarket's patients rely on Medicaid, and 25-30% have no insurance and rely on state-funded programs.

### Haymarket DuPage

75.     Individuals from DuPage County and the collar counties often seek treatment at Haymarket Chicago. In 2017-2018, nearly 2,000 men and women from DuPage County and the collar counties were patients at Haymarket Chicago.

76.     In and around 2019, to address the need for its services in DuPage County and the collar counties, Haymarket Center conducted an exhaustive search for a site for a recovery home and treatment center in DuPage County.

77.     In early 2019, Haymarket Center's search identified a five-story Holiday Inn hotel with 168 units located at 860 W. Irving Park Road in Itasca ("Property") as a potential site for a facility to serve DuPage and the collar counties. The Holiday Inn was for sale because, as the owners had informed Itasca Defendants and Pruyn, it had been underperforming and the costs of maintaining it were too great.[21] The Property is directly adjacent to Interstate 290 and visible from the highway, near where Interstate 290 and Interstate 355 converge. The Property is located

---

[21] Letter from Rehan Zaid and Bimal Doshi to Pruyn (April 26, 2019) *available at* http://www.itasca.com/DocumentCenter/View/10512/HCD-17---Letter-from-Holiday-Inn-to-Mayor-re-support-of-Haymarket-dated-42619---Presented-102819

in the Village's zoned B-2 District in which a "Health Center" is an authorized special use. *See* Itasca Zoning Ordinance §8.04(2)(m).

78.     The Property is ideal for Haymarket because it requires no new construction or changes to the outside structure and is located in an area zoned as a business/industrial district. The nearest residential parcel to the east of the Property is more than 2,287 feet away and separated by a highway overpass and a set of train tracks. The nearest residential parcel to the west is more than 1,950 feet away and is separated by a business park. It is also reasonably accessible for patients, has sufficient parking, already includes individual rooms, each with a bathroom, and has a commercial kitchen and rooms appropriate for patient intake and treatment. The acquisition of the Property also allowed for the transfer of all interior furnishings, including beds.

79.     Haymarket DuPage intends to provide a continuum of care at the Property, including detoxification services, inpatient treatment, outpatient treatment, recovery home treatment health care services, GED classes, and employment placement. Recovery home treatment denotes a temporary environment that supports individuals as they transition to long-term recovery. Recovery homes are an important aspect of substance use treatment and Haymarket's continuum of care. There would be a maximum of 240 beds on site: 96 inpatient treatment beds and 144 recovery home beds. All patients are admitted voluntarily and undergo background checks, and no violent criminals or sex offenders are allowed to participate in treatment at Haymarket.

80.     Treatment will be convenient and open to all 24 hours a day, 7 days a week, 365 days a year, regardless of an individual's ability to pay.

81.     As part of Haymarket's continuum of care, it initially proposed to include its

Mother and Child Program, which would allow women to undergo treatment at Haymarket,

accompanied by up to two children under the age of five. This program, offered at Haymarket

Chicago, addresses the principal barrier to treatment for women with children: the need for

childcare.

82.     Because of the overwhelming need and Haymarket Chicago's strong reputation,

Haymarket DuPage's effort to operate a treatment center in Itasca garnered support from local,

regional, state, and national experts on substance use treatment, such as: Edward-Elmhurst

Hospital; Advocate Medical Group; Cook County Health; National Alliance on Mental Illness –

DuPage; Thresholds; Northwestern Medicine at Central DuPage Hospital; Loyola Medicine;

Kenneth Young Center; Rush University Health System; DuPage County Medical Society;

Illinois Primary Health Care Association; Illinois Association for Behavioral Health; Heartland

Alliance Health; League of Women Voters of Roselle-Bloomingdale, Elmhurst, Arlington

Heights-Mt. Prospect, Buffalo Grove-Wheeling-Prospect Heights-Elk Grove Village, Naperville;

Hope for Healing; LTM Foundation; Live4Lali; DuPage County Sherriff; DuPage County Health

Department; NAMI DuPage; DuPage HOPE Task Force; DuPage County NAACP; National

Safety Council (based in Itasca); National Council for Behavioral Health; The Kennedy Forum;

and many others.[22]

**Itasca Deliberately Misclassifies the Project**

83.     In April 2019, Haymarket DuPage representatives met with Itasca's Director of

Community Development, Shannon Malik Jarmusz, ("Ms. Jarmusz") about its proposal for the

treatment facility. The threshold issue discussed was the classification of Haymarket DuPage,

---

[22] Exhibit A.

because the Itasca Zoning Ordinance does not specifically delineate treatment centers for substance use disorders and mental health disabilities. The Zoning Ordinance, however, does specifically address healthcare facilities.

84.     Because the proposed facility met the Zoning Ordinance's definition of a "Healthcare Facility," which is permitted in the B-2 District as a special use, Haymarket DuPage asserted it should be allowed to submit an application for a special use as a Healthcare Facility. However, during the meeting in April 2019, Ms. Jarmusz stated Itasca did not know how to classify the facility.

85.     Itasca's Zoning Ordinance defines "healthcare facility" as:

**HEALTHCARE FACILITIES (HEALTH CENTERS)**

Hospital: A hospital is any institution, place, building, or agency, public or private, whether organized for profit, or not, devoted primarily to the maintenance and operation of facilities for the diagnosis and treatment or care of two (2) or more unrelated persons admitted for overnight stay or longer in order to obtain medical care, including obstetric, psychiatric, and nursing or care of illness, disease, injury, infirmity, or deformity.

The term "hospital", without regard to length of stay, shall also include:

1. Any facility which is devoted primarily to providing psychiatric and related services and programs for the diagnosis and treatment or care of two (2) or more unrelated persons suffering from emotional or nervous disease; and

2. All places where pregnant women are received, cared for, or treated during delivery irrespective of the number of patients received.

The term "hospital" includes general and specialized hospitals, tuberculosis sanitaria, mental or physical hospitals and sanitaria, and includes maternity homes, lying-in-homes, and homes for unwed mothers in which aid is given during delivery.

Itasca Zoning Ordinance §3.02.

86.     On May 9, 2019, Ms. Jarmusz informed Haymarket DuPage that Itasca claimed the facility was "a mixed use of residential and medical, which would require a special use under

26

Section 8.04(2) of the Itasca Zoning Ordinance." Letter from Shannon Malik Jarmusz to Donald Musil (May 9, 2019), *attached as* Exhibit C. She also stated that "given the expected number of variances needed to accommodate this mixed use," Haymarket should apply for approval as a Planned Development (not as a Healthcare Facility).[23] *Id*.

87.    Itasca's Zoning Ordinance defines "planned development" as:

> a parcel of land or contiguous parcels of land of a size sufficient to create its own character, controlled by a single landowner or by a group of landowners in common agreement as to control, to be developed as a single entity, the character of which is compatible with adjacent parcels, and the intent of the zoning district or districts in which it is located; the developer or developers may be granted relief from specific land-use regulations and design standards and may be awarded certain premiums in return for assurances of an overall quality of development, including any specific feature which will be of exceptional benefit to the Village as a whole and which would not otherwise be required by the Zoning Ordinance. The area of a Planned Development shall remain under one (1) ownership or unified control unless safeguards are provided that, in the opinion of the Plan Commission (See Section 4.04.5) and Board of Trustees of the Village of Itasca, will provide for the continuation of the original Planned Development concept.

Itasca Zoning Ordinance §3.02.

88.    The purported "residential" use cited by Itasca is the recovery home component of Haymarket DuPage, where patients continue treatment after completion of a short-term, inpatient period. The average stay in the recovery home at Haymarket Chicago is 90 days. Haymarket DuPage expected the average length of stay in Itasca to be the same as in Haymarket Center.

89.    The Zoning Ordinance defines "dwelling unit" as "one (1) or more rooms, which are arranged, designed or used as living quarters for one (1) family only. Individual bathrooms and complete kitchen facilities, permanently installed, shall be included in each dwelling unit." Itasca Zoning Ordinance §3.

---

[23] Ultimately, Itasca recognized that the majority of the planned development variances did not apply to this project.

90.     While the FHA applies to treatment centers and recovery homes such as Haymarket DuPage, the individual units at Haymarket DuPage would not be "dwellings" as defined in Itasca's Zoning Ordinance. Each would be a shared, hotel-style room without a kitchen. Patients, whether in "treatment rooms" or "recovery rooms," would rely on one communal kitchen. As such, Itasca's determination that Haymarket DuPage would be "residential" under its Zoning Ordinance contradicted the plain language of the Zoning Ordinance. In addition, planned developments are typically projects that involve new construction on larger sites with more complex and multiple uses, not an adaptive re-use of an existing building for one use.

91.     Under the Zoning Ordinance, it is more onerous to apply for a special use as a planned development than to apply for a special use as a healthcare facility.

92.     In order to qualify as a special use under Itasca's Zoning Ordinance, a project must show that it:

(1) is deemed necessary for the public convenience at the location;

(2) is so designated, located and proposed to be operated such that the public health, safety and welfare will be protected; [and]

(3) will not cause substantial injury to the value of other property in the neighborhood in which it is located; and has been recommended by the Plan Commission and approved by the President and the Board of Trustees, and conforms, except in the case of a Planned Development, to the applicable regulations of the district in which it is located.

Itasca Zoning Ordinance §14-15.

93.     If an applicant files for approval as a planned development, and "the Plan Commission finds that the planned development may create special problems for traffic, parking, landscaping, and/or economic feasibility," it can request additional information from an applicant, including "a tax impact study detailing the impact which the planned development will

have upon all taxing bodies." *See* Itasca Zoning Ordinance §§14-31 - 14-35. This is known as an "economic impact statement."

94.     In addition, designation as a planned development requires an applicant to satisfy significantly more standards than if the proposal were designated as a simple special use, such as a healthcare facility.

95.     Haymarket DuPage did not agree with Ms. Jarmusz' decision. Accordingly, on July 3, 2019, Haymarket DuPage submitted two applications for zoning approval: one for a special use as a healthcare facility (which was accompanied by a request for a variance to waive certain height and yard standards because the exterior of the Property would not change), and another for a special use as a planned development.

96.     On July 16, 2019, Itasca Attorney Yordana Wysocki ("Ms. Wysocki") informed Haymarket DuPage via email that Itasca rejected its application for a special use in the B-2 District as a healthcare facility, and determined Haymarket must apply for a special use as a planned development. Email from Yordana Wysocki to Michael Roth (July 16, 2019), *attached as* Exhibit D. She also wrote that the application for special use as a planned development was "deficient" because it did not contain an economic impact statement or landscape plan. *Id.*

97.     On August 13, 2019, Haymarket DuPage appealed the following decisions by Itasca to the Plan Commission: (1) Itasca's rejection of its application for a special use as a healthcare facility, (2) Itasca's refusal to allow the special use and planned development applications to proceed concurrently, (3) Itasca's requirement that it apply only for a special use as a planned development, and (4) Itasca's denial of its request to be exempt from certain planned development requirements.

98.     On August 21, 2019, the Plan Commission voted unanimously to deny the appeal.

29

99.     On September 17, 2019, the Village Board upheld that decision.

100.     Accordingly, Haymarket DuPage was forced to proceed to secure zoning approval as a planned development, which resulted in lengthy delays and considerable extra expense.

101.     On December 16, 2019, Haymarket DuPage filed a complaint in Illinois state court against Itasca for its failure to classify its plan for use of the Property as a special use for a healthcare facility rather than as a Planned Development. During the pendency of the litigation, Itasca's public hearings on the zoning application were suspended.

102.     On March 16, 2020, the court dismissed Haymarket DuPage's case without prejudice. The Court determined the matter was not ripe because zoning hearings were ongoing.

103.     After the state court case was dismissed, the Plan Commission hearings were further delayed due to the COVID-19 pandemic, and the decision by Haymarket DuPage to file amended zoning applications.

104.     On June 30, 2020, pursuant to the FHA, Haymarket DuPage sent a reasonable accommodation request letter to Itasca that asked Itasca to classify Haymarket's use of the Property as a special use for a healthcare facility instead of as a planned development. The request was predicated on the fact that Haymarket's recovery home beds did not constitute a residential use under Itasca's Zoning Ordinance and that:

> [T]he proposed Healthcare Facility is in appearance and practice identical to that of a hospital: it will contain individualized rooms with no kitchens, is licensed by the State of Illinois, and will provide medical and psychiatric treatment for people in treatment for substance use and mental health disorders under the supervision of a Medical Director. Indeed, the Zoning Ordinance contemplates various medical settings under its "hospital" definition, including "general and specialized hospitals, tuberculosis sanitaria, mental or physical hospitals and sanitaria, and includes maternity homes, lying-in-homes, and homes for unwed mothers in which aid is given during delivery," and it defines a hospital this way "*without regard to length of stay*"… Haymarket DuPage is exactly that – a facility for people in treatment and recovery for a temporary period of time. In other words, it is, for all

30

intents and purposes under the Zoning Ordinance, precisely what is contemplated by the term "hospital."

Letter from Kenneth M. Walden to Charles Hervas (June 30, 2020) (emphasis in original), *attached as* Exhibit E.

105.    Haymarket DuPage also stated that when a municipality imposes a more onerous zoning process for approval of a facility or home that will serve people with disabilities, and does so due to their disabilities, that constitutes discrimination:

Because the Property is the equivalent of a hospital under the Zoning Ordinance, by forcing Haymarket to file as a Planned Development, rather than as a Healthcare Facility, the Village is treating people with substance use and mental health conditions in a different, more onerous and costly manner than those who require regular hospital care (or a maternity home, or a home for unwed mothers, etc.). This is the essence of discriminatory treatment.

Further, because the Village's interpretation of its own Zoning Ordinance is so at odds with its plain meaning, a fair conclusion to draw is that the Village has forced Haymarket to endure a more burdensome application process *because* the individuals served by Haymarket will be people who are in treatment for substance use and mental health disorders. This is the exact type of differential and discriminatory treatment the FHA was designed to prevent.

Ex. E.

106.    On July 8, 2020, Itasca denied the reasonable accommodation request, and again stated Haymarket must apply for zoning approval as a planned development. Letter from Charles Hervas to Kenneth M. Walden (July 8, 2020), *attached as* Exhibit F.

107.    During the hearings before the Plan Commission, extensive testimony was provided by two experts for Haymarket DuPage who opined Haymarket's proposed use of the Property, under the Itasca Zoning Ordinance, is not a mixed-use development, and should have been classified as a special use for a healthcare facility rather than as a Planned Development.

31

### Public Opposition by Itasca's Mayor

108.    From the very beginning, Jeffrey Pruyn, the Mayor of Itasca ("Pruyn"), publicly opposed Haymarket DuPage. Pruyn's public opposition encouraged Itasca, its governmental entities, and Itasca residents to oppose the project.

109.    On or about April 30, 2019, Haymarket DuPage had an initial meeting with Pruyn, during which it described the need for treatment in DuPage County and how Haymarket DuPage would help address this need.

110.    Pruyn regularly posted open letters to the community on Itasca's website to express his opposition to the proposed healthcare facility. Itasca also emailed these oppositional statements to residents and others who subscribed to Itasca's mailings. Pruyn also sent anti-Haymarket letters to Haymarket DuPage executives and to public officials, and these too were posted on the Itasca website and sent to Itasca residents on the mailing list.

111.    On June 21, 2019, a month before Haymarket DuPage filed its zoning applications, Pruyn published an open letter that claimed "revenue will be permanently lost if the property is converted to a not-for-profit use and removed from the tax rolls." He then stated:

> It is impossible for me to comprehend how [DuPage County] Chairman Cronin and other regional elected officials have endorsed Haymarket's proposal BEFORE they have any idea what the impact with be on Itasca's 8,700 residents, or how removing the hotel from a thriving business park will affect the companies located there, or whether Itasca's police and fire departments have the resources to service the facility without raising taxes on Itasca's existing residents and businesses.

Statement from Pruyn (June 21, 2019) (capitalization in original), *attached as* Exhibit G.[24]

---

[24] All of Pruyn's statements to the public are available on the Itasca website: http://www.itasca.com/1953/Holiday-Inn---Haymarket-Center-Proposal.

112.    In a June 23, 2019 letter to the Editor of the Daily Herald, Pruyn wrote: "As mayor of Itasca, I refuse to bow to political pressure. Instead, I promise to listen with an open mind not only to Haymarket, but also to "our neighbors, our family members, our friends, our co-workers" through a public and transparent process. Whatever the outcome, I hope that everyone involved will respect the democratic process moving forward."

113.    On July 16, 2019, Pruyn published another open letter to express his concerns regarding Haymarket DuPage, and encouraged residents to show up to a scheduled public hearing regarding the proposed facility:

> At a recent board meeting, a group of residents expressed their frustrations and fears around this project. We heard all of you. That is why I want to emphasize once again how important it is for everyone, no matter your views, to be a part of the public hearing on September 18th. Illinois law is clear that the Plan Commission may only consider testimony provided through the official public hearing process.

Statement from Pruyn (July 16, 2019) *attached as* Exhibit H.

114.    On July 22, 2019, Pruyn publicly issued a series of questions to Haymarket DuPage that reflected and spread negative stereotypes about the individuals Haymarket would serve. Most questions concerned security, including whether patients at Haymarket DuPage would be allowed to leave the Property while in treatment, how many security staff would be employed, whether security staff would be armed, and whether Haymarket DuPage intended to build a fence around the Property. Letter from Pruyn to Michael Roth (July 22, 2019), *attached as* Exhibit I.

115.    On July 24, 2019, in an article in the Daily Herald, Pruyn stated "we don't have all the facts" regarding Haymarket, which continued the coordinated effort to sow mistrust of the proposed healthcare facility.

116. On August 2, 2019, in response to Pruyn's July 22 letter, Haymarket DuPage sent the Mayor a fact sheet on Haymarket DuPage to address his inquiries. Haymarket DuPage FAQ, *attached as* Exhibit J.

117. On August 8, 2019, the Daily Herald reported "Mayor Pruyn said most of the residents he's hearing from are 'concerned' about the impact Haymarket's plan would have on the village. 'Can a town of 8,700 people -- with limited resources -- service a 200-bed facility?'"[25]

118. On August 12, 2019, Pruyn sent a public letter to Haymarket DuPage to request another meeting. In it, he said: "I have been extremely disappointed by Haymarket's lack of transparency and responsiveness throughout this process. Since day one, Haymarket's plans have been cloaked in secrecy." Pruyn intended this statement to cultivate distrust of Haymarket and fear that Haymarket DuPage had an undisclosed harmful agenda. Letter from Pruyn to Haymarket President and CEO Dr. Dan Lustig (August 12, 2019), *attached as* Exhibit K.

119. On August 15, 2019, Haymarket President and CEO Dr. Dan Lustig ("Dr. Lustig") responded to Pruyn by letter. He agreed to meet with Pruyn, but noted his objection to Itasca's negative characterizations of Haymarket DuPage. Letter from Dr. Lustig to Pruyn (August 15, 2019), *attached as* Exhibit L.

120. On August 23, 2019, Haymarket DuPage again met with Pruyn and Village Administrator Carie Anne Ergo ("Ergo") at Haymarket Chicago. During the course of this

---

[25] Sanchez, Robert, "Big Crowds Expected at Meetings for Controversial Haymarket Center Proposal" (August 8, 2019) Daily Herald, available at https://www.itasca.com/DocumentCenter/View/8605/August-9-2019---Daily-Herald-Article---Big-crowds-expected-at-meetings-for-controversial-Haymarket-Center-proposal. While the population in Itasca has increased by 1,262 from 8,543 in 2009 to 9,805 people in 2019, more than twice that amount worked in Itasca. Employment has fluctuated over the ten-year period from 2009 to 2019, but has increased by 1,714 to 18,786 jobs. Gruen+Gruen Report, page 2, *available at* https://www.itasca.com/DocumentCenter/View/9248/I--August-7-2020-Supplement---The-Fiscal-and-Economic-Impact-of-the-Proposed-Haymarket-DuPage.

meeting, in order to assuage Pruyn's concern that the proposed facility would unduly compromise EMS in Itasca, Haymarket DuPage offered to buy a second ambulance for Itasca. Ergo responded that the ambulance would require additional staffing and an additional building to store it, and thus Itasca rejected the offer without making any counter proposal.

121.    On September 5, 2019, Haymarket DuPage sent detailed responses to the earlier set of questions posed by Pruyn on July 22, 2019. "Haymarket DuPage Response to Village of Itasca Questions for Haymarket," (September 5, 2019), *attached as* Exhibit M.

122.    On September 24, 2019, Pruyn made Haymarket DuPage a primary topic of discussion at his State of the Village Address, where he reiterated many of his previously mentioned positions. A Daily Herald article covering the address quoted Pruyn as stating:

> The mere fact alone that this is putting a heavy weight on our village's staff and checkbook echoes the same sentiment we're all concerned about with the Haymarket proposal . . . What kind of strain would Haymarket's 272-bed facility have on our village? And those are questions that we don't have all the answers to yet because we're missing facts from Haymarket.[26]

123.    On or about October 10, 2019, Illinois State Representative Deborah Conroy, Pruyn, Ergo, Illinois State Senator Tom Cullerton, and Illinois State Representative Diane Pappas met to discuss the proposed facility. During the course of the meeting, Representative Conroy stated she could secure half a million dollars in grant funds to offset the potential lost tax revenue to Itasca due to the non-profit status of Haymarket DuPage.

124.    The next day, Pruyn sent a letter to Representative Conroy. He asked her to "hold off on requesting any state funding for this project until Village staff has sufficient time to analyze all the data presented at the upcoming public hearings to better determine the total

---

[26] Smith, Kaitlyn, "Mayor, Haymarket CEO Spar on Itasca Treatment Center," Daily Herald, (September 24, 2019) *available at* https://www.dailyherald.com/news/20190924/mayor-haymarket-ceo-spar-on-itasca-treatment-center-?cid=search.

financial impact to Itasca taxpayers." He stated: "I stand ready to be a part of any discussion on potential solutions that would not place the financial burden of solving this crisis squarely on the residents and businesses of our small town." Letter from Pruyn to Rep. Conroy (October 11, 2019), *attached as* Exhibit N.

### Fire District Opposition

125.    The Fire District also opposed Haymarket DuPage. On May 28, 2019 - the same day Haymarket DuPage representatives met with Pruyn - Haymarket DuPage also met with James F. Burke, Chief of the Fire District, and Mike Lisek ("Lisek"), Fire Prevention Bureau Director, to discuss the project. During the course of the meeting, Fire District staff acknowledged there were many overdoses in the area, but expressed concerns the Fire District had only one ambulance to respond to EMS calls. Haymarket DuPage's purported burden on EMS became the major pretextual reason for Defendants' objections going forward.

126.    Lisek also noted that while fire code deficiencies had existed but were unenforced at the Holiday Inn, Haymarket DuPage would be placed under increased and detailed scrutiny by the Fire District. In particular, he noted the staircase at the Holiday Inn was not up to code. While Haymarket DuPage had no issue with repairing the site to be in full compliance with all fire and other safety measures, given that the Fire District had not enforced the fire code at the Holiday Inn, those statements presented as threatening and punitive.

127.    Since the one meeting on May 28, 2019, Haymarket DuPage offered on several occasions to meet again with the Fire District to discuss its concerns, but on each occasion the Fire District refused to meet – all the while continuing its vocal opposition to the zoning applications.

**Opposition by Itasca Residents**

128.    In accord with Defendant Pruyn, residents in Itasca vocally opposed Haymarket

DuPage based on stereotypes about and bias against people with substance use disorder.

129.    Shortly after the Haymarket DuPage proposal became public, the Concerned

Citizens created a Facebook group titled "No Itasca Haymarket." It has over 1,400 members. It

also created a website at www.noitascahaymarket.com to encourage Itasca residents to oppose

the project.

130.    In or around July 2019, the Concerned Citizens issued an "open letter" to public

officials in DuPage County regarding the project. The letter was posted on the "No Itasca

Haymarket" website. In it, the Concerned Citizens state:

> [t]here are a number of youth- and public-focused facilities in the immediate
> vicinity;
>
> [i]t is our contention that the construction of this facility will lead to an increase
> in drug-related crimes in the immediate area, thus straining our limited police
> resources; and
>
> the stigma associated with such a facility will result in drastic reductions in
> property values in the immediate vicinity, which by extension also impacts the
> finances of the Village and other taxing bodies. Studies show negative impacts
> of up to 17% on home values in the immediate area of these facilities.

"Open Letter to All Elected Officials Representing the Citizens of Itasca, Illinois," *attached as*

Exhibit O.

131.    On or around July 29, 2019, the Concerned Citizens also produced a flyer titled

"The Truth About Haymarket," which contained false statements. "The Truth About

Haymarket", *attached as* Exhibit P. It states Haymarket DuPage will provide "addiction and

mental-health treatment, including 'alternative to incarceration' programs," and would be within

"close proximity to children-based businesses and schools." It further stated the treatment center

will be "within a ½ mile of 5 businesses selling/serving alcohol and 3 video-gaming facilities,"
and that "[r]esearch shows a property value loss of up to 17% on homes near opiate and
methadone treatment centers." The flyer further credited Pruyn and the Fire District's pretextual
concern regarding EMS services, and raised additional concerns about patients at Haymarket. *Id.*

132.    Beginning in August 2019, Itasca citizens began to reiterate the concerns detailed
in the flyer and stated by Pruyn in the media. For example:

    a.  On September 9, 2019, in a Daily Herald article, Itasca Resident Nicole
        Dietsel said the Holiday Inn is not appropriate for Haymarket DuPage
        because it "is close to children-based businesses along with schools, the
        water park, the library and park district." Itasca resident Dustin Sneath said
        Haymarket was not being transparent.[27]

    b.  On September 19, 2019, in a Chicago Tribune article, Tony Walis, the
        owner of American's Best Train, Toy and Hobby Shop located across the
        street from the Property, stated: "(Patients) are going to wander here, they're
        going to shoplift because they're just going to be looking for money for
        drugs." He added: "They don't care what they take."[28]

133.    Posts on social media and emails to Itasca during this period also revealed the bias
residents harbored against people with substance use disorder. They included these statements:

    a.  There is nothing you can say that justifies this crack house being brought to
        Itasca. Nothing, and that's what it is, a CRACK HOUSE[!] Safety will no
        longer be an option with these unstable individuals and their drug dealers
        walking around our town. It's not just Itasca. This little area will become a
        ghetto. Is this what we want for our kids? Really? We're all crazy about
        being environment friendly and going green, but should we be okay when
        turning our towns and schools into ghettos? You better wake up.
        (capitalization in original).

    b.  Everyone screams about the environment, going green, saving the planet for
        our kids and future generations. But it's ok to ruin a good neighborhood,

---

[27] Sanchez, Robert "Opposition Growing to Haymarket's Plans for Rehab Facility in Itasca." Daily Herald (September 9, 2019) *available at* https://www.itasca.com/DocumentCenter/View/8607/September-9-2019---Daily-Herald-Article---Opposition-growing-to-Haymarkets-plans-for-rehab-facility-in-Itasca.

[28] Keilman, John "Prudence or Fear? Itasca Residents Aim to Prevent Opening of 200-Bed Drug Rehab Center" Chicago Tribune (September 19, 2019) *available at* https://www.chicagotribune.com/news/breaking/ct-haymarket-drug-treatment-center-itasca-20190916-l4axomiwe5hvnjf4m7gr3bihh4-story.html#:~:text=Prudence%20or%20fear%3F-,Itasca%20residents%20aim%20to%20prevent,200%2Dbed%20drug%20rehab%20center.&text=His%20sales%20pitch%20was%20simple,was%20ready%20to%20provide%20it.

make it a ghetto and leave a ghetto for our kids. All this tells me we're like the slaves, work our butts off, pay property taxes but can be messed with and pushed around. It's really frustrating.

c. I do not live here to have children exposed to abnormal behavior. If so, I would have stayed in Chicago. There's enough crimes in the metropolitan area, do we need to add it to our small town?

d. To deny the fact that drug problems start in Chicago as well as primary schools in DuPage and carry on through adulthood is naïve. We don't need any more negative influences on our children as well as vagrants and panhandlers every time we want to go to the post office or take a Metra tour.

e. This facility would be extremely close to children's center and public sections of Itasca. The nature of this facility is such that it attracts the criminal element into the community. Anyone saying differently has not researched the fact that's out there and met someone who has had first-hand experience with these elements.

f. The walking distance from our train station to the Holiday Inn is only three-quarters of a mile. For most people, this would be a nice 20-minute walk on a concrete sidewalk year-round. What that means is that a large 'variety' of people in Chicago could board a train to Itasca and then leisurely take a 20-minute walk to the Holiday Inn.

g. Do you really want Chicago's drug addicts in your city?

h. I don't want it in my neighborhood and our schools and a lot of other places where kids hang out. I have a two-year-old. I don't want this crap. Take it somewhere else.

134. On September 18, 2019, the first hearing before the Plan Commission was set to begin at Peacock Junior High School in Itasca. On the day of the hearing, approximately 1,500 individuals marched through the streets to oppose Haymarket DuPage. Many carried "NO HAYMARKET" signs. Also, well before the hearing date, over 1,000 "NO HAYMARKET" signs had been posted on properties throughout Itasca. A newspaper article from that date stated:

The opposition, which has already printed flyers, issued an open letter and created a busy Facebook page, made its case with spectacle, marching to the school in a line that stretched for blocks and filled the width of E. North St. Inside, many people wore T-shirts bearing that slogan or stickers that read "No Itasca Haymarket." Resident Jerry Johnson, noting that the local fire district has a single ambulance,

said it couldn't afford to keep up with what he said would likely be a slew of medical calls from the facility.[29]

135.    Ultimately, the hearing on September 18, 2019 was postponed because the school could not accommodate the number of people who attended. On September 25, 2019, Pruyn published an open letter on the Itasca website that stated Itasca was looking for a hearing venue that could accommodate 2,000 people. Pruyn Letter to Itasca Residents (September 25, 2019), *attached as* Exhibit R.

136.    On October 16, 2019, the hearing process before the Plan Commission began at Lake Park High School in Roselle. Over 1,000 people attended the hearing, most in opposition to Haymarket DuPage.

137.    Along with the Fire District and the School District, the Neighborhood Opposition were parties to the case in opposition to Haymarket DuPage (collectively "the Objectors"). All Objectors were represented by counsel.

138.    The Neighborhood Opposition included: (1) The Concerned Citizens; (2) the single-family home at 260 N. Oak, (3) the single-family home at 308 West Center, (4) the single-family home at 943 Willow, (5) the single-family home at 107 W. George, (6) the single-family home at 505 Catalpa, (7) 865 W. Irving Park Road LLC, (8) Mr. David's Flooring, and (9) 960 Maplewood LLC. The majority of the single-family homes included in the Neighborhood Opposition are owned by either Steven Ellenbecker, an Itasca resident and the attorney who represented the Neighborhood Opposition, or by members of his family.[30] One of the homes is

---

[29] Keilman, John, "Massive Crowd Forces Itasca to Postpone Hearing Over Proposed Haymarket Drug Treatment Center," Chicago Tribune, (September 19, 2019) *attached as* Exhibit Q: *see also* Jones, Will, "Itasca Residents Protest Plans to Turn Hotel into Drug Rehab Facility," ABC 7 News (September 18, 2019) *available at*: https://abc7chicago.com/itasca-il-news-protest-drug-rehab/5551160/.

[30] Over time, the attorney presented conflicting information as to who he actually represented. By the time his closing statement was provided to the Village Board on October 26, 2021, the attorney stated that he only represented 865 W. Irving Park Road LLC and 960 Maplewood LLC, and did not reference the Concerned Citizens or the individual home owners.

owned by James Diestel, an Itasca resident who administers the private Facebook group titled "No Itasca Haymarket." Another is owned by Dustin Sneath who helps administer the same "No Itasca Haymarket" Facebook group.

## Zoning Applications Meet Their Burden under the Zoning Ordinance

139.     The first set of hearings before the Plan Commission occurred from October 16, 2019 through December 4, 2019. Thereafter, the hearings were suspended: initially, due to the complaint Haymarket DuPage filed in state court to challenge Itasca's requirement that it apply for approval as a planned development rather than as a healthcare facility; and later because of the emergence of COVID-19 and Haymarket DuPage's decision to file amended zoning applications.

140.     On August 7, 2020, Haymarket DuPage filed amended zoning applications: one for a special use as a planned development, and a second for a special use as a healthcare facility. A third amended application was filed that sought approval of Haymarket's application for Class 1 Site Plan review.[31]

141.     As explained in the cover letter attached to the amended applications: "Haymarket DuPage filed an application for a special use as a healthcare facility 'to maintain its position that it is the proper zoning approval to seek under the Village Zoning Ordinance for its proposed Health Center.' [Haymarket does] not expect the Village to change the position espoused on this issue in 2019." The application for a special use as a healthcare facility was never considered by the Plan Commission or Village Board.

---

[31] The Amended Applications and attached reports are available at http://www.itasca.com/2019/Haymarket-Documents.

142. The principal differences between the amended zoning applications and the initial applications were: (1) to reflect that on April 6, 2020, Haymarket bought the Property; (2) to alert Itasca that Haymarket withdrew the Mother and Child Program in Itasca to resolve concerns raised by the School District that its legal obligation to provide educational services to the children of Haymarket patients would be an undue burden; (3) to revise the Landscape Plan to provide enhanced landscaping and a fenced-in patio to serve Haymarket clients; and (4) to file supplemental expert reports to address issues raised during the earlier hearings.

143. Haymarket did not agree with the School District's assessment that its Mother and Child program would place an undue burden on Itasca's school system, which was based on the School District's belief that the children in this program would need special education services. Nonetheless, Haymarket DuPage hoped its decision voluntarily to forego this program in Itasca would appease the School District, and that the School District would no longer object to the zoning application.

144. On October 28, 2020, the Plan Commission hearings regarding Haymarket's zoning application for a Planned Development and Class 1 Site Plan review resumed. These hearings continued for over a year until a final vote by the Village Board to deny the zoning applications on November 2, 2021.

145. Over the course of the hearings before the Plan Commission, Haymarket presented expert reports and witnesses to provide facts to support its applications and met the legal standards required by the Zoning Ordinance for approval of its applications for a Planned Development and its Class 1 Site Plan review. These experts included:

- <u>Dr. Dan Lustig</u>, President and CEO of Haymarket, has 30 years of experience in the substance use treatment field and testified during numerous hearings on the following:

42

- Background information on Haymarket Chicago, where he has been employed for 25 years;

- Background on Haymarket DuPage, the primary barriers to successful treatment, the lack of access to treatment, the shortage of recovery home beds, and the stigma that prevents people from seeking treatment;

- Overview of Haymarket Chicago's over 46 years of experience operating a major healthcare facility to serve individuals with substance use disorder and behavioral health issues; and

- Overview of Haymarket Center's licensing and accreditation, Haymarket DuPage's proposed licensing and accreditation, the levels of service to be provided on site, the evidentiary based programs to be offered, staffing, security, and the overall operational plan for Haymarket DuPage.

- <u>Dr. Daniel Sullivan</u>, a physician and Chief Medical Officer[32] of Edward-Elmhurst Hospital, located in DuPage County, testified about the need for treatment facilities in DuPage County, the lack of available treatment and recovery home beds, and the ability of Haymarket to address this need. He testified that the top deficits in DuPage County to meet the challenge of the opioid epidemic are the lack of trained providers and access to treatment. He opined that Haymarket Center is well-respected for its success in treatment, specifically in its ability to treat the underinsured population, and recommended approval of the Haymarket DuPage zoning applications.

- <u>George Kisiel</u>, President of Okrent-Kisiel Associates and a land use planner with 40 years of experience in his field, submitted an expert report to the Plan Commission and testified that:

  - Haymarket DuPage's proposed healthcare facility is consistent with the underlying B-2 zoning in Itasca, and with Itasca's Comprehensive Plan;

  - A "special use" is a type of property use that is deemed compatible with other uses in the zoning district, and is expressly permitted within a zoning district by the controlling zoning ordinance so long as the use meets the special use standards outlined in the Itasca Zoning Ordinance;

  - The proposed healthcare facility meets all legal standards in Itasca for a special use as a Planned Development and site plan review;

---

[32] Now Chief Physician Executive.

- The proposed healthcare facility is consistent with the surrounding commercial and light industrial uses, and there will be no adverse impact on the path of development in the immediate area or in Itasca's downtown;

- There will be no adverse impact on residential areas in Itasca, particularly given their distance from the proposed Haymarket facility, and the buffer provided by I-290 and the business park;

- The proposed development will result in the rehabilitation of a vacant building, extensive landscaping will improve the aesthetics of the area, and the proposal satisfies Itasca's landscape requirements; and

- The building suits Haymarket's needs with limited internal renovations required, and because there will be no changes to the existing building, and its operations will be located inside the building, there will be no impact on light, air, noise, emissions, or vibrations in the area.

- <u>Aaron Gruen</u>, of Gruen + Gruen, an expert urban economist and attorney with over 50 years of experience in the field, submitted an expert report and testified on the issue of economic impact. He concluded Haymarket DuPage will not pose an undue burden on the taxing bodies, and would provide employment and commercial benefits. He found:

  - Itasca has a very healthy tax base. The tax base of Itasca and the Fire District increased by 19 percent - or almost $110 million - between the 2016 and 2020 tax years. This increase is equal to 36 tax-paying Holiday Inns being added to the tax base.

  - The proposed use would have a negligible economic impact on each taxing body.[33]

  - The proposed use would have a combined estimated net impact for both Itasca and the Fire District that equates to a maximum of $10.51 per resident. Because of this finding, Mr. Gruen concluded there would be no adverse fiscal impact on the Itasca General Fund and the Fire District.

  - In April 2021, the Fire District adopted an ordinance that more than doubled the cost of an individual ambulance call to $5,390 per call. Because (a) Fire District Chief Burke testified this was done to provide access to federal Ground Emergency Medical Transport

---

[33] Although Itasca's economic impact consultant, Sarah Ketchum, testified Haymarket did not study the impact of the project on taxing bodies, her testimony was incorrect.

monies, which are Medicaid funds, and (b) many of Haymarket's patients are eligible for Medicaid dollars, Mr. Gruen concluded the higher fees generated by providing EMS to Haymarket patients will help offset any potential costs generated by Haymarket DuPage.

- The tax impact of the project is further mitigated because Itasca approved the construction and operation of a new Holiday Inn in another location;

- The on-going operation of Haymarket DuPage will generate direct impacts of 163 new high-paying jobs with benefits, with an annual payroll of $9,600,000. He also concluded indirect impacts will support an estimated 191 total jobs (direct and indirect), and $10,600,000 of total annual earnings (both direct and indirect). Total annual output impact is estimated to be $27,700,000 in DuPage County. In addition, Dr. Lustig testified Itasca and local vendors will be given preferential treatment. Haymarket is currently using Itasca and local vendors.

- <u>Dr. David Merriman</u>, Ph.D, a professor at the University of Illinois, Chicago, and expert in the field of local property taxation, provided unrebutted testimony that when a non-profit obtains an exemption from property taxes, the local taxing bodies do not lose any tax revenue.[34]

- <u>Kenneth Polach</u>, an MAI appraiser and President of Polach Appraisal Group with over 50 years of experience in the field, submitted an expert report and provided unrebutted testimony that Haymarket DuPage will not: impact the use of the adjoining property, cause substantial injury to the value of other properties in the neighborhood in which it is located, or hurt property values or improvements in the vicinity of the Property.

- <u>Luay Aboona</u>, Principal of KLOA, Inc., a traffic engineering and consulting firm, and an expert with approximately 30 years of experience in the field, submitted an expert report and testified Haymarket DuPage will have sufficient on-site parking, and not cause traffic problems in the area.

---

[34] Healthcare facilities, permitted by the Property's B-2 zoning, are frequently non-profit organizations. However, as Kisiel's report noted, "this amount represents less than 0.3% of the total property taxes collected from Itasca properties. Similarly, it represents less than 1% of the budget/revenues of each taxing body including school, fire protection, park district, library and others." Kisiel Report, pg. 15. Moreover, as noted herein, Defendant Pruyn rejected a legitimate offer of substantial supplemental state funding from Rep. Conroy. In addition, Haymarket has paid and will continue to pay the property taxes for Special Service Area No. 3.

**Impact on EMS**

146.     During the hearings before the Plan Commission, the Fire District focused its opposition to the zoning applications on the projected impact of Haymarket DuPage on the Fire District's EMS services, alleging Haymarket would negatively impact the provision of EMS services to Itasca residents.[35]

147.     In initial conversations with Itasca in 2019, in order to address concerns about EMS impact, Haymarket DuPage offered to purchase an additional ambulance for Itasca. Itasca rejected this offer because Haymarket did not also offer to cover the cost of staffing the ambulance.

148.     When its offer to purchase an ambulance for Itasca was rejected, Haymarket took several additional steps to address the concerns of the Fire District:

a.  First, it executed a contract with Elite Ambulance, the second largest ambulance provider in Illinois, to respond to Haymarket's basic life support ("BLS") calls. Although not detailed in the contract, Elite Ambulance also can provide Advanced Life Support ("ALS") services. Because of this contract, and the capabilities of Elite Ambulance, the Fire Department would only have to respond to calls from Haymarket for ALS services. Because BLS calls do not require an immediate emergency response, and most EMS calls placed by Haymarket DuPage would be for BLS services, this contract and the additional ALS capabilities of Elite Ambulance would minimize the impact of Haymarket DuPage on Itasca's EMS services.

b.  Second, Haymarket emphasized it would have trained medical staff on-site 24 hours a day, seven days a week, 365 days a year. Because of this support, Haymarket would be able to address certain medical needs in-house, which would eliminate the need to call for EMS. In addition, because of in-house medical staff, Haymarket would know whether it was appropriate to call Elite Ambulance or 911 for EMS services, which would avoid unnecessary 911 calls for EMS from the Fire Department.

---

[35] This issue was the primary reason cited by the Plan Commission when it recommended denial of Haymarket's zoning applications.

c. Third, Haymarket DuPage offered to agree to a requirement that it maintain a contract with a private ambulance service as a condition of approval of its zoning application.

d. Fourth, if needed, Haymarket DuPage agreed to execute a contract with a secondary private ambulance company to minimize its impact on EMS in Itasca.

149. To further address EMS concerns, Haymarket DuPage hired Polaris Public Safety Solutions, and through it, James Dominik ("Dominik"), a retired fire chief with 29 years' experience, as well as national and international experience as a consultant to fire and police departments. Dominik conducted additional research on Haymarket DuPage's potential impact on EMS services, and reviewed the qualifications of Elite Ambulance to provide timely and reliable responses to Haymarket DuPage's BLS calls and minimize any burden on the Fire Department. Dominick, who was certified as an expert by the Plan Commission, concluded Haymarket would not unduly impact the provision of EMS services in Itasca. He based his expert opinion on, among other factors, the following:[36]

- His analysis of 11 treatment facilities and recovery homes which, although smaller than the proposed facility, represent a broad range of treatment centers that provide the same levels of licensed services to the same populations as proposed for Haymarket DuPage and, thus, provide the best sites to be studied. Based on this analysis, Dominick projected the number of calls the new facility would generate. He found this number of calls would not unduly impact the Fire District's reliability and timely response to Itasca residents and businesses.

- Itasca is a part of MABAS Division 12 (an acronym for "Mutual Aid Box Alarm System"). MABAS is a statewide mutual aid system designed to coordinate the effective and efficient response of mutual aid fire, EMS, and specialty team personnel and equipment during emergencies and disasters. Based on a report from the Office of the State Fire Marshall, covering 2014 – 2018, Dominik found that the Itasca Fire District has one of the lowest call volumes in MABAS 12. The Fire District has a call volume of 2.55

---

[36] As part of its extensive analysis, Polaris' study addressed the following issues: call volumes, concurrent calls, mutual aid usage, unit hour utilization, response times, historic growth patterns for the Fire District, call volume data for 11 comparable sites, historic CAD data from Haymarket Chicago, EMS call volumes generated by Haymarket Chicago in 2018, and the operations and capabilities of Elite Ambulance.

EMS calls per day, which includes those occasions when the Fire District sends its own personnel and equipment to other communities on mutual aid calls.

- From 2014-2018, the Itasca Fire District provided 48% - 60% more mutual aid to other communities than it received.

- The Itasca Fire District shared its Chief with the Wood Dale Fire Protection District.[37] The Itasca Fire District also has agreements with the Wood Dale Fire Protection District and Village of Roselle that ensure the sharing of resources, as necessary, to promote the efficient provision of EMS calls to each respective area.

- Analysis of Itasca's unit hour utilization, a method used by fire departments around the country to determine when additional staff and equipment are needed to ensure reliable and timely responses. Dominik found the Fire District has a current unit hour utilization of .1, while the national standard is .3. At its current level, Dominik testified the number of calls the Fire District responds to would have to triple before such calls would unduly impact reliability and availability of EMS services to Itasca residents. Dominik stated reliability and availability would be maintained even if one applied the potential call volume predicted by Bruce Moeller ("Moeller"), the expert witness called by the Fire District.

150. Fire District expert Moeller's projection of the number of annual EMS calls to be generated by Haymarket DuPage was higher than any other projections offered into evidence. Nonetheless, Moeller testified that "currently the Itasca Fire Protection District has sufficient capacity to absorb the increased demand from the proposed Haymarket DuPage project," and that no new staff or equipment would be required to meet the anticipated call volume. In other words, the Fire District's own expert concluded the Fire District, as currently staffed and equipped, could handle the anticipated increase in EMS calls from Haymarket DuPage.

151. Fire District Chief Burke ("Burke") disagreed with Moeller, the Fire District's own expert, and with the testimony provided by Dominick. Without providing any additional evidence, Burke stated he did not believe MABAS could be relied on to serve the needs of Itasca

---

[37] This shared arrangement terminates in January 2022, and Fire Chief Burke will then only serve the Wood Dale Fire Protection District.

in the event Itasca's ambulance was busy on a call to Haymarket. He also testified, based on no empirical analysis, that he did not credit Dominik's projected numbers or Dominik's finding that Elite Ambulance would minimize any burden on the Fire District. Instead, Burke insisted the Fire District would need to purchase and staff a second ambulance to meet the need, and that the approximate cost of doing so would be $1 million per year. Burke made these assertions even though they were odds with the fire dept's own testimony, and with that of Dominik. Dominik found that (a) calls for EMS in Itasca would have to triple before additional staff and equipment would be required, and (b) Elite Ambulance would capably respond to BLS calls from Haymarket DuPage.

152.    During the hearings, both Moeller and Burke were asked to identify the point at which the number of EMS calls in Itasca would require additional equipment and staff. Neither could provide an answer.

153.    Since the Spring of 2019, Haymarket engaged in a repeated effort to meet with the Fire District to discuss its EMS concerns, and the protocols developed between Haymarket and Elite Ambulance to minimize any impact on EMS in Itasca. The Fire District repeatedly refused to meet.

154.    Dominik also studied the potential impact of Haymarket DuPage on the Itasca Police Department. Based on data produced by the Wood Dale Police Department,[38] confirmed the low call volumes handled by the Itasca Police Department, and he concluded the impact on the Itasca Police Department would be minimal and not affect its ability to provide high-quality

---

[38] The Wood Dale Police Department is a Commission on Accreditation for Law Enforcement Agencies ("CALEA") internationally accredited police agency. As part of the CALEA accreditation process, the Wood Dale Police Department completes an extensive annual report that includes comparison data with surrounding communities. Data included in the 2014-2018 annual reports was reviewed and utilized in Dominik's report.

49

services to the community. Also, Robert O'Connor, Itasca's Director of Police, testified his department handles its call load with only a minimal need to reach out for assistance from neighboring police departments.

155.     In summary, during the zoning hearings, Haymarket DuPage provided extensive testimony and documentary evidence to the Plan Commission, including expert reports, to demonstrate compliance with the standards for approval of its applications for a special use as a Planned Development, and Class 1 Site Plan Review. Accordingly, the Plan Commission and the Village Board were obliged to approve Haymarket's application. The evidence also demonstrated Itasca treated other zoning proposals, such as the Bridge Development, In a vastly different manner than it treated Haymarket DuPage.

## The Bridge Development

156.     The process Itasca required of Haymarket stands in sharp contrast to that followed when Itasca approved an application for a planned development for the Bridge Development, part of which was approved during the same time period that the Haymarket DuPage hearings were suspended. The Bridge Development is a multi-phase project that will ultimately comprise: three industrial buildings for warehousing, distribution, light manufacturing, and logistics purposes, with an estimated total square footage of 761,591; and a commercial area, including a gas station, restaurants, retail stores, and notably a new five-story Holiday Inn, with an estimated total square footage of 47,451.

157.     The Bridge Development is a total of 809,042 square feet, or more than 15 times larger than Haymarket's proposed adaptive re-use of the former Holiday Inn, which has a total square footage of 52,262. Although Itasca required Haymarket DuPage to submit an economic impact statement, at no point during its consideration of the Bridge Development did Itasca

50

require the developer to prepare an economic impact statement, or question the impact of this development on Itasca, any other taxing body, or EMS services.

158.    During Haymarket's cross-examination of Burke, Burke revealed that during his ten years as Fire District Chief, the Fire District never hired a consultant to examine the potential call volume to be generated by any other Planned Development, including the Bridge Development. Thus, the Fire District's expenditure on a consultant to oppose Haymarket DuPage was a first for the Fire District.

159.    Burke testified the Fire District had no concerns about the Bridge Development. Indeed, the Fire District submitted only a one-page report to the Plan Commission regarding this development.[39] That report, in its entirety, stated:

> The following are comments based on my review of the proposed plan submitted by Bridge Development Partners:
>
> 1. Construction type of proposed hotel.
>
> 2. Access road to handle 80,000 GVM.
>
> 3. Turning radius needs, see attached Fire Department documentation.
>
> 4. Traffic lights/Automatic gates would require Opticom type system. Manual gates would require a lock that is operable with our KNOX BOX key.
>
> 5. Fire Protection/ fire pump(s) needs for buildings 1/2/3

Memorandum from Michael Lisek to Shannon Malik-Jarmusz (June 11, 2018), *attached as* Exhibit S.

160.    Notably, that report raised no concerns about the impact of the much larger Bridge Development on EMS services.

---

[39] The Bridge Development was considered over the course of 6 hearings: 1) Plan Commission preliminary workshop session, 2) preliminary planned development approval, 3) final planned development approval, 4) approval of retail, hotel, gas station and restaurant, 5) amendment for construction of gas station, and 6) amendment for gas station and drawings for retail/restaurant building.

161. In addition, O'Connor testified he had concerns about Haymarket DuPage's impact on EMS, but did not have the same concerns about other zoning proposals in Itasca, including the Bridge Development.

### Itasca School District Opposition

162. The School District Board of Education has adopted policy statements that the School District "shall provide a free appropriate public education . . . to all children with disabilities enrolled in the District," and that

> [e]ach child of a homeless individual and each homeless youth has equal access to the same free, appropriate public education, as provided to other children and youths, including a public pre-school education. . . . A homeless child may attend the District school that the child attended when permanently housed or in which the child was last enrolled. A homeless child living in any District school's attendance area may attend that school.

Itasca School District Policy Statements §§6-120; 6-140. These policy statements largely echo the School District's obligations under state and federal school laws, such as the Individuals with Disabilities Education Act (IDEA) and the McKinney-Vento Act. *See e.g.* Individuals with Disabilities Education Act, 20 U.S.C. §1400, *et seq.*; McKinney – Vento Homelessness Assistance Act, 42 U.S.C. §11431 *et seq*.

163. Notwithstanding these policy statements, the School District, through Benes, opposed Haymarket DuPage, claiming the School District would suffer an undue economic burden should Haymarket DuPage open in Itasca. First, it claimed children, infant to age 5, who would reside at Haymarket DuPage through its Mother and Child Program would pose an undue economic burden on the School District because they would be children with disabilities who required special education services.

164. Second, the School District, through Benes, claimed homeless patients at Haymarket DuPage would be able to claim residency in Itasca, and thus their children would be

able to receive free education at the cost of the School District. This interpretation of school residency law in Illinois is incorrect.

165.     Third, although no representative of Lake Park High School testified during the hearing, the School District, through Benes, claimed patients at Haymarket DuPage who were aged 18 - 22, and subject to Individualized Education Placement plans due to their disabilities, would be able to secure free educational services through the local high school district, and thus unduly burden the district.

166.     Even after Haymarket DuPage withdrew its Mother and Child Program, the School District continued to oppose Haymarket due to its fear that Haymarket would open the program in the future. During this time, save for a phone call in early November 2020, the School District and Benes also refused to meet with Haymarket to discuss their concerns.

167.     Immediately prior to Benes' testimony before the Plan Commission, the School District and Benes sent a letter to all families in the School District, and a press release to the media. The press release provided an overview of Benes' testimony. The press release asserted the children of Haymarket DuPage patients might enroll in the School District and be homeless or have disabilities, and this would be costly to the School District. Specifically, it stated:

> Under varying circumstances, the children of patients at the facility may be eligible to attend Itasca District 10 schools as governed by several laws including residency guidelines, IDEA and the McKinney-Vento homeless law. Increases in enrollment with no tax revenue will adversely impact the school district. The per pupil cost in District 10 is just over $11,000 and that cost may increase to nearly $28,000 if a student has special needs…

> We have a strong commitment to students with disability [sic] and inclusivity of all students. We believe strongly in this mission and district goals and use both to guide our efforts each and every day. However, our district goals also call for fiscal responsibility as our commitment to this directly impacts the quality of education for both current and future students. The existing proposal is economically adverse to our students and the district.

Benes Press Release (April 7, 2021), *attached as* Exhibit T.

168.     Benes' letter to parents in the School District also repeated the wrongful assertion that the presence of Haymarket DuPage could compromise the ability of the Fire District and Police Department to respond to emergencies at the three schools within the District. It even suggested the Fire District and Police Department might have to cease their involvement in educational programming at the schools if Itasca allowed Haymarket DuPage to open. Benes stated:

> I will also share details about our strong relationship between District 10 and the Itasca Police and Fire Departments. One concern being shared is regarding the potential for services at the proposed development, which could impact response time for emergency situations at any of our three schools. In addition, District 10 benefits from both departments being highly involved in our education programs for students through classroom and school-wide presentations and other connections. An additional concern is that if that would continue given the potential impact on the police and fire resources.

Letter Benes to Itasca District 10 Parents (April 7, 2021), *attached as* Exhibit U.

169.     Finally, the press release also incorrectly claimed that if Haymarket DuPage, due to its nonprofit status, was determined to be exempt from property taxes, "lost tax revenue and potential new student costs" would be "an economic hardship." Ex T. As described in Dr. Merriman's testimony above, this assertion is wrong.

170.     In summary, the School District's statements misinterpreted school residency law, and implied the children of patients at Haymarket DuPage would necessarily have disabilities, require special education services, and/or be homeless. These statements furthered negative stereotypes of the patients Haymarket would serve, and encouraged the community in Itasca to oppose the project because of who would be served there, in violation of anti-discrimination laws.

## **Public Questioning and Comment**

### 2019 Public Questioning

171.     During the initial hearings in 2019, the Plan Commission allowed residents to question each witness who testified.

172.     During this part of the hearings, residents repeatedly questioned Haymarket DuPage witnesses about why the project had to be in Itasca, and asked other questions that revealed bias toward the individuals to be served at Haymarket DuPage.

   a.  Have you ever considered Indian Lakes in Bloomingdale?

   b.  My question here is why do they call it Haymarket Healthcare Center when it's a drug treatment facility? Are you trying to influence everybody's minds here or what?

   c.  My question is why here . . . why here for the Haymarket? Why is the best place over here to open up?

   d.  [W]ouldn't Haymarket, would you feel that Haymarket would be better addressed in a different area of DuPage? There's a million people in DuPage. We have 9,000, and all the towns around here that you mentioned, I know that everyone can benefit in DuPage, but wouldn't you feel, especially knowing the whereabouts of Bloomingdale for instance, that it would be better suited in another area where it's much closer to the population?

   e.  [H]ow much interaction is there between the residents of Haymarket and the local community. What is the procedure?

   f.  I guess a question that we have is the individuals, since this is an open facility, could come and go and leave the establishment, say a short walk to the train and they might use that train. If they're before the meeting they might hang and have coffee at a Starbucks in town or go to the 7-11 for a beverage. I assume some of these people that would come to the facility are maybe using at that time because they're starting to step to the process. I don't know if you're a mother, you have children, let's say they are … If my child or anybody's child from town happen to be hanging out at the same facility with these individuals and started interacting with them, is it a good experience for that let's say seven to 18-year-old to spend 20, 30, 40, 50 minutes with somebody that may be using at the time? Because I think that's a very possibility that could happen.

173.    During the 2019 hearings, Itasca resident Anthony D'Amato testified in support of Haymarket and the need for its services. Specifically, Mr. D'Amato testified regarding the experience of his close childhood friend, a person with substance use disorder who was treated at Haymarket Chicago. He also testified that although he was only 26 years old, 12 of his friends had died of overdoses.

174.    In response to Mr. D'Amato's testimony, Itasca residents asked questions that challenged Mr. D'Amato's credibility and revealed a belief that efforts should not be made to help people with substance use disorder:

> [JAMES KEATHLEY]: I'll start with a credibility question, but if he supplies the names of his 12 friends now or later just to check to make sure he actually had 12 friends that did pass away.

> MR. BERGNER: I'm Brian Bergner; I'm an Itasca resident. The friend that you described, someone who has a lot of friends, a lot of family members, a lot of interpersonal social connections, people who would be affected by their behavior and by this person passing. So, without Haymarket, would your friend still be alive or would he be dead?

> MR. DAMATO: I cannot a hundred percent answer that as a correct yes or no question, but I can tell you that I know the path that he was going down, and I know that Haymarket played an extremely substantial role on his life towards saving him.

> MR. BERGNER: And is the world a better place with him in it or would the world be a better place if he had died?

175.    Members of the Plan Commission themselves voiced fears regarding whether the population at Haymarket DuPage would be able to leave the facility. For example:

> COMMISSIONER DRUMMOND: If a patient wants to take the train to and from his home or her home and then walked to the Holiday Inn, which is doable, it's just down the street, would that be allowed?

> DR. LUSTIG: You mean if they're coming in for treatment?

> COMMISSIONER DRUMMOND: Yes.

> DR. LUSTIG: If they're coming in for treatment, it will be allowed because obviously –

56

COMMISSIONER DRUMMOND: If they're like an outpatient?

DR. LUSTIG: Yes, if they're an outpatient, then they would be allowed to commute, yes. They would be able to use the train, yes.

COMMISSIONER DRUMMOND: And what about patients that want to just stop the program if they're not happy with it, they just want to leave, would they be able to exit the building –

DR. LUSTIG: All of our clients that we – why don't we look at staff advice, have a clinical staffing done prior to their leaving. Part of that clinical staffing is being able to transport them out of the facility using a Haymarket Center van. Now, if there is an individual that wants to walk out and doesn't want to receive services, I believe that's possible.

COMMISSIONER SWETS: I would like to ask a quick question with that also. In comparing the West Loop to the DuPage, you said that it's different in the kind of, probably treatment. What would stop the DuPage Center from becoming what the West Loop is?

MR. BALDWIN (a witness for Haymarket DuPage): What's that suggesting?

COMMISSIONER SWETS: So, when you said the West Loop had more severe mental cases, I think that's it, what would stop DuPage from becoming that silo of center in DuPage?

COMMISSIONER SWETS: No, no, I'm just trying to understand. . . if somebody refuses the transportation, if I walked in and you said I can't treat you, and I want to walk out, what happens?

DR. LUSTIG: …we would, we have a team of case managers and recovery coaches that would work to place this patient into appropriate facility and work with that patient to transport them out.

COMMISSIONER SWETS: And if they refuse?

DR. LUSTIG: If they refuse transportation?

COMMISSIONER SWETS: Yes.

DR. LUSTIG: Then we would try to give them some type of other transportation. We would call family members that might assist with this.

57

COMMISSIONER SWETS: But there's a possibility they could walk out themselves without you stopping it. I would assume you'd call the police at that point, but --

DR. LUSTIG: The answer is, is there a chance? Yes. Why we would call the police when they haven't done anything?

COMMISSIONER SWETS: I mean, if they're, if they are aggravated or, I mean, if they're causing a situation, you would call, if they were being disorderly, I would assume.

<u>Public Questioning and Comment in 2020/2021</u>

176.     Before the Plan Commission hearings resumed in October 2020, Haymarket and the Objectors agreed to modify the hearing format from 2019 that had allowed questions by the public after each witness. Instead, the parties agreed that after all parties concluded putting on their respective cases, there would be: (a) a public questioning period where members of the public could question the parties and witnesses, and (b) a public comment period where members of the public could issue comments about the proposed facility, and (c) closing statements by the parties.

177.     Thereafter, the usual zoning protocol would occur. First, the Plan Commission would recommend approval or denial of the application. Next, the matter would go before the Village Board to issue a final decision.

178.     In the summer of 2021, the hearing process finally reached the public questioning and public comment periods. This phase of the hearing revealed residents in Itasca were fearful of the population to be served by Haymarket DuPage, assumed its presence would adversely impact the community, harbored discriminatory animus about those with substance use disorder, and/or preferred Haymarket DuPage find anywhere but Itasca to operate a facility. For example, the following comments occurred during the public questioning period:

a. How do you think Haymarket is going to affect [the crime level within] the Village if it ever comes to Itasca?

b. [A]fter recently speaking to the DuPage County Sheriff, [Dr. Lustig] reported to me that over 80 percent of the detainees in jail have an opioid disorder. Are we going to think that none of these inmates live in Itasca or have had an impact on Itasca?

c. Is there recourse of any kind to the residents of Itasca if Haymarket changes their "vision" or any of their intentions for the facility that they've stated during this hearing that do not fall under the restrictions of zoning? For example, if they change their programs to accept sexual offenders or they decide to accept mothers with young children, etc.

179.    The following statements were made during the public comment period:

a. Our town will never be the safe, small town that it is right now with kids riding their bikes freely. You may think I'm being dramatic or exaggerating. I am not. I lived this, and I know it. It's like bringing death to Itasca. Our crime rate will skyrocket.

b. I must sadly confirm that there are at least a handful, if not more, Itasca residents who have made comments, both publicly and privately, that stigmatized addiction. If you haven't noticed it personally already, then this is something you need to be aware of.

Certain residents speak of how this facility might ruin our beautiful town, as if there is something ugly about treating addiction or about those facing substance use disorders.

Certain residents question whether those people should be allowed to use our library, as if those struggling with addiction are somehow a threat.

Certain residents have even implied that Haymarket should be denied due process. Some of the comments are blatant, others are a little more subtle, but they are all inexcusable. There is no place for those views here.

c. [T]hen there's this other side that was just ugly where I saw kids shouting negative slogans and saying negative things and not even understanding what was going on, all because an organization who works downtown wanted to move out into DuPage County and has had some issues trying to find a place because of -- you can say it's not stigma, but it is.

d. My concern is regarding economy [sic] impact on town residence. One aspect of economy [sic] impact is property value. Dr. Lustig himself has expressed concern about general public's negative bias towards substance abuse treatment center facilities. If we take his own argument it's not hard to imagine that once Haymarket DuPage opens here in Itasca, future would investors would not invest in Itasca. This is because of same bias that Dr.

Lustig has talked about. Future home buyers would prefer nearby towns compare[d] to Itasca because of the same negative bias. This could result in property prices plummet in Itasca. For some of us investment in house and businesses is the only retirement savings we have. This concern has not been talked about much so far in hearing. I and my whole family [sic] (3 more adults besides me) strongly oppose Haymarket's proposal.

e. I truly believe that somewhere else is the perfect location/city/town for this type of facility with larger proximity from its residents and their everyday life… and do not want our kids to live and grow up in this environment which is toxic to them and their future.

f. I have been living in Itasca since 1980 and I believe that this Haymarket will do more harm than help for us the Itasca residents. Our emergency services will be jeopardized as the Haymarket's patients may be in need and use the little equipment we have. I also believe that the location where it currently wants to open is not ideal for the residents['] safety. There is a lot of facilities being [used] by children within walking distance from the potential site. Such as the library, the pool, the music classes, the gymnastics center and not too far is the park district. This will put our community children in danger. Let's keep our small village safe.

180. Some public comments echoed the comments Pruyn previously made, without basis, that Haymarket DuPage was not being transparent:

a. Based on Haymarket's presentations, I question their transparency and willingness to be good neighbors. I wonder how this proposed facility in Itasca will be productive for our community and its patients. Over the past two years we've been given many promises from them, but we've also seen very many inconsistencies in their testimony. They have removed their mothers-with-children program for now, but we know it can be brought back as fast as it was taken away.

b. At the beginning of Haymarket's testimony, Dr. Lustig talked numerous times about being good neighbors to the residents of Itasca. However, his lack of transparency couldn't make that statement further from the truth.

181. Itasca Resident Helen Zakos, one of the Concerned Citizens of Itasca, presented the Plan Commission with a petition and stated "[f]irst off, please don't be fooled by the lack of people gathered tonight. The people of Itasca are still heavily against this proposal. I have over 3,000 signatures and petitions in my hand that I want to present tonight against the Haymarket DuPage proposal."

182.    Haymarket objected to the submission of the petition into evidence because: (a) it contained incorrect information about Haymarket, (b) it was not dated, (c) it included far fewer than 3,000 signatures, (d) it contained signatures from people who do not live in Itasca, and (e) in many instances it was obvious one person signed for two people. Nonetheless, it was admitted into evidence.

### Procedural Anomalies

183.    A number of procedural decisions by Itasca regarding the hearing process deviated from the usual protocols for a zoning matter and, essentially, were intended to "stack the deck" against Haymarket DuPage. They included, but were not limited to, the following:

- Itasca granted the Objectors full standing as parties to oppose Haymarket. In addition to the usual right to present testimony and cross-examine witnesses, the Objectors were granted the authority to (a) review and comment on the hearing procedures, (b) make closing statements, (c) present proposed findings of fact, and (d) exercise other procedural rights not consistent with practices traditionally followed in zoning hearings;

- Charles Hervas ("Hervas"), the attorney for Itasca, acted as the "impartial" legal counsel to the Plan Commission throughout the zoning hearings, including suggesting specific rulings to the Plan Commission Chair, and who, himself, ruled on several objections to testimony. Despite the veil of impartiality, Hervas recommended a witness, Kevin Wrigley, to Steven Ellenbecker, the attorney for the Neighborhood Opposition, who Mr. Ellebecker called to testify in opposition to Haymarket DuPage. Haymarket sent Hervas a letter to object to his suggestion of a witness for the Neighborhood Opposition, and asked him to provide his communications with Mr. Wrigley, which he refused to do;

- Mr. Hervas also represented two witnesses – Police Chief O'Connor and Sarah Ketchum - who testified on behalf of the Village. In this role, Mr. Hervas reviewed their statements, and objected to questions posed to them. Given Mr. Hervas' active participation in the hearing on behalf of these two witnesses, the Village engaged special counsel to fill the "impartial' role otherwise held by Mr. Hervas;

- With respect to the public questioning phase of the hearing in the summer of 2021, Itasca refused to require members of the public to sign-up in advance to identify those witnesses from Haymarket DuPage and the Objectors they planned to question. This forced Haymarket DuPage to incur the financial burden of preparing its witnesses to appear and testify during this phase, regardless of

whether the public intended to question them. In fact, several Haymarket witnesses were present for questions from the public, and no questions were asked. This caused Haymarket to endure unnecessary expenses;

- In contrast, Itasca did not require the Neighborhood Opposition to appear in-person for questions from the public as required by Plan Commission rules governing large hearings, even though it required all other parties to do so, and Haymarket specifically requested in writing that the Neighborhood Opposition appear. Instead, Itasca only required that Steven Ellenbecker, the attorney for the Neighborhood Opposition, respond to written questions only from the public;

- Itasca allowed all parties, including the Objectors, to present proposed findings of fact to the Plan Commission; and

- Itasca allowed all parties, including the Objectors, to present closing statements to the Plan Commission, and initially proposed each party, including Haymarket, would get an equal allotment of 20 minutes. (Haymarket DuPage was ultimately allowed an hour, an amount of time equal to the cumulative time allowed for the Fire District, School District, and Neighborhood Opposition.).

184. These procedural anomalies contributed to unfair and discriminatory proceedings before the Plan Commission.

<u>Plan Commission Recommends Denial of Haymarket's Application</u>

185. On September 22, 2021, after two years and over 35 hearings, the Plan Commission unanimously rejected Haymarket DuPage's zoning applications in a 45-minute hearing.

186. Prior to the meeting, individuals from the community held what they labeled a "silent protest" outside the Village Hall that included "No Haymarket" signs.

187. During deliberations, the members of the Plan Commission determined there was a need for a treatment center in DuPage County, but claimed there was not enough evidence of the need for treatment in Itasca itself. Commissioners also criticized the size of the proposed facility.

188. The Plan Commission based its decision to deny the zoning applications on Haymarket's supposed burden on EMS services. With respect to the purported EMS burden,

Plan Commission Chairman Brendan Daly ("Daly") stated, "[t]he only number I feel comfortable with in this entire hearing is the number one. Itasca has one ambulance. … I have a real hard time feeling confident that should this development go through in its proposed size and current condition, it will not have a detrimental impact on the village." Notwithstanding Haymarket DuPage's contract with Elite Ambulance, expert testimony to the contrary, and Itasca's earlier refusal of Haymarket's offer to purchase a second ambulance, Daly also claimed the Fire District would need to purchase a second ambulance:

> It is our responsibility to provide a reasonable accommodation; however, I believe that the capital expense of $300,000 for a new ambulance, an additional $700,000 and up for the staff to man that ambulance from Chief Burke's testimony on May 5th, 2021, line 17, page 26, and that just ballpark figure would be roughly $300,000 for that unit, page 27, line 11 -- that's just the fire department. And then that annual cost for staffing would be an ongoing thing. So you know you'd probably be in that 700- to $750,000 range annually. To me, I can't rationalize that as a reasonable accommodation for the proposed development.

189.    Further, Daly stated he "just can't get [his] head around how having a contract with Elite is going to lesson [sic] the proposed burden -- not the proposed -- the possible burden on the Village Fire Protection District's ability to respond to both calls at Haymarket and the balance of the Village."

190.    Plan Commissioner Drummond also stated the Plan Commission had "never seen a contract" [with Elite], despite that the contract with Elite had been entered as an exhibit and made part of the record.

191.    As to the School District, Daly stated: "I believe that the schools can also -- we've heard testimony from Mr. Benes, and I do believe that the standard for the schools, the lack of impact to the schools, that burden of proof has not been met." The other commissioners agreed with this assertion, even though it was unsupported by the facts or school residency law, and no children would live at Haymarket DuPage.

192.    Even though Itasca forced Haymarket to apply for a special use as a Planned Development due to the purported "residential" nature of the proposed facility, Plan Commissioner Drummond[40] stated she did not think the proposed facility could truly be characterized as residential. Plan Commissioners Carello and Daly agreed with this statement, but also again claimed the facility would unduly burden EMS.

193.    Immediately before voting, Ms. Wysocki, attorney for Itasca, directed the Plan Commission to discuss reasonable accommodations. Ms. Wysocki stated:

> [The FHA and ADA] create an affirmative duty on the part of the Village to reasonably accommodate these disabled individuals in zoning matters; therefore, even if Haymarket does not meet the standards of the zoning ordinance, this Commission must consider whether accommodations should be made to alleviate the discrimination. The Commission can consider whether the requested accommodation is necessary to alleviate the discrimination and whether the requested accommodation is reasonable and proportional to the cost implemented. So that is two factors. I would ask that -- I know that Chairman Daly talked a little bit before about the reasonability of the accommodation, but I would ask that the commissioners consider both factors.

194.    Ms. Wysocki did not clarify to what "accommodation" she was referring; however, the only "accommodation" discussed during the hearing at all was the cost of purchasing and servicing a second ambulance. Moreover, Ms. Wysocki seemed incorrectly to suggest that even if Itasca found Haymarket had not met the standards, that a reasonable accommodation to buy and staff a second ambulance would be the only accommodation possible, and that it was unreasonable. This characterization constitutes a material misstatement of the facts and relevant civil rights law.

195.    To this, Plan Commissioner Ray responded that her concerns "go back to health and safety and to being able to accommodate residents, and I don't believe with the lack of EMS

---

[40] The transcript identifies the speaker as Commissioner Ray; however, Commissioner Drummond made this statement.

services that we have in this town and the burden on those services that we're going to be able to protect and residents are going to be able to thrive in that environment." Plan Commissioner Drummond agreed.

196.     Plan Commissioner Carello opined that "size, I think, is a big issue…if this was a substantially smaller property, we would not be here today. This would have been done a long time ago."

197.     Daly reiterated that the cost of purchasing and staffing a second ambulance was not reasonable and that "again, I go back to capital expense of $300,000, plus or [minus], for a new ambulance because I do believe that if this was to be approved, that second ambulance would be required."

198.     The Plan Commission did not discuss any reasonable accommodations other than purchasing and staffing a second ambulance.

### **Haymarket Reaffirms Conditions**

199.     On October 11, 2021, in response to the misplaced concerns expressed by Itasca's Plan Commission, Haymarket DuPage, through counsel, sent a letter to the Village reaffirming the conditions Haymarket would agree to if the Village approved the zoning application. Haymarket DuPage agreed:

- to always maintain a contract with a private ambulance company to handle BLS calls generated by Haymarket DuPage;

- to execute an additional contract with a second private ambulance company if needed to provide additional capacity to handle BLS calls from Haymarket DuPage;

- to meet immediately, or at any time prior to the opening of the facility, with the Itasca Fire Protection District to review protocols that will govern Haymarket's relationship with any private ambulance company. Haymarket further agreed to consider any reasonable recommendations suggested by

65

the Fire District to ensure collaboration and the provision of efficient emergency services to Itasca residents and businesses;

- to meet as needed upon the request of the Fire District and/or the Police Department to review call volumes generated by Haymarket DuPage. Haymarket further committed to work collaboratively to further the provision of efficient emergency services to Itasca residents and businesses; and

- to continue to pay the property taxes for Special Service Area No. 3

Letter from Bridget O'Keefe to Charles Hervas (October 11, 2021), *attached as* Exhibit V.

200.    On October 26, 2021, the Village, through counsel, responded that it would not agree to any of the conditions, claiming they were not enforceable under *Keystone Montessori Store v. Village of River Forest,* 2021 IL App (1st) 191992 (1st Dist. 2021). Letter from Yordana Wysocki to Bridget O'Keefe (October 26, 2021), *attached as* Exhibit W.

201.    That same day, Haymarket through counsel, responded that *Keystone* did not apply. Among other points, Haymarket noted that: (a) the Illinois Municipal Code explicitly states a special use may be subject to conditions reasonably necessary to meet the standards set forth for approval of a special use; (b) conditions on a special use are commonly considered by municipalities across the state; and (c) the conditions offered here (with the exception of the offer to pay the tax assessments for the Special Service Area) directly relate to the zoning standards for a special use in Itasca, namely the impact of Haymarket DuPage on the health, safety, and welfare of the community (i.e., the impact on EMS). Letter from Bridget O'Keefe to Yordana Wysocki (October 26, 2021), *attached as* Exhibit X.

202.    The Village failed to respond to Haymarket DuPage's letter.

### Village Board Denies Haymarket Proposal

203.    On October 26, 2021, Itasca allowed all parties, including the Objectors, to present closing statements to the Village Board. Itasca initially proposed each party, including

66

Haymarket DuPage, would get an equal allotment of 20 minutes for such statement. After Haymarket objected, Haymarket was allowed to have an hour to make a statement to the Board.

204. On November 2, 2021, the Village Board, in a meeting that lasted 17 minutes, denied the Haymarket proposal.

205. Prior to calling for the vote, Pruyn made a public oppositional statement that constituted approximately eight minutes, or half the total meeting time, wherein he claimed, without basis, that Haymarket's proposal was unreasonable because it would cause too great an economic burden on Itasca. In particular, Pruyn stated Itasca would be required to buy and staff a second ambulance, which it could not afford:

> As time went on, we learned more and more about the immense size and scope of Haymarket's plan, and I kept coming back to one question: How could Itasca reasonably handle a facility like this. . .

> The bottom line is, the forecasting is more than what our fire district can handle now with our one ALS ambulance.

> Haymarket suggested they could provide a second ambulance, but that would also require staff, maintenance, and other costs Itasca just doesn't have …

> It was clear to state-elected officials, county-elected officials, and local officials that one of the smallest communities was going to have to absorb 100 percent of the cost, risk, and burden of servicing a facility that would be accepting residents beyond Itasca. More importantly, it was also clear to Haymarket that costs went beyond Itasca means.

206. Like the Plan Commission, Pruyn did not address (a) the conditions with which Haymarket DuPage offered to comply if zoning were approved, or (b) any reasonable accommodations requested, other than to state that buying and staffing a second ambulance was unreasonable. Pruyn also referenced Representative Deborah Conroy's offer in 2019 to secure a half million dollars in state monies to offset the potential lost tax revenue for Itasca due to Haymarket's non-profit status, an offer he rejected the day after it was made. He claimed Itasca

did not have enough information about Haymarket DuPage at the time the grant was offered, and the offer had no value because he could not know whether the grant would be renewed indefinitely.

207.    After Pruyn's speech, only Trustee Ellen Leahy made a statement, in which she echoed Pruyn's remarks. She falsely stated: "Itasca is being asked to support a 200-bed facility that could potentially cost Itasca and its residents $1 million annually." Also, despite Representative Conroy's offer to secure half a million dollars in state funding, Trustee Leahy stated: "[Neither] Itasca nor the Itasca Fire Protection District has ever received a financial commitment from the State of Illinois to help support Haymarket."

208.    The Village Board voted unanimously, 6-0, to deny the requested zoning relief.

209.    At 7:29 p.m., roughly ten minutes after the Village Board vote, Itasca issued a press release announcing the decision and publishing Pruyn's remarks. Itasca Press Release (November 2, 2021), *attached as* Exhibit Y.

### Defendants' Actions Injured Haymarket

210.    Even though Haymarket DuPage satisfied all zoning requirements for a planned development and Class 1 Site Plan Review, the Village denied Haymarket's use of the Property. This decision was without legal basis or justification.

211.    The Village's decision to reject Haymarket's applications for the planned development and Site Plan Review was arbitrary, capricious, without basis, and unreasonable. The decision denied Haymarket its substantive due process rights and violated Illinois law.

212.    The Itasca Defendants intentionally discriminated against Haymarket DuPage and its prospective patients based on discriminatory bias because they were materially influenced by

discriminatory community opposition, and discriminatorily applied the Itasca Zoning Ordinance to prohibit Haymarket DuPage from opening a healthcare facility in Itasca.

213.    Moreover, the Itasca Defendants refused reasonably to accommodate Haymarket DuPage. These Defendants refused to treat the proposal as a special use as a "healthcare facility," and insisted Haymarket DuPage apply under the more onerous and less appropriate "planned development" standard. These Defendants refused to meet with Haymarket DuPage to discuss any reasonable accommodations or to approve any proposed conditions. In doing so, the Itasca Defendants failed to accommodate Haymarket in violation of disability discrimination laws.

214.    Defendants' actions prevented Haymarket DuPage from opening Haymarket DuPage in Itasca, accepting patients, and operating a treatment facility in Itasca.

215.    Defendants' actions denied housing opportunities to people with substance use disorder in Itasca. As a result of Defendants' actions, prospective patients of Haymarket DuPage are restricted in their opportunities to live and receive treatment in the facility of their choice, thus interfering with their rights to integrated housing and services.

216.    Defendants and their agents knew Haymarket DuPage would provide treatment and a healthcare facility for people with disabilities, but acted intentionally and willfully, and with callous and reckless disregard for the statutory rights of Haymarket and its prospective patients. This entitles Haymarket DuPage to punitive damages.

217.    As a result of Defendants' conduct, Haymarket DuPage has suffered compensatory damages, reputational harm, and injury to and frustration of its mission. Defendants' actions also denied Haymarket DuPage the use and enjoyment of its Property, and forced Haymarket to expend considerable undue costs and resources, and to divert its resources.

Likewise, Defendants' discrimination harmed the patients Haymarket DuPage would serve, and their children.

218.    Haymarket DuPage has no adequate remedy at law. Unless this Court provides equitable relief, Haymarket will continue to suffer irreparable injury due to Defendants' discriminatory conduct. Accordingly, Haymarket is entitled to injunctive relief.

219.    Defendants' actions are ongoing and continuing and constitute continuing violations under the FHA, ADA, and Section 504.

## CLAIMS

## COUNT I: FAIR HOUSING ACT

### Itasca and Itasca Plan Commission ("Itasca Defendants")

220.    Haymarket re-alleges and incorporates the preceding paragraphs and allegations as if fully set forth herein.

221.    By applying its zoning ordinance to prohibit the operation of Haymarket DuPage in Itasca in the B-2 district, requiring an onerous and discriminatory zoning hearing process, denying Haymarket's requests for zoning relief, refusing to make reasonable accommodations to allow Haymarket to operate a treatment facility for people with disabilities, and through Itasca's agents' false and discriminatory statements, Itasca Defendants have:

   a. Interpreted and applied Itasca's Zoning Ordinance in a manner that discriminates against persons with disabilities by refusing to permit a treatment center and recovery home for people with disabilities in the B-2 district, in violation of 24 C.F.R. §100.70(d)(5);

   b. Made unavailable the facility owned by Haymarket DuPage to the potential Haymarket patients because they are people with disabilities, in violation of 42 U.S.C. §3604(f)(1);

   c. Discriminated in the provision of services in connection with Haymarket because the potential patients of Haymarket are people with disabilities, in violation of 42 U.S.C. §3604(f)(2);

d. Failed or refused to make reasonable accommodations in rules, policies, practices, or services when such accommodations are necessary to afford people with disabilities an equal opportunity to use and enjoy temporary housing, in violation of 42 U.S.C. §3604(f)(3)(B);

e. Restricted or attempted to restrict the choices of people with disabilities so as to discourage or obstruct choices in a community, neighborhood or development, in violation of 24 C.F.R. §100.70(a);

f. Denied Haymarket DuPage's requests for zoning approval because of discriminatory animus against persons with disabilities, in violation of 42 U.S.C. §3604(f) and 24 C.F.R. §100.70(d)(5);

g. Coerced, intimidated, or interfered with Haymarket DuPage because it asserted its right, under the Fair Housing Act, to operate a center in Itasca, in violation of 42 U.S.C. §3617; and

h. Through its agents, made, printed, published, or caused to be made, printed, or published statements that intentionally discriminated against people with disabilities with respect to housing, in violation of 42 U.S.C. §3604(c).

222. Itasca Defendants strategically acted in concert together and with other key Village agencies, Pruyn, and Objectors to orchestrate discriminatory conduct, with discriminatory intent, to deny housing to persons with disabilities, in violation of the Fair Housing Act.

223. Itasca Defendants' conduct was intentionally discriminatory, willful, wanton, and/or in reckless disregard of Haymarket's rights under the Fair Housing Act.

### COUNT II: FAIR HOUSING ACT

Itasca Fire Protection District No. 1

224. Haymarket DuPage re-alleges and incorporates Paragraphs 1 - 219, above as if fully set forth herein.

225. As alleged herein, the Fire District:

a. Strategically acted in concert with other key Village entities, Pruyn, and Objectors to orchestrate discriminatory conduct, with discriminatory intent, to deny housing to persons with disabilities, in violation of the Fair Housing Act.

b. Materially contributed as a recognized Objector to, supported, and acted in concert with Objectors and other named Defendants to create false and pretextual reasons, not based in fact but rather based on discrimination, to reject Haymarket DuPage;

c. Threatened undue scrutiny of Haymarket DuPage's compliance with fire safety protocols, but admitted to not similarly scrutinizing fire safety provisions of the previous owner of the Holiday Inn site, which was not associated with people with disabilities;

d. Intentionally presented, and persisted in presenting, inaccurate information during the zoning proceedings that Haymarket DuPage would deprive Itasca residents of EMS;

e. Failed and refused to meet with Haymarket concerning potential reasonable accommodations relating to supplementing EMS services; and

f. Failed and refused to recognize Haymarket's contract with Elite Ambulance, though entered into the record, and failed to withdraw its objection to Haymarket even after Haymarket cured its objections with proposed conditions.

226. Defendant Fire District violated the Fair Housing Act as follows:

a. Materially and discriminatorily contributed to making unavailable the facility owned by Haymarket DuPage to the potential Haymarket patients because they are people with disabilities, in violation of 42 U.S.C. §3604(f)(1);

b. Discriminated in the provision of and/or withholding of EMS and fire protection services in connection with Haymarket because the potential patients of Haymarket are people with disabilities, in violation of 42 U.S.C. §3604(f)(2);

c. Failed or refused to make reasonable accommodations in rules, policies, practices, or services when such accommodations are necessary to afford people with disabilities an equal opportunity to use and enjoy temporary housing, in violation of 42 U.S.C. §3604(f)(3)(B);

d. Through its agents, made, printed, published, or caused to be made, printed, or published statements that intentionally discriminated against people with disabilities with respect to housing, in violation of 42 U.S.C. §3604(c); and

e. Coerced, intimidated, or interfered with Haymarket DuPage because it asserted its right under the Fair Housing Act to operate a treatment and recovery center in Itasca, in violation of 42 U.S.C. §3617.

227. Defendant's Fire District's conduct was intentionally discriminatory, willful,

wanton, and/or in reckless disregard of Haymarket's rights under the Fair Housing Act.

## COUNT III – FAIR HOUSING ACT

### Itasca Public School District 10

228.    Haymarket DuPage realleges and incorporates by reference paragraphs 1 – 219

above, as if fully set forth herein.

229.    As alleged herein, Defendant School District:

a.   Strategically acted in concert with other key Village agencies, the Mayor, and Objectors to orchestrate discriminatory conduct, with discriminatory intent, to deny housing to persons with disabilities, in violation of the Fair Housing Act;

b.   Materially contributed as a recognized Objector to, supported, and acted in concert with Objectors and other named Defendants to create false and pretextual reasons, not based in fact but rather based on discrimination, to reject Haymarket DuPage;

c.   Caused Haymarket DuPage to withdraw its Mother and Child Program to satisfy claims the children who would accompany their mothers during treatment would be children with disabilities who would place an undue economic burden on the School District;

d.   Intentionally presented and persisted in presenting false and inaccurate information during the zoning proceedings to further the strategy of steering Haymarket out of Itasca, and garnering community opposition, by claiming:

i.   Children of mothers in treatment at Haymarket DuPage would require free special education services through the School District;

ii.   Children of Haymarket DuPage patients who are homeless would claim free educational services through the School District for their children, despite the fact that their children would not be residents of Itasca;

iii.   Haymarket DuPage patients aged 18-22 would place an undue economic burden on the high school district if they were students with disabilities with an Individualized Education Plan, as they would claim free school services; and

iv.   EMS services demanded by Haymarket DuPage would divert fire and police programming from the School District.

230.    Defendant School District violated the Fair Housing Act as follows:

a.   Materially contributed to making unavailable Haymarket DuPage to the potential Haymarket patients because of discriminatory perceptions of people with disabilities, including those who may have children, in violation of 42 U.S.C. §3604(f)(1) and 3604(b);

b. Confirmed its intention to discriminate in the provision of and/or withholding of educational services to children if they would reside with patients of Haymarket DuPage who are people with disabilities, to further the strategy of steering Haymarket DuPage away from Itasca, in violation of 42 U.S.C. §§3602(k), 3604(b) (familial status), 3604(f)(2) (association with person with a disability), and contrary to the *Joint Statement on Reasonable Accommodations under the Fair Housing Act[41]*;

c. Endorsed and disseminated false and discriminatory statements about adverse impacts of Haymarket DuPage's provision of housing and services to people with disabilities and their children, which statements were strategically used to drive Haymarket DuPage out of Itasca, in violation of 42 U.S.C. §3604;

d. Through its agents, made, printed, published, or caused to be made, printed, or published statements that intentionally discriminated against people with disabilities with respect to housing, in violation of 42 U.S.C. §3604(c); and

e. Coerced, intimidated, or interfered with Haymarket DuPage because it asserted its right under the Fair Housing Act to operate a treatment center in Itasca, in violation of 42 U.S.C. §3617.

231. Defendant School District's conduct was intentionally discriminatory, willful, wanton, and/or in reckless disregard of Haymarket's rights under the Fair Housing Act.

## **COUNT IV – FAIR HOUSING ACT**

### Jeffrey Pruyn (Official Capacity)

232. Haymarket DuPage realleges and incorporates by reference paragraphs 1 - 219, above, as if fully set forth herein.

233. The federal Fair Housing Act allows government officials to be sued both in their individual and official capacities.

234. As alleged herein, Defendant Pruyn:

a. Utilized his position as Mayor to publish and mail false and discriminatory information that denigrated Haymarket and the patients it would serve, encouraged Itasca residents to oppose Haymarket DuPage, and fostered false and pretextual bases to reject Haymarket DuPage, in concert with and in furtherance

---

[41] *HUD/DOJ Joint Statement on Reasonable Accommodations under the Fair Housing Act, available at* https://www.justice.gov/sites/default/files/crt/legacy/2010/12/14/joint_statement_ra.pdf (hereinafter "Joint Statement on Reasonable Accommodations").

of the Village-wide strategy to steer Haymarket away from Itasca, and deny use of its Property for a healthcare facility in compliance with Village zoning;

b. Intentionally presented, and persisted in presenting, inaccurate discriminatory information including but not limited to: (a) depicting Haymarket as deceitful and not transparent in the process, and (b) falsely claiming Haymarket DuPage could be an undue burden on Itasca's EMS services and tax base.

c. Strategically acted in concert with Itasca, the Plan Commission, other key Village agencies, and Objectors to orchestrate discriminatory conduct, and false pretextual bases, to reject Haymarket DuPage, and did so with discriminatory intent to deny housing to persons with disabilities, in violation of the Fair Housing Act;

d. Rejected Haymarket's offer to purchase a second ambulance for Itasca, and then used the lack of a second ambulance as a basis to oppose Haymarket's application; and

e. Rejected State Representative Deborah Conroy's offer of state funding and, just prior to the vote by the Itasca Village Board on Haymarket's DuPage's zoning applications, made a speech to encourage the Village Board to deny the zoning application.

235. Defendant Pruyn violated the Fair Housing Act as follows:

a. Materially contributed to making unavailable the facility owned by Haymarket DuPage to the potential Haymarket patients because they are people with disabilities, in violation of 42 U.S.C. §3604(f)(1);

b. Utilized his position as Mayor to cause discrimination in the provision of services in connection with Haymarket DuPage because the potential patients of Haymarket DuPage are people with disabilities, in violation of 42 U.S.C. §3604(f)(2);

c. Failed or refused to make reasonable accommodations in rules, policies, practices, or services when such accommodations are necessary to afford persons with disabilities an equal opportunity to use and enjoy temporary housing, in violation of 42 U.S.C. §3604(f)(3)(B);

d. Restricted or attempted to restrict the choices of people with disabilities so as to discourage or obstruct choices in a community, neighborhood or development, in violation of 24 C.F.R. §100.70(a);

e. Coerced, intimidated, or interfered with Haymarket DuPage because it asserted its right, under the Fair Housing Act, to operate a treatment center in Itasca, in violation of 42 U.S.C. §3617; and

f. Made, printed, published, or caused to be made, printed, or published statements that intentionally discriminated against people with disabilities with respect to housing, in violation of 42 U.S.C. §3604(c), as described herein.

236.    Defendant Pruyn's conduct was intentionally discriminatory willful, wanton, and/or in reckless disregard of Haymarket's rights under the Fair Housing Act.

## COUNT V – FAIR HOUSING ACT

### Craig Benes (Official Capacity)

237.    Haymarket DuPage realleges and incorporates by reference paragraphs 1 - 219 above, as if fully set forth herein, including paragraphs 229 - 232 of Count III, above, against the School District.

238.    As alleged herein Defendant Benes:

a. Directed and carried out Itasca School District 10's material interference with the rights of Haymarket DuPage, Haymarket's patients and, specifically, their children in violation of policies adopted by the School District relative to provision of special education and educational services to the homeless, the Fair Housing Act, and state and federal school laws;

b. Utilized his position as School Superintendent to publish and mail false and discriminatory information concerning Haymarket DuPage, its patients with disabilities and their children with whom they are associated, and intentionally fostered false and pretextual bases to reject Haymarket DuPage, in concert with and in furtherance of the Village-wide strategy to steer Haymarket away from Itasca and deny use of its property for a healthcare facility, which included the statement that: "[a]s has been shared by others testifying, we have concerns that the proposed facility will have an impact on the police and fire resources, potentially meaning a reduction in the services provided to our students";

c. Strategically acted in concert with Itasca, the Plan Commission, other key Itasca agencies, and Objectors to orchestrate discriminatory conduct, with discriminatory intent, to reject Haymarket DuPage, and deny housing to persons with disabilities, in violation of the Fair Housing Act;

d. Materially contributed to Haymarket's decision to voluntarily withdraw its Mother and Child Program at Haymarket DuPage based on false and discriminatory assumptions and assertions about provision of special education services to the children of Haymarket DuPage's patients; and

e. Intentionally presented, and persisted in presenting, inaccurate discriminatory information as the Superintendent of the School District during the zoning proceedings. Specifically, he (a) testified to the purely hypothetical adverse economic impact to educate children of Haymarket DuPage patients, based either on the assumption they would be children with disabilities in need of special education services (despite the withdrawal of the Mother and Child program),

76

and/or be deemed homeless and claim residency in Itasca, (b) falsely disseminated fear and "concern" that the Police Department and Fire District would have decreased response time to Itasca's schools because of Haymarket, (c) falsely disseminated fear and "concern" that, due to Haymarket, the involvement of the Itasca Police Department and Fire District in school presentations and activities would no longer occur, and (d) falsely disseminated fear and "concern" regarding the economic burden to be borne by the local high school district by Haymarket DuPage patients with disabilities aged 18-22 who would claim free special education services while securing treatment at Haymarket DuPage.

239. Defendant Benes violated the Fair Housing Act as follows:

a. Materially contributed to making unavailable the facility owned by Haymarket DuPage to the potential Haymarket patients because they are people with disabilities, in violation of 42 U.S.C. §3604(f)(1);

b. Utilized his position to cause discrimination in the provision of services in connection with Haymarket because the potential patients of Haymarket are people with disabilities, and may have children who in varying circumstances could live with them, in violation of 42 U.S.C. §3604(f)(2), and contrary to the *Joint Statement on Reasonable Accommodations*;

c. Coerced, intimidated, or interfered with Haymarket DuPage because it asserted its right, under the Fair Housing Act, to operate a treatment center in Itasca, in violation of 42 U.S.C. §3617;

d. Made, printed, published, or caused to be made, printed, or published statements that intentionally discriminated against people with disabilities with respect to housing, in violation of 42 U.S.C. §3604(c), as described herein; and

e. Utilized his position to cause discrimination in the provision of services in connection with Haymarket because the potential patients of Haymarket may be individuals with children, in violation of the prohibition in the Fair Housing Act against discrimination on the basis of familial status, 42 U.S.C. §3604(b).

240. Defendant Benes' conduct was intentionally discriminatory, willful, wanton, and/or in reckless disregard of Haymarket's rights under the Fair Housing Act.

## COUNT VI: TITLE II OF THE ADA

### All Defendants

241. Haymarket DuPage realleges and incorporates by reference paragraphs 1 - 219, above, as if fully set herein.

242.    Haymarket is associated with and/or attempting to provide temporary housing and services to people with disabilities, as defined in 42 U.S.C. §12102(1).

243.    Defendants Itasca, Itasca Plan Commission, Fire District, and School District are public entities under 42 U.S.C. §12131(1). Defendants Pruyn and Benes are public officials employed by, and agents for, the respective public entities they represent, and are sued in their official capacity for violations of the Americans with Disabilities Act.

244.    Defendants, through their actions described above, have:

   a.  Discriminated against qualified individuals with disabilities, in violation of 42 U.S.C. §12132 and 28 C.F.R. §35.130;

   b.  Failed or materially contributed to the failure to make reasonable modifications to their policies, practices, or procedures necessary to avoid discrimination against persons with disabilities, in violation of 42 U.S.C. §12132 and 28 C.F.R. §35.130(b)(7);

   c.  Denied, or materially contributed to the denial of the prospective patients of Haymarket an opportunity to participate in a program in the most integrated setting appropriate to their needs, in violation of 28 C.F.R. §35.130(d);

   d.  Utilized or materially contributed to the utilization of zoning requirements that are not imposed upon other groups of related or unrelated non-disabled persons to deny Haymarket, due to the disabilities of the prospective patients of Haymarket, the enjoyment of its civil rights, in violation of 28 C.F.R. §35.130(b); and

   e.  Interfered with Haymarket DuPage because it asserted its right, under the Americans with Disabilities Act, to operate a treatment center in Itasca, in violation of 42 U.S.C. §12203(b) and 28 C.F.R. §35.134(b).

245.    The past and continuing acts and conduct of Itasca, Itasca Plan Commission, Fire District, School District, Pruyn, and Benes, described above, were and are intentional, and were carried out with malice and/or reckless indifference to the federally protected rights of Haymarket and its projected patients.

246.    Defendants intentionally and knowingly engaged in the practices described above, with the intent of denying rights under the ADA.

78

247. Defendants' conduct was intentionally discriminatory, willful, wanton, and/or in reckless disregard of Haymarket's rights under the ADA.

## COUNT VII: SECTION 504 OF THE REHABILITATION ACT

### Itasca Defendants

248. Haymarket DuPage realleges and incorporates by reference paragraphs 1 – 219 above, as if fully set forth herein.

249. Haymarket is associated with and/or attempting to provide temporary housing and services to individuals with disabilities, as defined in 24 C.F.R. §8.3.

250. Itasca Defendants, through their actions described above, have:

a. Discriminated against or materially contributed to discrimination against persons with disabilities by refusing to make reasonable accommodations or modifications to Itasca zoning procedures, in violation of 29 U.S.C. §794(a);

b. Failed to or materially contributed to a discriminatory failure to make a reasonable accommodation or modification to their policies and practices when necessary to avoid discrimination, in violation of 29 U.S.C. §794(a);

c. Denied housing, or materially supported the denial of housing, to the potential Haymarket patients, and potentially their children, because they are persons with disabilities, in violation of 24 C.F.R. §8.4(a) and (b)(1)(vii);

d. Utilized zoning requirements that are not imposed upon other groups of related or unrelated non-disabled persons in a manner that denies the prospective patients of Haymarket an equal opportunity to benefit from the housing, aid, benefits, or services of Itasca, in violation of 24 C.F.R. §8.4(b)(1)(ii);

e. Denied housing or materially contributed to the denial of housing to Haymarket because the prospective patients of its treatment and recovery center are persons with disabilities, in violation of 24 C.F.R. §8.4(b)(1)(vii);

f. Limited the prospective patients of Haymarket in the enjoyment of rights, privileges, advantages, or opportunities enjoyed by others receiving the housing, aid, benefit, or services of Itasca, in violation of 24 C.F.R. §8.4(b)(1)(viii); and

g. Denied the prospective patients of Haymarket an opportunity to participate in a program in the most integrated setting appropriate to their needs, in violation of 24 C.F.R. §8.4(d).

251. The past and continuing acts and conduct of Defendants, described above, were and are intentional and have been carried out with malice and/or reckless indifference to the federally protected rights of Haymarket DuPage and its projected residents.

252. Itasca Defendants intentionally and knowingly engaged in the practices described above, with the intent of denying rights under Section 504 of the Rehabilitation Act.

253. Itasca Defendants' conduct was intentionally discriminatory, willful, wanton, and/or in reckless disregard of Haymarket's rights.

## COUNT VIII: ILLINOIS STATE LAW

### Itasca Defendants

254. Haymarket DuPage re-alleges and incorporates the preceding paragraphs 1 - 219, above, as if fully set forth herein.

255. This Court has supplemental jurisdiction over Haymarket DuPage's claims against Defendants Itasca and the Plan Commission under Illinois law pursuant to 28 U.S.C. §1367 because the claims arising out of the failure of Itasca Defendants to fairly apply its zoning ordinance are so related to the claims in the action over which the Court has original jurisdiction that they form a part of the same case or controversy.

256. Under Illinois law, Itasca is bound to comply with its Zoning Ordinance, which permits healthcare facilities, such as Haymarket DuPage, to operate as a special use in areas zoned B-2. *See* 65 ILCS §5/11-13-1 *et seq.*; Itasca Zoning Ordinance §8.04(2)(m).

257. Itasca's Zoning Ordinance also permits special use zoning by application for a Planned Development and site plan review. Itasca Zoning Ordinance §14.12(2).

258.    The Illinois Municipal Code provides that a municipal board's decision in regard to an application for a special use as a planned development and site plan review is subject to *de novo* judicial review as a legislative decision of the municipality. 65 ILCS §5/11-13-25.

259.    Haymarket's evidence clearly established that its proposed use of the subject property as a residential treatment center for people with substance use disorder satisfies the requirements of the Itasca Zoning Ordinance. Haymarket's proposed use is necessary for the public convenience at its location. The proposed use will be operated such that the public health, safety, and welfare will be protected. Finally, the proposed use will not be injurious to the neighborhood or detrimental to the public welfare in any way. To the contrary, the facility will promote public health and welfare in the neighborhood and community.

260.    Itasca Defendants' decision to deny Haymarket DuPage's applications for a special use for Planned Development and Class 1 Site Plan review was against the manifest weight of the evidence, an abuse of discretion, arbitrary and capricious, and incorrect as a matter of law.

261.    Itasca Defendants unlawfully and improperly ignored uncontroverted evidence that established the healthcare facility would operate as a proper special use in the B-2 District under the ordinance.

262.    Itasca Defendants proffered reasons for denying approval of the Planned Development and Class 1 Site Plan review were arbitrary and unlawful.

263.    Itasca Defendants engaged in irregular conduct concerning the zoning process and its actions deviated from the Itasca Zoning Ordinance as well as standard practices.

264.    Itasca Defendants' improper conduct with respect to the zoning procedures as set forth in the preceding paragraphs is further evidence of discrimination in violation of the Fair

Housing Act, the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act, as set forth in Counts I, VI, and VII.

265.    Itasca Defendants provided no rational basis for concluding the proposed healthcare facility would impact the Village of Itasca in a manner different than any other similarly-situated facility, such as a hospital.

266.    Haymarket DuPage has been improperly denied the use and enjoyment of the Property as a result of Itasca Defendants' unlawful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Haymarket DuPage LLC respectfully requests that this Court enter judgment in its favor and grant the following relief:

(1) Declare Defendants Itasca, Plan Commission, Fire Protection District, Itasca Public School District 10, Mayor Jeffrey Pruyn, and Superintendent Craig Benes, based on their actions described above, violated the Fair Housing Act and the Americans with Disabilities Act;

(2) Declare Defendants Itasca, and Itasca Plan Commission, based on their actions described above, violated Section 504 of the Rehabilitation Act;

(3) Enjoin all Defendants from discriminating on the basis of disability and familial status, and from violating the Fair Housing Act, the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act, in accord with Counts I through VII, above;

(4) Enjoin all Defendants from refusing to permit and interfering with the opening and operation of Haymarket DuPage in Itasca;

(5) Declare Defendants Itasca and Plan Commission violated Itasca's Zoning Ordinance, and that their actions to deny Haymarket DuPage zoning approvals necessary to operate its

healthcare facility in Itasca were arbitrary, capricious, and against the manifest weight of the evidence;

(6) Enjoin Defendants from applying and enforcing or encouraging the application and enforcement of the Itasca Zoning Ordinance in a manner that prohibits or interferes with the opening and operations of Haymarket DuPage in Itasca;

(7) Require Itasca Defendants to make reasonable accommodations or reasonable modifications to the Itasca Defendants' policies, practices, rules, or services as necessary to promote the opening and operations of Haymarket DuPage in Itasca;

(8) Enjoin Defendants from issuing false and biased public statements that denigrate Haymarket, its patients, its leadership, its staff, and its supporters;

(9) Declare Defendants' actions were intentional, arbitrary, capricious, unreasonable, and in reckless disregard of the rights of Haymarket DuPage;

(10) Award compensatory damages to Haymarket for its out-of-pocket expenses, reputational harm, other economic harms, and interference with and frustration of Haymarket's mission to treat people with substance use disorder;

(11) Award punitive damages to Haymarket in an amount to be determined at trial to punish Defendants for their intentional, arbitrary, capricious, unreasonable, and reckless disregard for Haymarket's rights, and to deter Defendants from engaging in similar conduct in the future;

(12) Award Haymarket its reasonable attorneys' fees and costs, including but not limited to attorneys' fees and costs incurred as a result of Defendants' discriminatory conduct during the zoning proceedings in Itasca; and

(13) Award any other such relief as this Court deems appropriate.

83

## **JURY DEMAND**

Plaintiff demands a Trial by Jury.


Respectfully Submitted,

*/s/ Mary Rosenberg*

Mary Rosenberg                                  Jennifer K. Soule
Kenneth M. Walden                               *Soule, Bradtke & Lambert*
*Access Living of Metropolitan Chicago*         402 Campbell Street
115 W. Chicago Avenue                           Suite 100
Chicago, IL 60654                               Geneva, IL 60134


Dated: January 11, 2022

84