**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| HAYMARKET DUPAGE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 22-cv-160 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| VILLAGE OF ITASCA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Haymarket Center is the largest non-profit substance abuse treatment provider in

Chicago.  But it wanted to expand.  It purchased an old hotel in DuPage County and tried to get

zoning approval from the Village of Itasca to open a treatment center.  After two years of

countless meetings, negotiations, haggling, and hearings, the Village of Itasca denied

Haymarket's application.

Haymarket responded by filing suit against the Village of Itasca and five other public

bodies and officials.  The other defendants include the Itasca Plan Commission, Itasca Mayor

Jeffrey Pruyn, the Itasca Fire Protection District No. 1, the Itasca Public School District 10, and

School Superintendent Craig Benes.  The complaint alleges violations of the Fair Housing Act,

the Americans with Disabilities Act, the Rehabilitation Act, and state law.

Three of the six Defendants moved to dismiss.  The Fire District, the School District, and

Superintendent Benes argued that Haymarket does not have Article III standing, and that the

complaint fails to state a claim.

For the following reasons, this Court grants the motions to dismiss for lack of subject

matter jurisdiction.  At bottom, Haymarket is suing the School District and the Fire District about

decisions made by someone else (*i.e.*, the Village Board), so the alleged injury is not fairly traceable to the conduct of the School District and the Fire District. The lack of traceability means that Haymarket lacks standing to sue.

## Background

Before diving into the facts, the Court offers three overarching observations. The Court offers a reminder, a forewarning, and a head's up.

First, at the motion to dismiss stage, the Court must accept as true the complaint's well-pleaded allegations. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

Second, the complaint is hefty, weighing in at 87 pages. *See* Fed. R. Civ. P. 8(a) (requiring a complaint to be "short"). It gives a detailed, up-close-and-personal summary of the dispute between Haymarket and the Itasca public officials. It's a long-drawn-out saga, and the complaint is unsparing in its summary of the nitty-gritty details. The complaint gives a blow-by-blow summary of the back-and-forth with the Village about its proposal, over a span of years.

Third, as you read along, keep an eye out for references to the School District and the Fire District. They filed the motions to dismiss in question, so their role in the dispute has special importance. There are lots of other characters in the story, too, but they didn't file motions to dismiss. You may notice that other players – meaning Defendants who did not move to dismiss – played an outsized role in the story. That's partly the point of the motion to dismiss.

This Court will summarize the allegations in the 16 pages that follow, so buckle up for a long read. There are a lot of trees. Here's the forest:

Haymarket wanted to open a treatment facility for substance abuse in Itasca. Haymarket tried and tried to get approval, over a span of two years. Hearing after hearing, discussion after discussion, and protest after protest followed. But in the end, Itasca voted it down. And then Haymarket sued.

### Haymarket

The COVID-19 pandemic spread a new illness from coast to coast. During the same time, a different lurking disease destroyed the lives of tens of thousands: drug addiction. In the twelve months leading up to April 2021, more than 100,000 people died from a drug overdose.[1]

Putting that number in perspective, the seating capacity of Soldier Field is 61,500, and the seating capacity of Wrigley Field is 41,649. So, the number of people who die each year from a drug overdose is roughly the amount of people that it would take to fill those two stadiums to the brim.

Haymarket is Chicago's "largest and most comprehensive non-profit provider of treatment for substance use disorders and mental health disabilities." *See* Cplt., at ¶ 3 (Dckt. No. 1). Unlike many other treatment facilities, Haymarket accepts people who need help regardless of their ability to foot the bill. *Id.*

### An Eye for Expansion

In 2019, Haymarket recognized that people in DuPage County and the other so-called collar counties needed help, too. *Id.* at ¶ 76. Haymarket started searching for its next location. *Id.*

---

[1] *See Drug Overdose Deaths in the U.S. Top 100,000 Annually*, CDC (Nov. 17, 2021), https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2021/20211117.htm (last accessed Feb. 23, 2024).

Haymarket set its sights on a for-sale Holiday Inn hotel in Itasca, a town in DuPage County. *Id.* at ¶ 77. The property is visible from Interstate 290. *Id.*

Haymarket thought that the hotel was just right. Haymarket wouldn't need to construct a new building, and it wouldn't need to change the outside structure. *Id.* at ¶ 78. The building boasted sufficient parking, too. *Id.* In other words, Haymarket wouldn't need to do very much other than change the sign on the door.

Haymarket had a vision for the property. It would offer inpatient treatment, outpatient treatment, detoxification services, recovery home treatment health care, GED classes, and employment placement. *Id.* at ¶ 79. It would help people get back on their feet. And it would lend a hand 24 hours a day, 7 days a week, 365 days a year. *Id.* at ¶ 80.

***Initial Efforts***

Haymarket tried to get the ball rolling in April 2019. *Id.* at ¶ 83. It met with Itasca's Director of Community Development. *Id.* The meeting focused on the project's classification. *Id.*

Before getting to the meeting, the Court offers a note about Itasca's zoning. The Holiday Inn hotel is nestled in Itasca's "B-2 District." *Id.* at ¶ 77. Itasca permits healthcare facilities to operate in the B-2 District as an authorized special use. *Id.* at ¶¶ 77, 84.

Itasca's zoning ordinance defines the term "healthcare facility." *Id.* at ¶ 85. A healthcare facility is any "institution, place, building, or agency" devoted to operating "facilities for the diagnosis and treatment" of more than two unrelated people "admitted for overnight stay or longer" so the patient can "obtain medical care, including . . . care of illness, disease, injury, infirmity, or deformity." *Id.*

4

Haymarket thought that its proposed facility fit within the ordinance. *Id.* at ¶ 84. At the meeting with Itasca's Director of Community Development, Haymarket explained that it should be allowed to apply for special use B-2 District healthcare facility authorization. *Id.* at ¶¶ 83–84.

Itasca's Community Development Director wasn't sure about the proposal. *Id.* at ¶ 84. She explained that the Village "did not know how to classify" Haymarket's proposed facility. *Id.*

Later, the Community Development Director reached out to Haymarket. *Id.* at ¶ 86. She told Haymarket that its facility was a "mixed use of residential and medical." *Id.* She told Haymarket that it should apply for approval as a "planned development," not as a healthcare facility. *Id.*

The Village apparently thought that Haymarket's proposal had a "residential" use, because Haymarket planned to offer patients a recovery home service. *Id.* at ¶ 88. The recovery home program would allow patients to continue treatment for ninety days after completing a short-term, inpatient treatment. *Id.*

In other words, the Village apparently leaned on the definition of "dwelling unit" in its ordinance. *Id.* at ¶¶ 88–89. A dwelling is one "or more rooms, which are arranged, designed, or used as living quarters for one" family only. *Id.* at ¶ 89. "[E]ach dwelling unit" must include individual "bathrooms and complete kitchen facilities." *Id.*

The Village's position perplexed Haymarket. Haymarket didn't think that its project would have a "dwelling" in sight. *Id.* at ¶ 90. Each room would be a shared hotel-style room, without a kitchen. *Id.* In sum, Haymarket thought that the Village's position – classifying the project as "residential" – contradicted the ordinance's "plain language." *Id.*

More than semantics were at stake. Haymarket cared about whether it needed to apply as a healthcare facility or as a planned development, because the zoning ordinance raises the bar for planned developments. *Id.* at ¶¶ 91–94. Planned development applications are more "onerous." *Id.* at ¶ 91.

In any event, all special use applications need to satisfy three criteria. *Id.* at ¶ 92. A project must show that (1) it is necessary for the public convenience at the location; (2) the public health, safety, and welfare will be protected; and (3) it will not substantially injure the value of other neighborhood properties. *Id.*

In July 2019, Haymarket moved forward by submitting two applications. *Id.* at ¶ 95. One application was for special use as a healthcare facility. *Id.* The other application was for use as a planned development. *Id.*

Two weeks later, Itasca's attorney sent a rejection email for Haymarket's healthcare facility application. *Id.* at ¶ 96. The attorney told Haymarket that the right type of application was a planned development application, not a healthcare facility application. *Id.*

In the next breath, the attorney also bounced the planned development application as "deficient." The lawyer explained that the application did not include an economic impact statement or a landscape plan. *Id.*

Haymarket appealed those decisions within the Village, but lost. *Id.* at ¶¶ 97–99. So Haymarket plowed forward with its efforts to get zoning approval as a planned development – the only open road. *Id.* at ¶ 100.

### *The Mayor*

Haymarket's efforts caught the Mayor's attention, in a bad way. Itasca Mayor Jeffrey Pruyn opposed the project from "the very beginning." *Id.* at ¶ 108. Mayor Pruyn's "public

6

opposition encouraged Itasca, its governmental entities, and Itasca residents to oppose the project." *Id.*

He "regularly posted open letters to the community on Itasca's website to express his opposition to the proposed healthcare facility." *Id.* at ¶ 110. In one public letter addressed to Haymarket, he complained that Haymarket's "plans have been cloaked in secrecy." *Id.* at ¶ 118.

Mayor Pruyn and Haymarket talked face to face. In an August 2019 meeting, Haymarket addressed one of Mayor Pruyn's concerns – that the proposed facility would compromise Itasca's Emergency Medicine Services. *Id.* at ¶ 120.

Haymarket thought that it had a solution. *Id.* Haymarket offered to give the Village an ambulance. At that point, the Village had only one ambulance, so adding a second ambulance would double the fleet. *Id.*

Another meeting attendee (the Village Administrator) rejected the offer. The second ambulance wouldn't run itself. It "would require additional staffing and an additional building to store it." *Id.* And that requires money.

Chatter about the project spread beyond the Village's borders. Mayor Pruyn met with two Illinois State Representatives (Representative Deborah Conroy and Representative Diane Pappas), along with Illinois State Senator Tom Cullerton. *Id.* at ¶ 123. Representative Conroy said that she "could secure half a million dollars in grant funds to offset the potential lost tax revenue" that would hit the Village's books, since Haymarket enjoyed non-profit status. *Id.*

The next day, Mayor Pruyn dropped a letter in the mail. He asked Representative Conroy to "hold off on requesting any state funding" until the Village could "better determine the total financial impact to Itasca taxpayers." *Id.* at ¶ 124.

Haymarket confronted headwinds from other Itasca community members, too. According to Haymarket, Itasca's Fire Protection District No. 1 opposed the project. *Id.* at ¶ 125.

### *The Fire District*

Up to this point in the story, you haven't met the Fire District or the School District, meaning the Defendants who moved to dismiss. That's about to change.

Haymarket met with the Fire District's Chief (James Burke) and the Fire Prevention Bureau Director (Mike Lisek). *Id.* The men told Haymarket that they were worried about the Fire District's sole ambulance. *Id.* According to them, Haymarket's facility would generate too many calls for the ambulance to adequately answer. *Id.* After all, one ambulance can be in only one place at a time.

Fire Prevention Director Lisek also seemed to give Haymarket a warning. He told Haymarket that its project would face "detailed" fire code "scrutiny." *Id.* at ¶ 126. Haymarket read between the lines and perceived a "threatening and punitive" warning, because the Fire District had not enforced the code at the Holiday Inn. *Id.*

Haymarket and the Fire District met only once. *Id.* at ¶ 127. After the meeting, the Fire District rebuffed Haymarket's several invitations to talk again. *Id.*

But the Fire District didn't forget about Haymarket's project. It continued "its vocal opposition to" Haymarket's zoning applications. *Id.*

### *Public Opposition & More Hearings*

Haymarket faced proverbial fire from another front, too.

Itasca residents vocally opposed the project. *Id.* at ¶ 128. According to Haymarket, those residents opposed the project because they "harbored" a bias against people with substance use disorders. *Id.* at ¶ 133.

The complaint highlights statements that Itasca residents made on social media. For example, one resident declared that "nothing" would justify Haymarket's "crack house being brought to Itasca." *Id.* at ¶ 133(a). The same resident warned that the facility would turn Itasca's "little area" into a "ghetto." *Id.*

Some residents spread a keep-Chicago's-problems-in-Chicago message. One wondered, "[t]here's enough crimes in the metropolitan area, do we need to add it to our small town?" *Id.* at ¶ 133(c). Others worried about "vagrants and panhandlers" and "Chicago's drug addicts" pouring into town. *Id.* at ¶ 133(d), (g).

Those residents also took their message offline. In September 2019 – the day of the first zoning hearing – 1,500 people marched through the Village. *Id.* at ¶ 134. The parade of people carried "NO HAYMARKET" signs. *Id.*

The hearing didn't end up happening on the day that it was scheduled. *Id.* at ¶ 135. The meeting's location (a school) couldn't stuff the number of people who showed up inside. *Id.*

About a month later, with a bigger space secured, the Itasca Plan Commission held the first hearing. *Id.* at ¶ 136. One thousand people filled the room. *Id.* Most weren't Haymarket's friends. *Id.*

Itasca's Plan Commission is an administrative body composed of seven Itasca residents, appointed by Mayor Pruyn with the advice and consent of the Village Board. *Id.* at ¶ 24. The Plan Commission hears applications for zoning relief and offers the Village Board recommendations about whether the Board should approve or deny the applications. *Id.*

9

After the first meeting, the Plan Commission hosted a few more meetings between October 2019 and December 2019. *Id.* at ¶ 139. It took a breather when Haymarket filed a state court lawsuit. *Id.*

The state court dismissed Haymarket's case in March 2020. *Id.* at ¶ 102. The state court explained that the issues were not ripe, because the zoning hearings were ongoing. *Id.*

Of course, March came in like a lion – but it didn't go out like a lamb. The COVID-19 pandemic struck with full force, and a lot of things went onto the back burner. The Plan Commission's hearings were no exception. *Id.* at ¶ 103.

### The Amended Zoning Applications

Haymarket returned in August 2020 with amended zoning applications. *Id.* at ¶ 140. The amended applications prompted the appearance of the next character in the story, the School District. Recall that the School District filed one of the motions to dismiss, and the Fire District filed the other.

Haymarket filed three amended applications. *Id.* Haymarket filed one for special use as a planned development, another for special use as a healthcare facility, and a third for Class 1 Site Plan review (whatever that is – the complaint does not say). *Id.*

The new applications informed the Village that Haymarket had purchased the hotel property. *Id.* at ¶ 142. The applications also explained that Haymarket had modified its programming vision. *Id.*

The amended applications attempted to resolve an earlier dispute about Haymarket's hopes for a Mother and Child Program. *Id.* at ¶ 81. Originally, Haymarket wanted a program to let women undergoing treatment at Haymarket bring two children under five with them. *Id.* In

10

its words, Haymarket wanted to destroy the principal barrier that women with children face when they need treatment:  the need for childcare.  *Id.*

Haymarket had included that program in its original proposal, and it landed poorly. The program came under fire from Itasca School District Superintendent Craig Benes.  *Id.* at ¶ 163.  Superintendent Benes claimed that the program would "pose an undue economic burden on the School District because [the program's children] would be children with disabilities who required special education services."  *Id.*

The School District, through Superintendent Benes, also warned that homeless Haymarket patients would claim residency in Itasca, so their kids could get free education from Itasca schools.  *Id.* at ¶ 164.

The School District "refused to meet with Haymarket" to discuss its concerns, except for one phone call.  *Id.* at ¶ 166.  (The complaint does not reveal what happened during the call.)

But the School District did make its concerns widely known.  For example, Superintendent Benes sent a letter to parents "repeat[ing] the wrongful assertion" that Haymarket's presence "could compromise the ability of the Fire District and the Police Department to respond to emergencies at the three schools within the District."  *Id.* at ¶ 168.

In Haymarket's view, the School District's reaction to that original proposal was all wrong.  The School District "misinterpreted school residency law, and implied the children of patients" would "necessarily have disabilities, require special education services," and "be homeless."  *Id.* at ¶ 170.  As Haymarket tells it, the School District megaphoned "negative stereotypes" in "violation of anti-discrimination laws."  *Id.*

11

Haymarket attempted to resolve that long-simmering dispute in the amended applications. Facing School District pressure, Haymarket erased the Mother and Child Program from its amended applications to appease the community. *Id.* at ¶ 142.

### More Public Hearings

In October 2020, the Plan Commission resumed the public hearings for Haymarket's planned development application (but not its healthcare facility application). *Id.* at ¶ 144. The hearings stretched over the span of one year, from October 2020 to November 2021. *Id.*

Haymarket made its pitch at the hearings with the help of expert witnesses. *Id.* at ¶ 145. *Many* experts. In many, many fields: substance use treatment, land use planning, urban economics, local property taxation, property values, and traffic impact. *Id.*

Haymarket also revisited the Fire District's worries about its single ambulance. *Id.* at ¶ 148. After the Village rebuffed Haymarket's offer to put a shiny new one in the driveway, Haymarket rolled out new ideas. *Id.*

For example, Haymarket signed a contract with Elite Ambulance – the second largest ambulance provider in Illinois – to respond to many of Haymarket's basic life support calls. *Id.* at ¶ 148(a). Haymarket also offered to execute a contract with a secondary private ambulance company. *Id.* at ¶ 148(d).

Going further, Haymarket assured the community that it would have medical staff on-site every minute of every day. *Id.* at ¶ 148(b). So, Haymarket said that it could "address certain medical needs in-house," lightening the load on Itasca's EMS. *Id.*

Haymarket didn't ask Itasca to simply accept Haymarket's assurances, either. Haymarket hired a retired fire chief with 29 years of experience. *Id.* at ¶ 149. The Chief opined that Haymarket "would not unduly impact the provision of EMS services in Itasca." *Id.*

For its part, the Fire District offered an expert witness of its own. The Fire District's own witness didn't seem concerned about the Fire District's sole ambulance. *Id.* at ¶ 150. According to the Fire District's expert, the Fire District, "as currently staffed and equipped, could handle the anticipated increase in EMS calls from" Haymarket. *Id.*

So a lot of effort, from a lot of people, from a lot of different angles, went into developing, debating, discussing, and dissecting Haymarket's project. But according to Haymarket, the Village didn't demand the same effort from other zoning applicants. *Id.* at ¶ 156.

Haymarket alleges that another project – the Bridge Development – breezed through the Village's inspection. *Id.* According to Haymarket, the Bridge Development is fifteen times larger than Haymarket's project, but the Village never questioned its impact on the Village's EMS services. *Id.* at ¶ 157.

***Post-COVID Public Comment Period***

The fever pitch against the project continued during the Plan Commission's post-COVID public comment period. *Id.* at ¶ 178. The public comment period "revealed residents in Itasca were fearful of the population" Haymarket would serve. *Id.* The public "assumed" Haymarket's "presence would adversely impact the community," and "harbored discriminatory animus about those with substance use disorder." *Id.*

For example, one resident said that Itasca would "never be the safe, small town" of its present glory. *Id.* at ¶ 179(a). Instead, Haymarket's project would be "bringing death to Itasca," and the "crime rate" would "skyrocket." *Id.*

Concern about property values bubbled, too. A resident stated that "property prices" might "plummet" because "[f]uture home buyers would prefer nearby towns." *Id.* at ¶ 179(d).

13

Another resident expressed worry that Itasca neighbors were turning their back on this country's bedrock principles. *Id.* at ¶ 179(b). The resident conveyed that concerning town-chatter "implied that Haymarket should be denied due process." *Id.*

On the theme of process: Haymarket alleges that the zoning application hoops it had to jump through were far from the normal course. *Id.* at ¶ 183. Haymarket alleges that the deviations reflected the Village's efforts to "stack the deck" against Haymarket. *Id.*

For example, Haymarket alleges that the Village's attorney acted as the "impartial" legal counsel to the Plan Commission, but his impartiality "veil" was a fake cover. He recommended a witness who testified in opposition of the project. *Id.*

Itasca also "refused to require members of the public to sign-up in advance to identify those witnesses from Haymarket" who they planned to question. *Id.* That refusal forced Haymarket to swallow "the financial burden of preparing its witnesses to appear and testify during this phase, regardless of whether the public intended to question them." *Id.*

***The Plan Commission's Vote***

After winding its way through the Plan Commission's procedures, Haymarket reached a critical juncture on September 22, 2021. After two years, and after 35 hearings, the Plan Commission voted on whether to recommend the proposal to the Village Board. *Id.* at ¶ 185.

Outside the Village Hall – the meeting location – Itasca residents held up the "No Haymarket" signs in a "silent protest." *Id.* at ¶ 186.

Haymarket fared no better inside the hall. The Plan Commission unanimously rejected Haymarket's zoning applications. *Id.* at ¶ 185.

The Plan Commission "determined there was a need for a treatment center in DuPage County, but claimed there was not enough evidence of the need for treatment in Itasca itself." *Id.* at ¶ 187. "Commissioners also criticized the size of the proposed facility." *Id.*

According to Haymarket, the Plan Commission also "based its decision to deny the zoning applications on Haymarket's supposed burden on EMS services." *Id.* at ¶ 188.

The Commission thought that its sole ambulance would get overworked and become the little-engine-that-couldn't. *Id.* For example, Commission Chairman Brendan Daly stated: "the only number I feel comfortable with in this entire hearing is the number one. Itasca has one ambulance[.]" *Id.*

Commissioner Daly also mentioned the schools. He said that he did not think that Haymarket satisfied its burden to show that the project would not impact Itasca's school district. *Id.* at ¶ 191. "The other commissioners agreed with this assertion, even though it was unsupported by the facts or school residency law, and no children would live" at Haymarket. *Id.*

Another Plan Commissioner (Commissioner Drummond) focused on the facility's "residential" nature. *Id.* at ¶ 192. "Even though Itasca forced Haymarket to apply for a special use as a Planned Development due to the purported 'residential' nature of the proposed facility, Plan Commissioner Drummond stated she did not think the proposed facility could truly be characterized as residential." *Id.* "Plan Commissioners Carello and Daly agreed with this statement, but also again claimed the facility would unduly burden EMS." *Id.*

Before the Plan Commission voted, Itasca's attorney "directed the Plan Commission to discuss reasonable accommodations." *Id.* at ¶ 193. She explained that the Fair Housing Act and the Americans with Disabilities Act "create an affirmative duty on the part of the Village to reasonably accommodate those disabled individuals in zoning matters." *Id.*

In response, Plan Commissioner Ray (supported by Commissioner Drummond) said that her concerns went "back to health and safety," and that she didn't "believe with the lack of EMS services" that residents would "be able to thrive in that environment." *Id.* at ¶ 195. Commissioner Daly reiterated the "cost of purchasing and staffing a second ambulance." *Id.* at ¶ 197.

In a different vein, Plan Commissioner Carello opined that the property's "size" was a "big issue," and noted that if the property was "smaller," the project "would have been done a long time ago." *Id.* at ¶ 196.

In any event, Haymarket didn't give up after it lost before the Plan Commission. *Id.* at ¶ 199.

One month later, it sent a letter to the Village "reaffirming the conditions" that it would agree to "if the Village approved the zoning application." *Id.* Those conditions included always maintaining a contract with a private ambulance company, executing a contract with a second private ambulance company, and meeting with the Fire District as needed to review call volumes and ensure efficient emergency services. *Id.*

Two weeks later, the Village responded. It would not agree to the conditions. *Id.* at ¶ 200. The Village explained that the conditions were not "enforceable," citing an Appellate Court of Illinois decision. *Id.*

Haymarket responded the same day. *Id.* at ¶ 201. Its letter outlined why the Village's interpretation of the case was wrong. *Id.*

The Village ghosted Haymarket. *Id.* at ¶ 202.

*The Village Board's Vote*

At the end of October 2021, Haymarket made its final pitch to the Village Board. *Id.* at ¶ 203. The "Objectors" (a group of Itasca residents and businesses) and Haymarket both gave statements. *Id.* at ¶¶ 9, 203.

Haymarket hit the end of the road in November 2021. *Id.* at ¶ 204. In a meeting that lasted 17 minutes, the Village Board denied Haymarket's proposal. *Id.*

Before the vote, Mayor Pruyn made a public statement opposing the project. *Id.* at ¶ 205. The ambulance issue came up. Mayor Pruyn stated that even though Haymarket suggested it could provide a second ambulance, the new rig would "require staff, maintenance, and other costs Itasca just doesn't have." *Id.*

After Mayor Pruyn spoke, one Board Trustee took the floor. *Id.* at ¶ 207. Trustee Ellen Leahy explained her position: "Itasca is being asked to support a 200-bed facility that could potentially cost Itasca and its residents $1 million annually." *Id.* Despite Representative Conroy's offer to drum up $500,000 in state money, Trustee Leahy reported that Itasca had never "received a financial commitment from the State of Illinois to help support Haymarket." *Id.*

The members of the Village Board cast their votes, and it wasn't close. *Id.* at ¶ 208. The Board voted unanimously (6-0) against the proposal, and denied the zoning relief. *Id.*

*The Federal Lawsuit*

Haymarket believes that it checked every box and jumped through every hoop. But in the end, the Village pulled the rug out from under it, and did so for improper reasons. *Id.* at ¶ 210. According to Haymarket, the Village's denial "was without legal basis or justification." *Id.*

Haymarket responded by filing this lawsuit. The complaint names six Defendants: the Village of Itasca, the Itasca Plan Commission, Mayor Jeffrey Pruyn (in his official capacity), the

Itasca Fire Protection District No. 1, the Itasca Public School District 10, and Superintendent Craig Bernes (in his official capacity). *Id.* at ¶¶ 23–28. Haymarket brought claims under three federal statutes, plus state law.

Counts I through V allege various Fair Housing Act violations against each Defendant. *Id.* at ¶¶ 220–40.

Count VI alleges that all Defendants violated Title II of the Americans with Disabilities Act. *Id.* at ¶¶ 241–47.

Count VII alleges that the "Itasca Defendants" violated Section 504 of the Rehabilitation Act. *Id.* at ¶¶ 248–53. (The complaint defines "Itasca Defendants" as the Village and the Plan Commission. *Id.* at ¶ 1).

Finally, Count VIII alleges that the Itasca Defendants violated "Illinois State Law." *Id.* at ¶¶ 254–66.

The "Illinois State Law" header is broad, to say the least. But the complaint does get a little more granular. It says that Illinois law requires that Itasca comply with its Zoning Ordinance. *Id.* at ¶ 256. It also notes that the Illinois Municipal Code provides that a board's decision about an application for a special use is subject to de novo judicial review. *Id.* at ¶ 258. In other words, the count seems to ask this Court to hold that the Village made the wrong decision.

Three of the six Defendants filed motions to dismiss. The Fire District filed one of the motions. *See* Fire District Mtn. to Dismiss (Dckt. No. 30). The two School District Defendants (the School District and Superintendent Benes) filed the other. *See* School Defs.' Mtn. to Dismiss (Dckt. No. 27). For the sake of simplicity, the Court will refer to the two School District Defendants as simply the "School District."

Defendants moved to dismiss on several grounds. They argued that Haymarket lacks standing, and that the complaint fails to state a claim for which relief can be granted.

The other three Defendants (the Village of Itasca, the Itasca Plan Commission, and Mayor Pruyn) did not move to dismiss.

## Legal Standard

A motion to dismiss under Rule 12(b)(1) challenges whether this Court has subject matter jurisdiction over a claim or case. *See* Fed. R. Civ. P. 12(b)(1); *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1007 (7th Cir. 2021). "A standing challenge under Rule 12(b)(1) typically can take the form of a facial or a factual attack on the plaintiff's allegations." *Id.* (cleaned up). "A facial attack tests whether the allegations, taken as true, support an inference that the elements of standing exist, and a factual attack tests the existence of jurisdictional facts underlying the allegations." *Id.* (cleaned up).

To evaluate a facial attack, this Court looks to the complaint to see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction. *Id.* The Court accepts "all well-pleaded factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff." *Id.*

## Analysis

The Constitution vests federal courts with judicial power in "Cases" and "Controversies." *See* U.S. CONST. art. III, § 2. That bedrock requirement has several layers of meaning. At bottom, a federal court can decide a case only if there is a real dispute brought by a person with standing to sue.

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *See Warth v. Seldin*, 422 U.S. 490, 498

(1975). Standing is "not merely a troublesome hurdle to be overcome if possible so as to reach the 'merits' of a lawsuit which a party desires to have adjudicated; it is a part of the basic charter promulgated by the Framers of the Constitution at Philadelphia in 1787." *See Valley Forge Christian College v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 476 (1982).

The Constitution imposes guardrails on judicial power, and the standing doctrine "helps safeguard the Judiciary's proper – and properly limited – role in our constitutional system." *See United States v. Texas*, 599 U.S. 670, 675–76 (2023). "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Allen v. Wright*, 468 U.S. 737, 752 (1984). Standing helps to prevent the judiciary from overstepping, and helps to prevent the other branches from getting stepped on.

A plaintiff has standing only if he can "allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006). That is, a plaintiff must have: (1) suffered an injury in fact; (2) that is fairly traceable to the defendant's challenged conduct; and (3) that is likely to be redressed by a favorable judicial decision. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

The Court will address each of the requirements, until it hits a dead end.

## I.  Injury in Fact

The Court starts with the injury-in-fact requirement. Standing requires a plaintiff to have a "personal stake in the outcome of the controversy." *Warth*, 422 U.S. at 498. An injury in fact

must be "concrete and particularized" and "actual or imminent," not "conjectural or hypothetical." *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (cleaned up).

Those guideposts have a driving purpose. They prevent "kibitzers, bureaucrats, publicity seekers, and 'cause' mongers from wrestling control of litigation from the people directly affected." *See Illinois Dep't of Transp. v. Hinson*, 122 F.3d 370, 373 (7th Cir. 1997). The injury-in-fact requirement makes sure that the plaintiff has skin in the game. And it ensures that the judiciary stays in its lane.

Haymarket has plausibly alleged an injury in fact. Haymarket owned the property. *See* Cplt., at ¶ 142 (Dckt. No. 1). Haymarket had a legally protected interest in using its property. And the Village denied Haymarket's special use permit. *Id.* at ¶¶ 210–17.

Haymarket alleges that it suffered an injury when the Village denied its applications for the project. That's enough to demonstrate an injury in fact. *See also Church of Our Lord & Savior Jesus Christ v. City of Markham*, 913 F.3d 670, 681 (7th Cir. 2019) ("In short, the church has sustained a concrete injury resulting from the city's interpretation of which zoning uses are permitted in the R-3 districts, and that injury is sufficient to give the church standing for Article III purposes."); *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 668 (1993) ("An allegation that a 'specific project' was 'precluded' by the existence or administration of the zoning ordinance would certainly have been sufficient to establish standing[.]") (cleaned up).

## II.    Traceability

The next requirement is traceability. The basic question is whether the alleged injury (*i.e.*, the denial of the application) is fairly traceable to the actions of the School District and the Fire District.

Traceability requires a causal nexus between the injury and the defendant's conduct. A plaintiff's injury must be "fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006). In other words, "there must be a causal connection between the injury and the conduct complained of." *See Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (citation omitted); *see also Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021) ("[F]or purposes of traceability, the relevant inquiry is whether the plaintiffs' injury can be traced to allegedly unlawful conduct of the defendant[.]") (cleaned up).

Traceability does not require that the defendant's action be the "very last step in the chain of causation." *See Bennett v. Spear*, 520 U.S. 154, 169 (1997). If causation is like a Rube Goldberg machine, traceability isn't limited to the last leg in the process.

The traceability requirement is not the same thing as proximate causation. "Proximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct." *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014). Proximate causation requires a direct causal link between the injury and the conduct. "[T]here must be some direct relation between the injury asserted and the injurious conduct alleged." *See Paroline v. United States*, 572 U.S. 434, 444 (2014) (citation omitted).

By comparison, traceability is a watered down version of causation. Unlike proximate causation, traceability includes both direct and indirect injuries. "The injury may be indirect, as long as the complaint indicates that the injury is fairly traceable to the defendant's acts or omissions. However, when the injury is indirect, it is likely to be more difficult to establish the

required causal nexus." *See* 15 James Wm. Moore *et al.*, Moore's Federal Practice § 101.41[2] (3d ed. 2023).

That said, standing is not about the merits, and traceability is not about the merits, either. *See Arizona State Legislature v. Arizona Independent Redistricting Comm'n*, 576 U.S. 787, 800 (2015); *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). "[S]tanding does not depend on the merits of a claim." *Davis v. United States*, 564 U.S. 229, 249 n.10 (2011); *see also Warth*, 422 U.S. at 500 (stating that standing "often turns on the nature and source of the claim asserted," but it "in no way depends on the merits" of the claim).

Traceability becomes more complicated when other actors come into the picture. Sometimes the "causal relation between injury and challenged action depends upon the decision of an independent third party." *See California v. Texas*, 141 S. Ct. 2104, 2117 (2021) (cleaned up). And in that case, "standing is not precluded, but it is ordinarily substantially more difficult to establish." *Id.*

A "plaintiff does not lack standing merely because the defendant is one of several persons who caused the harm. That circumstance may make it more difficult, but not impossible, to establish causation." *See Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 500 (7th Cir. 2005).

A court must be able to trace the injury "to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *See Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 134 (2011) (cleaned up); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

The causal connection might exist when the defendant produces the injury by "determinative or coercive effect upon the action of someone else." *See Bennett*, 520 U.S. at

169; *see also* 15 James Wm. Moore *et al.*, Moore's Federal Practice § 101.41[2] (3d ed. 2023) ("An indirect but actionable injury may occur when the defendant's actions lead to someone else burdening the plaintiff.").

On the other hand, traceability might not exist if a defendant's conduct is not "a necessary element" of the plaintiff's injury. *See* 15 James Wm. Moore *et al.*, Moore's Federal Practice § 101.41[1] (3d ed. 2023) "Some courts have held that the fact that the defendant's actions were not the only cause of the plaintiff's harm does not preclude a finding of causation sufficient to support standing. But while that is correct in the abstract, a court should be careful not to rely on this dictate to ignore the traceability and redressability prerequisites of Article III. Where defendant's conduct is not a necessary element for plaintiff's injury, i.e., the exact same injury would have occurred even absent defendant's conduct, it is questionable whether either of these core constitutional requirements has been satisfied." *Id.*

In sum, traceability is about the causal connection between the alleged injury and the conduct of the defendant. The inquiry boils down to whether the "line of causation between the illegal conduct and injury [is] too attenuated." *See Allen v. Wright*, 468 U.S. 737, 754 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). With those principles in mind, the Court turns to the claims against the School District and the Fire District. The punchline is that the denial of the applications is not fairly traceable to the conduct of the School District and the Fire District.

Recall, the School District opposed the original application submitted by Haymarket. The Superintendent spoke out against the original plan because it might overstretch the resources of the school system. *See* Cplt., at ¶¶ 163–70 (Dckt. No. 1). In particular, the School District opposed the Mother and Child Program. *Id.* But the School District continued to oppose the

program even after Haymarket withdrew that part of the plan and submitted a new application. *Id.* at ¶ 166.

The Fire District opposed the proposal, too. *Id.* at ¶¶ 126–27. Some of the concerns involved the possibility of overusing the ambulance and overstretching resources.

At best, the School District and the Fire District were voices in a chorus of opposition to the proposal. But the complaint stops short of alleging that the decision by Itasca was fairly traceable to their opposition.

The School District and the Fire District were not the decisionmakers. The power to vote up or down resided with the Village Board, not the School District or the Fire District. The School District and the Fire District spoke up, and the Board voted it down.

Getting their approval was not a necessary step in the process. The complaint does not allege, for example, that the Village needed to obtain the approval of the School District or the Fire District to grant the permit. The opposition of the School District and the Fire District did not predetermine and foreordain the denial of the applications by the Board.

The complaint does not allege that the School District and the Fire District controlled the Board, or otherwise had a "determinative or coercive effect upon the action of someone else." *See Bennett*, 520 U.S. at 169. There is no allegation that they were pulling the strings, and that the Board members were mere puppets who did their bidding. If anything, the complaint repeatedly acknowledges that the Village and the Plan Commission – not the School District or the Fire District – made the decision. *See* Cplt., at ¶¶ 1, 212, 213 (Dckt. No. 1).

Courts find a lack of traceability when a plaintiff sues a defendant about a decision made by someone else. In *Allen v. Wright*, parents of black public-school children sued the Internal Revenue Service. *See Allen v. Wright*, 468 U.S. 737, 739 (1984). They alleged that the IRS did

not adopt sufficient standards to fulfill its obligations to deny tax-exempt status to racially discriminatory private schools. *Id.* at 739. The parents alleged that the IRS harmed the children's ability to receive a desegregated public-school education. *Id.* at 739–40.

The Supreme Court held that the injury was not "fairly traceable" to the IRS's challenged conduct. *Id.* at 757. The "line of causation" was "attenuated at best." *Id.* The Supreme Court explained that it was "entirely speculative" whether – if the IRS corrected its behavior by withdrawing tax exemptions from racially discriminatory private schools – the schools would change its policies, and, in turn, salve the plaintiffs' injuries. *Id.* at 758.

The Supreme Court reached the same conclusion in *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26 (1976). There, "indigents and organizations composed of indigents" sued the Secretary of the Treasury and the Commissioner of Internal Revenue. *Id.* at 28. They alleged that the IRS violated the Internal Revenue Code when it issued a ruling giving favorable tax treatment to a nonprofit hospital that only offered emergency-room services to indigents, as opposed to offering full hospital services. *Id.* at 28, 33.

So, the plaintiffs' injury theory was a weakened ability to receive hospital services. *Id.* at 33. And the plaintiffs' traceability theory was that the IRS, when it adopted its rule, "encouraged" hospitals to deny services to indigents. *Id.* at 42.

The Supreme Court held that the plaintiffs did not have standing. The Supreme Court explained the link between the IRS's "encouragement" and the hospitals' "denial of services" was "entirely speculative." *Id.* The Supreme Court could only guess whether the hospitals denied service because of the IRS's "encouragement" or from "decisions made by the hospitals without regard to the tax implications." *Id.* at 42–43 (emphasis added).

As the Seventh Circuit later explained in a separate case, the Supreme Court found no traceability in *Simon* because the plaintiffs had not sued the decisionmaker. "[W]hile the IRS rule may have incentivized hospitals to deny the plaintiffs care, it was the hospitals – not the IRS – that *made the decision* not to treat the patients." *See Segovia v. United States*, 880 F.3d 384 (7th Cir. 2018) (describing *Simon*, 426 U.S. at 41–42) (emphasis added).

The Seventh Circuit built upon that foundation in *Segovia*. There, former residents of Illinois moved to Guam, Puerto Rico, and the Virgin Islands. *See Segovia*, 880 F.3d at 386. Federal law *allowed*, but did not *require*, states to provide absentee ballots in those territories.

The former residents filed suit against a group of federal defendants, alleging a denial of due process and equal protection. The Seventh Circuit dismissed their claims for lack of traceability. The federal defendants didn't make the decision to withhold ballots – the state of Illinois did. "The federal government doesn't run the elections in Illinois, so . . . whether the plaintiffs can obtain absentee ballots is *entirely up to* Illinois. Given that type of *unfettered discretion* with respect to the plaintiffs, the federal government cannot be the cause of their injuries." *Id.* at 390 (emphasis added).

The Seventh Circuit cemented the point in *DH2, Inc. v. SEC*, 422 F.3d 591 (7th Cir. 2005). There, a company that traded in mutual funds challenged an SEC rule that gave the funds discretion in how they calculate their daily prices. *Id.* at 592. The plaintiff wasn't governed by the rule – instead, the plaintiff challenged an SEC rule that gave discretion to non-parties (*i.e.*, mutual funds) when it came to pricing.

The Seventh Circuit found a lack of traceability because the alleged injury depended on the discretion of a non-party. *Id.* at 597 ("With or without the challenged statements in the SEC releases, mutual funds have the discretion to use fair value pricing in lieu of market quotations

27

when circumstances warrant the conclusion that market quotations are no longer current. Thus, to a significant degree, the injury DH2 complains of hinges on the decisions of independent actors whose discretion – though subject to securities laws and regulation by the SEC – is nonetheless quite broad.").

The same conclusion applies here. Haymarket isn't complaining about a decision made by the School District, or the Fire District. They weren't the decisionmakers. The Board, not the schools or the fire department, rejected the proposal. The Board had "unfettered discretion," and the decision was "entirely up to" them. *See Segovia*, 880 F.3d at 390.

At best, the complaint alleges that the School District and the Fire District worked "in concert" with the other defendants. *See, e.g.*, Cplt., at ¶ 11 (Dckt. No. 1) ("Defendants worked in concert with each other . . . to orchestrate the opposition to Haymarket[.]"); *id.* at ¶¶ 25, 229(a). Maybe Haymarket believes that there was a cabal or a conspiracy of some kind. Even so, standing cannot rest on conclusory allegations. *See Hope, Inc. v. DuPage County*, 738 F.2d 797, 807–08 (1984).

At the end of the day, the School District and the Fire District had a voice, but they didn't have a vote. So there is no traceability.

### Conclusion

For the foregoing reasons, the motions to dismiss the School District and the Fire District are hereby granted. The Itasca Fire Protection District No. 1, the Itasca Public School District 10, and School Superintendent Craig Benes are hereby dismissed for lack of standing.

Date:  February 27, 2024

Steven C. Seeger
United States District Judge