UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HAYMARKET DUPAGE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 22-cv-160 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| VILLAGE OF ITASCA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Haymarket DuPage, LLC wanted to open a treatment facility for substance abuse in the Village of Itasca. Haymarket tried and tried to get approval, over a span of two years. Hearing after hearing, discussion after discussion, and protest after protest followed. But in the end, the Itasca Plan Commission voted it down.

Haymarket responded by suing the Village and a number of its departments and officials, bringing a collection of disability-based discrimination claims under federal and state law. The United States later filed a motion to intervene as a plaintiff.

For the reasons stated below, the motion to intervene is denied.

**Background**

This Court already issued a lengthy opinion at the motion-to-dismiss stage. *See* 2/27/24 Mem. Opin. & Order (Dckt. No. 61). This Court assumes that any interested reader is familiar with the background.

In a nutshell, Haymarket DuPage, LLC is Chicagoland's "largest and most comprehensive non-profit provider of treatment for substance use disorders and mental health

disabilities." *See* Am. Cplt., at ¶ 3 (Dckt. No. 81). Haymarket wanted to open a new facility in an old Holiday Inn hotel in the Village of Itasca, a town in DuPage County.

Haymarket sought zoning approval from the Village. *See* Mtn. to Intervene, at ¶ 1 (Dckt. No. 94). The Village denied Haymarket's request. *Id.*

Haymarket then sued the Village, bringing eight claims, including a claim under Title II of the Americans with Disabilities Act ("ADA").

Several Defendants moved to dismiss. This Court granted those motions and dismissed three Defendants. *See* 2/27/24 Mem. Opin. & Order (Dckt. No. 61).

Haymarket then filed an amended complaint. *See* Am. Cplt. (Dckt. No. 81). Haymarket brings five claims against the Village, the Itasca Plan Commission, and the Mayor in his official capacity. The five counts include two claims under the Fair Housing Act, one claim under the ADA, one claim under the Rehabilitation Act, and one claim under state law.

Meanwhile, the United States opened an investigation into the Village's compliance with Title II of the ADA. The United States ultimately moved to intervene as a plaintiff in Haymarket's case against the Village. *See* Mtn. to Intervene, at ¶ 3 (Dckt. No. 94).

The United States attached a proposed complaint with two claims, including a disparate-treatment claim under the ADA, and a claim about a failure to provide reasonable accommodations under the ADA. *See* Cplt. in Intervention (Dckt. No. 94-1). Both claims fall under Title II of the ADA. *Id.* at ¶ 1 ("The United States brings this disability rights enforcement action against the Village of Itasca, Illinois, for violating Title II of the Americans with Disabilities Act of 1990.").

The motion to intervene prompted a number of states to file an *amicus* brief opposing intervention. *See* Amicus Brf. of Fifteen States (Dckt. No. 117-1).

## Analysis

"Intervention provides a mechanism for non-parties to protect interests that might otherwise be adversely affected by a trial court judgment." *iWork Software, LLC v. Corp. Express, Inc.*, 2003 WL 22494851, at *1 (N.D. Ill. 2003) (citing *Felzen v. Andreas*, 134 F.3d 873, 874 (7th Cir. 1998)).

The Federal Rules recognize two types of intervention: intervention as of right, and permissive intervention. *See* Fed. R. Civ. P. 24(a) ("Intervention of Right"); Fed. R. Civ. P. 24(b) ("Permissive Intervention"). The non-party who hopes to intervene has the burden to satisfy all of the requirements. *See Vollmer v. Publishers Clearing House*, 248 F.3d 698, 705 (7th Cir. 2001).

The United States seeks to join the case through both routes, so this Court will walk down each path. In the end, both routes are dead ends.

**I.      Intervention as of Right**

The first question is whether the government can intervene as of right. *See* Fed. R. Civ. P. 24(a)(2).

A district court "must" allow a non-party to intervene if that non-party "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." *See* Fed. R. Civ. P. 24(a)(2).

The Seventh Circuit has interpreted that rule to impose four requirements for intervention as of right: "(1) timely application; (2) an interest relating to the subject matter of the action; (3) potential impairment, as a practical matter, of that interest by the disposition of the action;

and (4) lack of adequate representation by the existing parties to the action." *See Planned Parenthood of Wis., Inc. v. Kaul*, 942 F.3d 793, 797 (7th Cir. 2019) (citation omitted); *Illinois v. City of Chicago*, 912 F.3d 979, 984 (7th Cir. 2019).

The proposed intervenor must satisfy all four requirements. *See Kaul*, 942 F.3d at 797; *Vollmer*, 248 F.3d at 705. But if the proposed intervenor satisfies all four requirements, a district court "must" allow the party to intervene. *See* Fed. R. Civ. P. 24(a)(2).

Here, the United States gets tripped up on two of the four hurdles. The government lacks an interest relating to the subject matter of the action. And the existing parties are adequately representing any interest that the United States may have in this case.

### A. An Interest in the Subject Matter

The first problem for the government is the lack of a legally protectable interest in this particular dispute.

Rule 24(a)(2) provides that the intervenor must have an "interest relating to the property or transaction that is the subject matter of the action." *See* Fed. R. Civ. P. 24(a)(2). "Intervention as of right requires a would-be intervenor to have a 'direct, significant, and legally protectable interest in the [subject] at issue in the lawsuit.'" *Bost v. Illinois State Bd. of Elections*, 75 F.4th 682, 687 (7th Cir. 2023) (citation omitted); *see also* 7C Mary K. Kane, Federal Practice & Procedure § 1908.1 (3d ed. 2024) ("If there is a direct substantial legally protectable interest in the proceedings, it is clear that this requirement of the rule is satisfied.").

The Seventh Circuit has explained that the intervenor's interest must be "unique." *See Bost*, 75 F.4th at 686–87. The idea is simply that the intervenor must have its own interest. The interest must be "based on a right that belongs to the proposed intervenor rather than to an existing party in the suit." *Id.* at 687 (citation omitted).

4

The Seventh Circuit has "never required a right that belongs *only* to the proposed intervenor, or even a right that belongs to the proposed intervenor *and not to* the existing party. Properly understood, the 'unique' interest requirement demands only that an interest belong to the would-be intervenor in its own right, rather than derived from the rights of an existing party." *Id.* (emphasis in original); *see also id.* at 687 n.2 ("As one of our colleagues recently put it, 'unique' means an interest that is *independent of* an existing party's, not *different from* an existing party's.") (emphasis in original) (citing *Kaul*, 942 F.3d at 806 (Sykes, J., concurring)).

Intervention as of right is not a way to carry water on behalf of someone else. A shared interest with a party counts, but a derivative interest does not.

The Seventh Circuit has held that "this interest must be at least as significant as the injury required for Article III standing." *See Bost*, 75 F.4th at 687 n.1. Other cases from the Seventh Circuit have elevated the bar even higher, holding that "the case law makes clear that more than the minimum Article III interest is required." *See Lopez-Aguilar v. Marion Cnty. Sheriff's Dep't*, 924 F.3d 375, 391–92 (7th Cir. 2019).

"Interest" doesn't mean that the proposed intervenor finds the case interesting. And "interest" doesn't mean that the proposed intervenor wants one side to win, and the other side to lose. A non-party can't intervene as of right simply because it wants to chime in on someone else's dispute, and cheer for one side or the other. Intervention as of right isn't a basis to invite the cheering section onto the field of play.

The case at hand is an odd fit with the language of Rule 24. Again, the proposed intervenor must have an "interest relating to the property or transaction." *See* Fed. R. Civ. P. 24(a)(2). But the United States does not have any interest in the property or transaction in

question. The United States is not a stakeholder in the treatment facility or in the Holiday Inn, and has no skin in the game.

Haymarket is not running a program on behalf the United States. The federal government doesn't own the property, and it is not a party to any transaction. No party is trying to compel the federal government to do something, or prevent the federal government from doing something. No party is challenging a federal statute or regulation, either. The United States is off in the distance, watching this case from afar.

The United States argues that it has an interest in ensuring compliance with the ADA, and in holding public entities accountable for violating the ADA. *See* Mtn. to Intervene, at ¶ 5 (Dckt. No. 94). In its view, Congress envisioned the federal government playing "a central role in enforcing the standards established" in the ADA "on behalf of individuals with disabilities." *Id.* (citing 42 U.S.C. § 12101(b)(3)).

That argument faces an uphill battle when it comes to the statutory text. The United States wants to exercise enforcement powers under Title II of the ADA. But it has no enforcement powers under Title II of the ADA. *See United States v. Sec'y Fla. Agency for Health Care Admin.*, 21 F.4th 730, 747–59 (11th Cir. 2021) (Newsom, J., dissenting from denial of reh'g en banc); *United States v. Florida*, 938 F.3d 1221, 1250–54 (11th Cir. 2019) (Branch, J., dissenting).

The ADA has three titles. Title I covers employment. Title II covers public services, programs, and activities. And Title III covers public accommodations. Haymarket brings a claim under Title II of the ADA. *See* Am. Cplt., at ¶¶ 228–34 (Dckt. No. 81).

Title I, Title II, and Title III each use different language when it comes to enforcement powers. After giving them a read, one thing jumps out: Title I and Title III expressly grant enforcement powers to the United States, but Title II does not.

Title I gives enforcement powers to the United States, and does so expressly. Title I conveys "the powers, remedies, and procedures . . . to the Attorney General, or to any person alleging discrimination on the basis of disability in violation of any provision of this chapter, or regulations . . . concerning employment." *See* 42 U.S.C. § 12117(a).

Notice the double dose of power vested by the statute. The "Attorney General" can enforce Title I, and so can "any person alleging discrimination." *Id.*

Title III also expressly grants enforcement power to the United States. That title expressly empowers the "Attorney General" to "commence a civil action in any appropriate United States district court." *See* 42 U.S.C. § 12188(b)(B).

But Title II includes no comparable textual hook for an enforcement action by the United States. The statute authorizes "any person alleging discrimination on the basis for disability" to bring a claim. *See* 42 U.S.C. § 12133. A reference to the Attorney General is nowhere to be found. Unlike its odd-numbered brethren, Title II doesn't expressly give the Attorney General any enforcement authority. The Attorney General has no hook to hang its claim on.

Putting it all together, Title I authorizes the Attorney General to bring a claim. Title III also authorizes the Attorney General to bring a claim. But Title II includes no such authorization.

The silence about the Attorney General in Title II speaks volumes, especially when compared to the nearby provisions in the same statutory neighborhood. "Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another."

7

*See Dep't of Homeland Security v. MacLean*, 574 U.S. 383, 391 (2015); *see also Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

Plus, if "person" in Title II includes the Attorney General, then Title I contains surplusage when it authorizes both a "person" and the "Attorney General" to file suit. Courts typically avoid interpretations that render text duplicative. *See Republic of Sudan v. Harrison*, 587 U.S. 1, 12 (2019) ("[W]e are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law.") (citation omitted); *Nat'l Ass'n of Mfrs. v. Dep't of Defense*, 583 U.S. 109, 128 (2018) ("Absent clear evidence that Congress intended this surplusage, the Court rejects an interpretation of the statute that would render an entire subparagraph meaningless."); A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 274 (2012) (noting that a term should not "needlessly be given an interpretation that causes it to duplicate another provision or have no consequence").

Boatloads of federal statutes give the United States enforcement powers. The list of possible examples is too long to do justice to the list. But the list doesn't include Title II of the ADA. Nothing in the text of Title II gives the United States the power to bring a claim.

The United States can't squeeze itself within the boundaries of the word "person" in Title II. "In the absence of an express statutory definition, the Court applies a 'longstanding interpretive presumption that "person" does not include the sovereign,' and thus excludes a federal agency." *See Return Mail, Inc. v. United States Postal Serv.*, 587 U.S. 618, 626 (2019) (citation omitted).

The Dictionary Act reinforces that longstanding understanding. *See* 1 U.S.C. § 1 (creating definitions and presumptions that apply "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise"). The Act defines the word "person" to "include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." *Id.* The federal government didn't make the cut.

Simply put, Title II authorizes a "person" who suffered discrimination on the basis of disability to bring a claim. Congress gave no such authorization to claims by the United States. And Uncle Sam isn't a person.

At best, the government's "interest" is a general interest in enforcing federal law. That wide-ranging interest isn't a sufficient basis for intervention as of right by the federal government. Otherwise, the United States could intervene as of right in every case that raises a federal claim. There is no limiting principle.

It would be strange to read the word "interest" in Rule 24(a) as an open invitation to the United States to intervene as of right whenever a case raises a federal question. That's an all-access pass. When it comes to statutes, Congress does not "hide elephants in mouseholes." *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). The Federal Rules do not hide elephants in mouseholes, either.

The government's reading would take the air out of a neighboring provision about permissive intervention. A district court "may" permit the federal government to intervene if a party's claim or defense is based on "a statute or executive order administered by the officer or agency." *See* Fed. R. Civ. P. 24(b)(2)(A). That provision wouldn't make much sense if a district court *must* allow the United States to intervene as of right whenever there is a federal question.

9

Congress creates the substantive rights, and Congress decides who can enforce them, and how. "Like substantive federal law itself," the right "to enforce federal law must be created by Congress." *See Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). And here, Congress withheld the power to enforce Title II from the federal government.

To sum it up, the United States has not satisfied the requirements for intervention as of right. Rule 24(a)(2) requires a proposed intervenor to have a legally protectable interest. The United States has no interest in the property or transaction, except a general interest in enforcing federal law writ large. It's hard to see how the United States could have a legally protectable interest if it has no enforcement powers under Title II at all.[1]

### B. Adequate Representation

The other hurdle is adequate representation. The question is whether the "existing parties adequately represent that interest," meaning the intervenor's "interest relating to the property or transaction." *See* Fed. R. Civ. P. 24(a)(2).

The United States doesn't get over that hurdle, for similar reasons why it tripped on the last one. The United States doesn't have any "interest relating to the property or transaction." *Id.* There are no interests of the United States for Haymarket to represent.

---

[1] In a recent case, Judge Newsom addressed whether Title II's reference to the Rehabilitation Act could create an avenue for the Attorney General to bring a claim. *See United States v. Sec'y Fla. Agency for Health Care Admin.*, 21 F.4th 730, 751–57 (11th Cir. 2021) (Newsom, J., dissenting from the denial of reh'g en banc). Basically, Title II points to the Rehabilitation Act, and the Rehabilitation Act points to Title VI of the Civil Rights Act of 1964. *See* 42 U.S.C. § 12133. As Judge Newsom explained, because Title II piggybacks off of Title VI, a plaintiff "can seek to effect compliance with Title II . . . [by] any other means authorized by law." *See Sec'y Fla. Agency*, 21 F.4th at 752 (Newsom, J., dissenting from the denial of reh'g en banc) (cleaned up). So, the question "is whether the Attorney General's suit here to enforce Title II constitutes an 'other means authorized by law.'" *Id.* (citation omitted). Judge Newsom exhaustively addressed this issue, and this Court adopts his reasoning in full. This Court thus concludes, as did Judge Newsom, that Title II does not create a cause of action for the Attorney General to enforce Title II, either by its own text or the text of the Rehabilitation Act or Title VI. *Id.* at 758.

Even if a wide-ranging interest in enforcing federal law counted as an "interest," there would be no reason to open the door and give the federal government a seat at the (counsel) table. Haymarket has an interest in enforcing its rights under the ADA, too. Haymarket is capably pursuing that interest on its own. If the point is that the federal government has an interest in enforcing the ADA in this dispute, then there is no need for another voice.

The Seventh Circuit applies "three different standards for showing inadequacy [of representation] depending on the relationship between the party and the intervenor." *See Bost*, 75 F.4th at 688. The stronger the relationship, the more proof of inadequacy is required before allowing intervention.

The parties agree that the lowest standard applies here, because there is no meaningful relationship between Haymarket and the United States. *See* Gov't's Reply, at 19 (Dckt. No. 115); Defs.' Resp., at 9 (Dckt. No. 107).

That standard is called the "default rule," which applies "when there is no notable relationship between the existing party and the applicant for intervention." *See Bost*, 75 F.4th at 688. The default rule is satisfied if "the applicant shows that representation of his interest 'may be' inadequate." *See Kaul*, 942 F.3d at 799 (quoting *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528 538 n.10 (1972)). The burden is "minimal," but it "is not nonexistent." *See Bost*, 75 F.4th at 690 (citing *Ligas*, 478 F.3d at 774).

The United States argues that private parties cannot adequately represent the federal government's views on the proper interpretation of the ADA. *See* Mtn. to Intervene, at ¶ 7 (Dckt. No. 94). The United States also believes that it is best positioned to decide whether Haymarket is adequately representing its interests. *See* Gov't's Reply, at 19 (Dckt. No. 115) (citing *Miami Tribe of Okla. v. Walden*, 206 F.R.D. 238, 241 (S.D. Ill. 2001)).

That argument doesn't get very far. The United States "does not point to any arguments that it would make that [Haymarket] has not already made." *See Bost*, 75 F.4th at 690. The United States might want the microphone, but as far as this Court can tell, it doesn't want to say anything that Haymarket isn't already saying.

Down the road, if the United States wants to chime in, and add its perspective on the meaning of the ADA, then the United States can seek leave to file an *amicus* brief. But in the meantime, the United States has not demonstrated inadequate representation.

## II.     Permissive Intervention

The other possibility is permissive intervention.

A district court "may" permit "anyone to intervene" who "has a claim or defense that shares with the main action a common question of law or fact." *See* Fed. R. Civ. P. 24(b)(1)(B). The text vests a district court with substantial discretion. The helping verb is "may," not "must."

That said, a non-party *must* satisfy two threshold requirements, right off the bat – before any discretion kicks in. Only then does the district court look at the case as a whole, and assess how opening the door to a non-party would affect the parties and the litigation going forward.

"Permissive intervention is within the discretion of the district court where the applicant's claim and the main action share common issues of law or fact and where there is independent jurisdiction." *See Ligas*, 478 F.3d at 775 (citing *Sec. Ins. Co. of Hartford v. Schipporeit, Inc.*, 69 F.3d 1377, 1381 (7th Cir. 1995)).

The United States satisfies those two requirements. The United States wants to bring claims that overlap with the claims by Haymarket, legally and factually. Again, the United States *can't* bring a claim (because it has no enforcement powers under Title II), but the putative claims are about the same kettle of fish as the claims by Haymarket. And federal-question

12

jurisdiction exists over the would-be federal claims, even if the claims are going nowhere on the merits. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998).

So, the question then becomes how the entrance of the United States would affect the case. The text of Rule 24(b)(3) doesn't place many limits on a district court's discretion. The decision to allow intervention is "wholly discretionary." *See Sokaogon Chippewa Cmty. v. Babbitt*, 214 F.3d 941, 949 (7th Cir. 2000).

But the text of Rule 24(b)(3) does point courts in one general direction. "In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." *See* Fed. R. Civ. P. 24(b)(3). A court must assess how the arrival of someone new would affect the parties who were here first.

The text emphasizes two key considerations. A district court must consider whether intervention would cause "undu[e] delay" or would "prejudice" the existing parties. *See* Fed. R. Civ. P. 24(b)(3). Those two factors are "the only *required* considerations by [a] district court." *See Bost*, 75 F.4th at 691 (emphasis in original).

That said, the Seventh Circuit "ha[s] never gone so far as confining [a] district court's discretion to only the two mandatory factors in Rule 24(b)(3) or to prohibit consideration of the elements of intervention as a matter of right as discretionary factors." *See Kaul*, 942 F.3d at 804 (citing *Ligas*, 478 F.3d at 776). Overall, the role of the district court is to "show[] a thorough consideration of the interests of all the parties." *Id.* (citing *Ligas*, 478 F.3d at 776).

Here, opening the door to the United States would add some burdens when it comes to discovery. The United States could serve discovery requests, and ask questions at deposition, and so on. More lawyers equals more burdens.

Even so, the parties apparently have been taking that approach during discovery anyway, by agreement. The United States has participated in discovery so far. *See* Pl.'s Resp., at 1 (Dckt. No. 112). So, if the United States formally intervened, the discovery process might not be that much different than the discovery process so far.

Still, it seems unavoidable that unfurling a longer welcome mat and prolonging the invitation to the United States would add burdens and create delays. The marginal cost of the involvement by the United States can't be zero. The line about too many cooks in the kitchen equally applies to too many lawyers in a conference room for a deposition.

The parties have made significant progress in discovery, but they aren't done. They separately filed a motion for three more months of discovery. Streamlining discovery in the last few months, without the involvement of the United States, might speed things along.

Expert discovery is another potential heavy lift. It's hard to know whether the United States would offer one or more experts. But adding even one expert would add to the burden of expert discovery.

Including the United States for the rest of the case would add burdens down the line, too. It could lead to another batch of summary-judgment motions, and more pretrial motions. Any such motions would impose costs on the Village.

Trial, too, could get complicated. The jury would have to decide additional claims, adding complexity to the jury deliberations and the verdict. And the jury might wonder why the United States is here at all. Worse yet, the jury might get the sense that the government is putting its oversized thumb on the scale.

The Village also would suffer prejudice from the involvement of the United States. Candidly, it feels like piling on. Haymarket is more than capable of defending its own interests.

Forcing the Village to litigate against Haymarket, *plus* the federal government, seems like overkill.

Overall, adding the United States to the mix would add burdens, delay, and judicial inefficiency. It would slow things down, and create extra work for the parties and the jury. There isn't much upside to counterbalance those costs, either. Haymarket is here, and Haymarket can stick up for itself. The costs seem certain, and the benefits seem uncertain, so the request for permissive intervention is denied.

The answer might be different if one of the parties targeted a federal statute or regulation. The federal government can stick up for federal law and defend its constitutionality. *See* Fed. R. Civ. P. 24(b)(2)(A), (B); *see also Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 277–79 (2022) (discussing permissive intervention and recognizing the government's legitimate interest in defending the constitutionality of its laws). But that's not this case.

Sometimes courts do allow intervention under Rule 24(b)(2) based on broader considerations of the "public interest." *See* 7C Mary K. Kane, Federal Practice & Procedure § 1912 (3d ed. 2024). But "intervention can be denied if the court, in its sound discretion, finds that intervention would unduly expand the controversy or otherwise lead to improvident delay or expense." *Id.* And that's this Court's finding.

## Conclusion

For the foregoing reasons, the motion to intervene is denied.

Date: March 31, 2025

Steven C. Seeger
United States District Judge